IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAURICE NELSON and CHRISTIE MARSHALL, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PACE SUBURBAN BUS and MARGARET MURRY, in her individual capacity and in her official capacity as Division Manager of Pace Suburban Bus, Heritage Division, <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> 17 C 7697 <br><br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are former employees of Defendant Pace Suburban Bus ("Pace"). They both worked at a Pace-operated garage where, they assert, Black drivers generally have been disciplined at higher rates than White drivers. Believing that Pace's disciplinary practices are racially discriminatory, Plaintiffs bring claims under the Civil Rights Act of 1866 (42 U.S.C. §§ 1981, 1985, and 1986); Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*); the Equal Protection Clause of the Fourteenth Amendment; the Illinois Human Rights Act (775 ILCS § 5/1 *et seq.*); and the Illinois Civil Rights Act of 2003 (740 ILCS 23/1 *et seq.*). 2d Am. Compl. ¶ 4.

Pursuant to Fed. R. Civ. P. 23, Plaintiffs seek to certify a class of all current and former non-supervisory Black employees who drove or moved buses at the Pace garage since 2011. Mot. Class Cert., ECF No. 109; *see* Fed. R. Civ. P. 23. Pace

objects to the request, arguing that Plaintiffs fail to meet the commonality requirement under Rule 23(a), because the putative class members were disciplined for violating different employment policies in different ways. In response, Plaintiffs point to one supervisor as the common denominator, Pace Division Manager Margaret Murry, who participated in disciplining against all putative class members. 2d Am. Compl. ¶¶ 1–3, ECF No. 69. For the following reasons, however, Plaintiffs' reliance upon Murry to establish Rule 23(a)'s commonality requirement is misplaced, and their motion for class certification is denied.

## I.     Background[1]

### A.     Murry's Involvement at Heritage Division

Pace is a regional governmental body providing bus and transportation service throughout Chicago's suburbs. 2d Am. Compl. ¶ 4. Plaintiffs worked at Pace's Heritage Division, which covers the southwest suburbs. *Id.* ¶¶ 7, 8. Murry, who is White, has worked for Pace since October 1994 and has been the Division Manager at the Heritage Garage for nearly twenty years. *Id.* ¶¶ 15, 16.

Murry directly supervises the Superintendent of Transportation (who currently is David Dines) and the Safety and Training Manager (who currently is Anthony Caputo). Murry Decl. ¶ 7, ECF No. 126-1 at 2. Dines, in turn, supervises four Dispatch Supervisors. *Id.* ¶ 8. The Dispatch Supervisors directly oversee all bus operators, who are responsible for driving Pace buses and other vehicles on fixed routes within the Heritage Division ("the drivers"). *Id.* ¶ 9. Murry herself reports

---

[1]     The following facts are undisputed unless otherwise noted.

to Regional Manager Mark Klafeta and has done so since June 2008. Klafeta Dep. at 15:18–25, ECF No. 109-7.

When a driver at Heritage Division is terminated, the termination process typically begins with a recommendation of termination from Murry to Klafeta. Murry 10/17/18 Dep. at 145:7–146:8, ECF No. 109-5. In the end, Klafeta must approve all terminations. *Id*. But that is not the end of the process.

When a driver is terminated or otherwise disciplined at the Heritage Division, he or she can dispute the action through a three-step grievance process. Collective Bargaining Agreement ("CBA") at 6–8, ECF No. 109-15. First, the driver must meet with Murry. If that does not resolve the dispute to the driver's satisfaction, the driver can appeal to Klafeta. Murry Decl. ¶¶ 75, 76. After that, the driver can request binding arbitration. *Id.* ¶ 77.

During a driver's first 120 days of employment, Murry can recommend termination for any reason. Beyond that period, any termination of a driver must be for cause, such as violating a Pace policy. Murry 10/17/18 Dep. at 135:8–16.

**B.    Pace Driver Policies**

Drivers at Heritage Garage are subject to written policies that govern attendance, safety and accidents, personal conduct, training, and other areas. Answer ¶ 23, ECF No. 109-2.

    **1.    Attendance Policies**

Pace's attendance policies categorize missed days into two categories— "instance[s] of absence" and "miss-outs." A "miss-out" occurs when a driver fails to

3

show up without sufficient advance notice of the absence. *See* Absenteeism Policy at 1–3, ECF No. 109-20.

Dispatch Supervisors are responsible for monitoring compliance with the attendance policies in the Heritage Division. Murry Decl. ¶¶ 23, 27, 30–31, 34. When a Dispatch Supervisor believes that a driver has violated the attendance rules, he or she must report the infraction to Murry and assign a stand-by driver to cover the late or absent driver's route. *Id.* ¶¶ 23, 33.

As a general matter, Murry only finds out about an attendance violation when reported by the Dispatch Supervisors. *Id.* Murry has the authority to excuse absences when a driver needs to attend to his or her child's school activities; Klafeta may excuse an absence or miss-out for any reason. On occasion, Klafeta has investigated the circumstances surrounding an absence or miss-out himself. *Id.* ¶¶ 24, 25, 37.

Drivers typically are issued a violation notice after two instances of absence and must undergo counselling sessions after their third and fourth. Absenteeism Policy at 2. The fifth, sixth and seventh absences can result in suspension, and the eighth can lead to termination. *Id.* "Miss-outs" result in more severe sanctions; a driver is terminated after his or her third miss-out. *Id.* at 2–3.

### 2. Safety and Accident Policies

Pace's Standard Operating Procedures also set out certain rules for the operations of Pace vehicles, including how and when a driver should turn, merge, and change lanes. *See* Standard Operating Procedures at 1–8, ECF No. 109-18. The

4

enforcement of these procedures falls primarily on Caputo, who is responsible for conducting investigations when accidents occur and determining whether they were "preventable" (avoidable by the driver) or "non-preventable" (not the driver's fault). Murry Decl. ¶ 53. Dines also investigates accidents and gives input on occasion. *Id.*

Pace's procedures provide that a driver may be terminated after their third preventable accident. *See* Dines Dep. at 46:17–47:3, ECF No. 109-9. Moreover, Murry may recommend termination even before a third accident if the accident qualifies as "severe"—such as hitting a pedestrian—or if a driver commits other serious violations such as "talking on a cell phone while . . . operating a bus." Murry 10/17/18 Dep. 137:2–4.

Pace's procedures require drivers to report all accidents and "incidents" and cooperate in all investigations. Pace defines an "incident" as anything unusual that happens in or around a Pace bus. Murry Decl. ¶ 64. Drivers who fail to report an accident or incident are "subject to immediate dismissal, unless . . . [it is] shown conclusively that . . . the employee did not [know] or could not have [known] . . . of the occurrence." CBA at 8–9.

If Pace learns of an accident or incident from a source other than the involved driver, Klafeta, Dines, or Murry can interview the driver and review video of the incident. Murry Decl. ¶ 66; Klafeta Dep. at 85:13–19, ECF No. 126-1 at 20. One or more of them then can decide based upon this review whether the driver should be disciplined. Murry Decl. ¶ 66.

### 3. Conduct Standards

Pace also has promulgated written standards that govern a driver's conduct with respect to safety, handling of property, and driver ethics, as well as drug and alcohol use and testing. Murry Decl. ¶ 46; *see also* General Rule Book, ECF No. 109-17. When a driver violates these standards, Pace utilizes a progressive disciplinary process, starting with a written warning, progressing to a written warning with a suspension, and finally termination. Murry 10/17/18 Dep. at 127:24–128:8.

Pace learns of driver violations from a number of sources, such as citizen complaints, Pace monitors who observe and report on driver performance in the field, other drivers, and sometimes from the driver directly. Murry Decl. ¶¶ 50–52. Murry, Dines and Caputo all have the authority to investigate a citizen complaint or incident, *id.* ¶ 54, and Dines or Murry can recommend to Klafeta whether a particular violation warrants discipline. *Id.* ¶ 47.

### 4. Training Standards

During their first 120 days on the job, drivers undergo training on Pace's policies and procedures. They also must learn the bus routes within the Heritage Division. Murry Decl. ¶¶ 67, 71. If a driver falls short of Pace's training standards, it is Caputo's responsibility to tell Murry and Klafeta whether the driver should be terminated. *Id.* ¶ 72.

### C. Discipline Statistics

According to Plaintiffs, Black drivers at the Heritage Garage have been suspended and terminated more frequently than their White counterparts.

6

Specifically, Plaintiffs note, from January 1, 2011, through March 31, 2019, 209 individuals held driver positions; of those, 57 (27.27%) were White, and 136 (65.27%) were Black. Personnel Records Summary ¶ 10, ECF No. 109-3. During that period, however, only one White driver was involuntarily terminated for violating Pace's policies, while 24 Black drivers were involuntarily terminated on similar grounds. *Id.* ¶ 15.

Furthermore, White drivers collectively were suspended a total of 43 times for any length of time (0.75 suspensions per driver); by contrast, Black drivers were suspended 157 times for any length of time (1.15 suspensions per driver). *Id.* ¶ 12. Moreover, no White driver was suspended for longer than 3 days; while Black drivers received suspensions that lasted longer than 3 days on six different occasions. *Id.* ¶¶ 13–14.

### D.  Named Plaintiffs

#### 1.  Maurice Nelson

Nelson worked as a part-time driver at the Heritage Garage starting in October 2014 and was promoted to full-time driver less than a year later. Answer ¶¶ 7, 42, 43, 50. During his time with Pace, Nelson received disciplinary write-ups and suspensions for purportedly violating numerous employment policies, including the attendance policy. Nelson Dep. at 43:17–58:6, ECF No. 109-11.

On October 20, 2016, Murry suspended Nelson pending investigation for his alleged failure to report an accident where his bus contacted another bus. *Id.* at 125:22–126:6; Answer ¶¶ 44–47. At a meeting with Murry, Dines, and a union

7

representative, Nelson disputed that he was involved in an accident or, at least, that he was aware of the accident. Nelson Dep. 119:12–122:10. A few days later, Murry sent Nelson a termination letter. Nelson Termination Letter, ECF No. 109-29. Nelson filed a grievance, which Murry and Klafeta denied. Nelson Dep. at 130:6–23, 160:22–161:8, Dines Dep. at 202:1–203:17.

### 2. Christi Marshall

Marshall worked at the Heritage Garage from October 2015 to October 2017, eventually becoming a full-time driver. Answer ¶¶ 8, 18, 56. In 2016, Marshall was terminated for failing to report an accident based upon video footage that Caputo and Murry reviewed. *Id.* ¶¶ 63–67.

Marshall filed a grievance, which Klafeta denied. Marshall submitted the dispute to arbitration, and the arbitrator found that the termination was unjustified. As a result, Marshall was reinstated, *id.* ¶¶ 68–69, only to be terminated again after she purportedly was involved in three other preventable accidents. *Id.* ¶¶ 77–78.

### E. Plaintiffs' Claims and Proposed Class Definition

Pointing to the disparities in the number of disciplinary actions against White and Black drivers at the Heritage Garage, Plaintiffs contend that Murry intentionally and unintentionally discriminated against the Black drivers on the basis of race in the way she enforced Pace's various policies and standards. 2d Am. Compl. ¶ 2. Based upon these allegations, Plaintiffs assert claims under the Civil Rights Act of 1866; Title VII of the Civil Rights Act of 1964; the Equal Protection

8

Clause of the Fourteenth Amendment; the Illinois Human Rights Act; and the Illinois Civil Rights Act of 2003. 2d Am. Compl. ¶ 4.

Plaintiffs also move under Rule 23 to certify a class of: "All current or former non-supervisory African-American employees of Pace who worked at the Heritage Garage at any point since January 1, 2011, and who drive/drove or move/moved Pace buses as part of their job duties." Mot. Class Cert. ¶ 2. According to Plaintiffs, this class comprises 148 drivers. Mem. Supp. Class. Cert. at 16.

## II. Legal Standard

Under Rule 23(a), to certify a class, a plaintiff must establish that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Once these elements are satisfied, a plaintiff also must show that the proposed class falls within one of three categories under Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk that the class action adjudication would, as a practical matter, either dispose of the claims of nonparties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common

9

questions predominate and class treatment is superior." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

By now, it is well understood that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And so, "[o]n issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff," *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012), but must conduct a rigorous analysis to ensure that the requirements of Rule 23 are satisfied, *see Bell v. PNC Bank*, Nat. Ass'n, 800 F.3d 360, 373 (7th Cir. 2015). The named plaintiff bears the burden of showing that a proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence, *Messner*, 669 F.3d at 811, and "[f]ailure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

Finally, although "as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained[,] . . . the boundary between a class determination and the merits may not always be easily discernible." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598-99 (7th Cir. 1993) (internal citations and quotations omitted). Consequently, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.*; *see also Dukes*, 564 U.S. at 351 (class certification analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim"). As the

10

Seventh Circuit has held, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889–90 & n.6 (7th Cir. 2011).

### III. <u>Analysis</u>

Like *Dukes*, this is an employment case, and as in *Dukes*, "[t]he crux of this case is commonality—the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" 564 U.S. at 349 (quoting Fed. R. Civ. P. 23(a)(2)); *cf. id.* at 350 ("Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

To satisfy commonality under Rule 23(a)(2), Plaintiffs must proffer some "common contention . . . that . . . is capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350; *see also id.* at 352 (noting that plaintiffs alleging discrimination must show that there is some "glue" holding together all of their claims in order to establish that a class action "will produce a common answer to the crucial question *why was I disfavored*."). Here, Plaintiffs contend that the commonality requirement is satisfied because Murry allegedly

11

discriminated, intentionally or unintentionally, against each and every member of the class. *See* Mem. Supp. Class. Cert. 17. Plaintiffs are correct that "the assertion of discriminatory bias on the part of the same supervisor" may suffice to establish commonality. *Id.* at 350; *see also Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012). However, such an assertion must still be "of such a nature that it is capable of classwide resolution." *Dukes*, 564 U.S. at 350; *see also id.* ("What matters to class certification . . . is not the raising of common 'questions'—even in droves— but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009))). That is not the case here.

As described above, Murry's level of involvement and discretion in making disciplinary decisions—and the level of involvement and input of other supervisors into those decisions—varies substantially based on the particular Pace policy at issue. For example, when it comes to driver absences, the Dispatch Supervisors are the ones that decide when to report them to Murry, and whereas Klafeta has wide-ranging authority to excuse any absence, Murry can excuse a diver's absence only in certain circumstances. Murry Decl. ¶¶ 23, 27, 30, 31, 34. As for a driver's failure to report an accident, in addition to Murry, Klafeta and Dines also have the ability to conduct their own inquiry and determine the appropriate level of discipline. Klafeta Dep. at 85:13–19; Murry Decl. ¶ 66. As for violations of conduct standards,

12

Dines also may give Klafeta input about whether a violation warrants discipline. Murry Decl. ¶ 47. Moreover, in some violations of policy, discipline is mandatory, and Murry has no discretion at all. *See* Murry Decl. ¶ 26; Absenteeism Policy at 2.

As a result of these factual variances, a trier of fact will have to consider an entirely different set of facts to determine whether Murry racially discriminated against one driver in one context (say, for example, when a driver missed a shift and the absence is reported to Murry), than another (say, when a driver is terminated for failing to report an accident, and the incident is investigated by Dines and not Murry). And, because the question of whether Murry discriminated against the putative class members cannot be answered on a class-wide basis, commonality is lacking.

The cases upon which Plaintiffs rely are readily distinguishable. For instance, in *Chicago Teachers Union v. Board of Education of City of Chicago*, the Seventh Circuit considered a proposed class of teachers who had lost their jobs after the City Board of Education determined that their schools needed a "turnaround," which consisted of replacing all teachers and staff. 797 F.3d 426, 440 (7th Cir. 2015). There, the class alleged that selection methodology was racially discriminatory. The district court granted certification, and the Court of Appeals affirmed, observing that the plaintiffs had pointed to "*a uniform employment practice* (the set of criteria used to evaluate the school) used *by the same decision-making body* to evaluate schools was discriminatory." *Id.* (emphases added).

In reaching its decision, the court emphasized:

13

> When a small group of decision-makers sits together in a room comparing and contrasting the success of schools in order to evaluate their ultimate fate, the concept of a uniform criteria and a single-decisionmaker emerge. They are of one mind, using one process. . . . Here we have one decision-making body, exercising discretion as one unit, with the ultimate decision in the hands of one single person."

*Id.* at 440. In the instant case, however, Plaintiffs' claims over a variety of different disciplinary decisions made over a long period of time with varying degrees of involvement by Murry and other Pace decision-makers.

Similarly, in *McReynolds v. Merrill Lynch*, the Seventh Circuit certified a class of brokers at Merrill Lynch on the common question of whether two company-wide policies, including one that permitted brokers to form working teams, encouraged racially discriminatory behavior. 672 F.3d 482, 488 (7th Cir. 2012). Here, by contrast, Plaintiffs do not challenge any one formal "policy"; the only practice they challenge is the manner in which Murry exercised her discretion. But the nature of that discretion differed significantly among class members. *See Patterson v. Gen. Motors*, 631 F.2d 476, 481 (7th Cir. 1980) ("Each disciplinary action would present a different set of facts for each employee . . . . [P]laintiffs' claims do not relate to general policies or practices which are allegedly discriminatory, but rather to individualized claims of discrimination which could not possibly present common questions . . . .").

Perhaps the issue of commonality might have been a closer question had Plaintiffs put forth evidence that Murry acted with a discriminatory motive when enforcing the various employment policies at issue. *See Dukes*, 564 U.S. at 350 ("A

14

party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared *to prove that there are in fact . . . common questions of law or fact.*" (emphasis added)). But the only evidence of discriminatory conduct Plaintiffs provide are the broad statistical differences in the way that Black and White drivers were disciplined at the Heritage Division over the years, without any attempt to isolate those incidents in which Murry's involvement was significant and substantially similar. *See Bolden*, 688 F.3d at 896 (denying class certification where plaintiffs alleged racial discrimination on the part of their supervisors, in part because their statistical analysis was rudimentary).

Furthermore, although Plaintiffs share anecdotes of a few Black employees who felt aggrieved by perceived unfair treatment from Murry and other decision-makers, Mem. Supp. Class Cert. at 13–14, and a few White employees who were treated comparatively well, *id.*, they put little effort in explaining how those employees were similarly situated. And Plaintiffs do not cite any other evidence, direct or indirect, showing that Murry behaved in a racially discriminatory manner at work. Nor do Plaintiffs offer a coherent theory of how Murry might have *unintentionally* discriminated on the basis of race when exercising her discretion.[2]

---

[2] Plaintiffs contend that Murry "conceded" during her deposition that the discipline at the Heritage Garage "is consistent with intentional discrimination." Mem. Supp. Class. Cert at 1. They point to the following exchange: "Q. Is it . . . correct that the criteria and methods you used to administer Pace's disciplinary system had the same effect as someone who would have been intentionally discriminating against individuals based on their race? A. It could be." Murry 7/18/19 Dep. 7/18/20 at 66:17–67:4, ECF No. 109-6. But Plaintiffs read too much into this brief exchange. Rather, Murry's statement is better read as merely acknowledging disparities in the overall numbers, rather than conceding the existence of intentional or unintentional discrimination.

Relatedly, the Court rejects Plaintiffs' attempt to rely on allegations of a "pattern or practice" of discrimination to justify class certification. Reply. Mem. Supp. Class. Cert. at 8–9, ECF No. 133. Specifically, Plaintiffs argue that their individual claims are properly asserted in a class action because evidence that Murry discriminated against some putative class members would be relevant to every other class member. *Id.*

Pattern-or-practice allegations are a method of proving intentional discrimination. *See Doe 1 v. City of Chi.*, No. 18 C 3054, 2020 WL 1166222, at *3 (N.D. Ill. Mar. 11, 2020). "In a pattern-or-practice case, the plaintiff tries to establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure, the regular rather than the unusual practice." *Dukes*, 564 U.S. at 352 n.7. "If [they] succeed[], that showing will support a rebuttable inference that all class members were victims of the discriminatory practice." *Id.*

But "there must be significant evidence of the alleged routine, *e.g.*, statistical evidence showing the disparities *and individual testimony recounting specific instances of discrimination.*" *Id.* at 624 (emphasis added). Because Plaintiffs here only present statistics showing disparities in overall numbers of suspensions and terminations, and not individual testimony capturing specific instances of *intentional* discrimination by Murry, they cannot rely on their pattern-or-practice allegations to support Rule 23 commonality. *Cf. Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 337 (1977) (statistical evidence was sufficient to carry

16

burden of proof on pattern-or-practice allegations where it was supported by individual testimony recounting over 40 specific instances of discrimination, including that numerous Black and Spanish-surnamed job applicants were given false or misleading information about requirements and application procedures); *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 495 (4th Cir. 1981) (statistical evidence was supported by testimony of 20 class members regarding instances of intentional discrimination).

In sum, Plaintiffs have failed to establish that the common question they propose to support certification—whether Murry discriminated against them—can be answered "all at once" and with "a single answer."[3] *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012). Plaintiffs have thus failed to satisfy Rule 23.

---

[3] Apart from their "key common question" of "whether Murry exercised discretion in implementing Pace's disciplinary system in a manner that discriminated against African Americans," Mem. Supp. Class Cert. at 19, Plaintiffs in passing also posit the existence of other common questions, such as, "are written warnings adverse actions?" *Id.* As Plaintiffs acknowledge, however, these questions are secondary, and they do not even attempt to show how their subsidiary questions would "resolve an issue that is central to the validity of *each one* of the claims in one stroke" and thus "drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis added).

## IV. <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' motion for class certification is denied.

**IT IS SO ORDERED.**

_____
**John Z. Lee
United States District Judge**

**Date: November 9, 2020**

18