# Exhibit 32

*Nelson et al. v. Pace et al.* – No. 17-cv-7696

**Plaintiffs' Summary of Voluminous Personnel Records and Human Resources Data**

(Prepared for purposes of Class Certification pursuant to Fed. R. Evid. 1006)

**Defendants' Human Resources Data**

1. The Declaration of Joshua Fedewa describes databases Defendants produced in this matter, including the following Excel workbooks:

    (a) "Heritage Oracle Data August 2017 to August 2018-1"

    (b) "Heritage PowerSource Data January 2011 to August 2017" and

    (c) "Nelson and Marshall PowerSource Data." (Fedewa Decl. ¶¶ 3-5).

Defendants supplemented that production with another Excel workbook produced on September 13, 2019 entitled "PACE0000116869 Copy of Heritage Data August 2018-2019." Collectively, these spreadsheets are referred to herein as "Human Resources Data." This summary is based, in part, on that data.

2. As noted in Fedewa's declaration: (a) Defendants' Human Resources Data does not record information about union employees' attendance or disciplinary actions. (Fedewa Decl. ¶ 8). Defendants' Human Resources Data does include information about Heritage Garage employees' race, date of hire, positions held, date of promotion or transfer, date of termination or separation from employment, and reasons for those events (among other things). (Fedewa Decl. ¶¶ 6-7, 9-10, 12-17, 21-23).

3. Defendants' Human Resources Data reflects that 148 African Americans were employed at the Heritage Garage at some point since January 1, 2011, in positions that required driving or moving buses as part of their job duties ("drivers"). (Human Resources Data; Pl. Dep. Ex. 5 – Job Title Summary with Fedewa handwritten notes). That number does not include: (a)

1

two African Americans whose offers of employment were rescinded (Employee ID No. 102292 per PACE 015381 and Employee ID No. 102948 per PACE 019636) nor (b) two individuals (Employee ID No. 104203 and Employee ID No. 104148) hired after April 1, 2019, whose race is identified as "Two or More."

4. Defendants' Human Resources Data reflects that 222 individuals were employed as drivers at any point after January 1, 2011 (excluding the two African Americans whose offers of employment were rescinded).

**Defendants' Personnel Records**

5. In response to Plaintiffs' discovery requests, Defendants produced personnel files containing Notices of Personnel Action ("NOPAs"), attendance calendars, accident/incident files or reports, performance evaluations, and other documents (collectively "Personnel Records") for drivers at the Heritage Garage in .pdf format. Defendants' Personnel Records total tens of thousands of pages. Defendants' Human Resources Data includes drivers for whom Defendants did not produce Personnel Records.

**Plaintiffs' "Source Material"**

6. To compare treatment of drivers under Defendants' policies, Plaintiffs recorded information about drivers from Defendants' Personnel Records (identifying documents by bates-label) and combined it with information from Defendants' Human Resources Data. A copy of that Excel spreadsheet – labeled "Source Materials – Summary of Voluminous Personnel Records and Human Resources Data" – has been provided to Defendants' counsel with this summary.

7. In the "Source Material" spreadsheet, Plaintiffs recorded the following events from Defendants' Personnel Records:

a. Disciplinary actions reflected on Notice of Personnel Actions ("NOPA"), performance reviews, and other documents (e.g., written warnings or suspensions and, where possible, cause and length of suspensions);

b. Absences on attendance calendars kept pursuant to Pace's Attendance Policy (e.g., instances of absence, miss outs, etc.);

c. Absences or miss outs that were "excused" pursuant to Pace's Attendance Policy (e.g., by Klafeta or Murry); and

d. Accidents that were graded as "preventable" or "non-preventable" (but not accidents or incidents with "no grade").

8. For each event, Plaintiffs identified the date(s) of the event (e.g., Date1), the type of event (e.g., Type1), the event (e.g., Record1), the cause of the event where applicable and, for absences, whether the absence was excused or unexcused (e.g., Cause1), and the source document(s) by bates-number for the forgoing information (e.g. Source1). Because of the manner of production, events are not recorded in date-order. Absences from attendance calendars related to union business, workers' compensation, and approved FMLA (among others) were not always included.

9. To demonstrate the effect of Defendants' disciplinary process on different racial groups, Plaintiffs describe the distribution of written warnings, suspensions, and terminations for violations of Pace's policies by race and make calculations based on Defendants' Personnel Records and Human Resources Data.

**Disciplinary Actions For Drivers Employed Before March 31, 2019**

10. The number of total drivers employed at any point from January 1, 2011, to April 1, 2019, as reflected in Defendants' Personnel Data, is 209. That total, broken down by race and

a race's percentage of the total drivers for that period (i.e., the total for a race divided by 209) is reflected in Table 1 below.

**Table 1 – Total Drivers (1/11/2019 to 3/31/2019)**

| Race | Total Drivers | Percentage |
|---|---|---|
| Caucasian (White) | 57 | 27.27% |
| African American (Black) | 136 | 65.07% |
| Hispanic | 13 | 6.22% |
| Asian | 3 | 1.44% |

Although drivers hired on or after April 1, 2019 appear in Defendants' Human Resources Data, they are not included in the "totals" in this summary because – generally speaking – Defendants did not produce attendance calendars with information or personnel records reflecting disciplinary actions for any drivers hired after April 2019.

11. <u>Written Warnings</u>: Defendants' Personnel Records reflect that drivers employed at any point from January 1, 2011, to April 1, 2019, received approximately 953 written warnings ("Source Material" Column YF). In Table 2 below, Column one [1] shows the number of written warnings by race (i.e., 256 for Caucasians). Column two [2] shows the race's percentage of total written warnings (i.e., 256 of 953 for Caucasians). Column three [3] shows the total number of written warnings for that race as a "ratio" of the total number of drivers of that race as reflected in Table 1 (e.g., 256 written warnings for 57 Caucasian drivers).

**Table 2 – Written Warnings Under Defendants' Disciplinary Process**

| Race | [1] Written Warnings | [2] Percentage Of Total Written Warnings | [3] "Ratio" Of Warnings To Drivers |
|---|---|---|---|
| Caucasian (White) | 256 | 26.86% | 4.49 |
| African American (Black) | 600 | 62.96% | 4.41 |
| Hispanic | 66 | 6.93% | 5.08 |
| Asian | 31 | 3.25% | 10.33 |

4

12. <u>Suspensions</u>: Defendants' Personnel Records reflect that drivers employed at any point before April 1, 2019, received approximately 214 suspensions, including instances of being suspended from service pending investigation ("Source Material" Column YR). In Table 3 below, Column one [1] shows the number of those suspensions by race (i.e., 43 for Caucasians). Column two [2] shows the race's percentage of those suspensions (i.e., 43 of 214 for Caucasians). Column three [3] shows the total number of those suspensions for that race as a "ratio" of the total number of drivers of that race as reflected in Table 1 (e.g., 43 suspensions for 57 Caucasian drivers).

**Table 3 – Suspensions Under Defendants' Disciplinary Process**

| Race | [1] Suspensions | [2] Percentage Of Total Suspensions | [3] "Ratio" Of Suspensions To Drivers |
|---|---|---|---|
| Caucasian (White) | 43 | 20.09% | 0.75 |
| African American (Black) | 157 | 73.36% | 1.15 |
| Hispanic | 11 | 5.14% | 0.84 |
| Asian | 3 | 1.40% | 1 |

13. As compared to other races, African Americans received longer suspensions overall and on average, as shown in Table 4 below. The length of suspensions pending investigation typically is not recorded. Putting those aside, no Caucasian driver received a suspension longer than three (3) days, only 4 of 34 suspensions were longer than one (1) day, and the average length of suspension was 1.16 days (i.e., a total of 39.5 suspension days divided by 34 suspensions). ("Source Material Columns YG to ZC). For Hispanics, no such suspensions were longer than one and a half (1.5) days and the average length was 1.07 days (i.e., a total of 7.5 suspension days divided by 7 suspensions). For Asians, there was only 1 suspension other than suspensions pending investigation; it was for three (3) days. ("Source Material Columns YG to ZC).

5

14. Not including suspensions pending investigation, African Americans were suspended more than one (1) day nineteen (19) times and received suspensions of four (4) days, four and a half (4.5) days, five (5) days (twice), five and a half (5.5) days, and seven and a half (7.5) days. The average length of suspension for African Americans was 1.4 days (i.e., a total of 160 suspension days divided by 115 suspensions). ("Source Material Columns YG to ZC).

**Table 4 – Severity Of Suspensions (Other Than "Pending Investigation")**

| Race | [1] Suspensions (Other Than Pending Investigation) | [2] Multi-Day Suspensions | [3] Percentage Of Multi-Day Suspensions | [4] Total Days | [5] Average Length (Days) |
|---|---|---|---|---|---|
| Caucasian (White) | 34 | 4 | 16.66% | 39.5 | 1.16 |
| African American (Black) | 115 | 19 | 79.17% | 160 | 1.39 |
| Hispanic | 7 | 0 | 0.00% | 7.5 | 1.07 |
| Asian | 1 | 1 | 33.33% | 3 | 3 |

15. <u>Terminations</u>: Defendants' Human Resources Data reflects that 26 drivers were terminated involuntarily due to violation of Pace's policies and no Caucasian employee has been terminated due to the employee's violations of Pace policies since November 2011. (PowerSource designation "TER-Open(Inv)" or "Termination Open-Involuntary" in Oracle). In Table 5 below, Column one [1] shows the number of terminations by race (i.e., 1 for Caucasians). Column two [2] shows each race's percentage of the overall number of involuntarily terminated drivers (i.e., 1 of 26 for Caucasians). Column three [3] shows the percentage of total drivers of that race in Table 1 that were involuntarily terminated (i.e., 1 of 57 for Caucasians). Column four [4] shows the percentage of all 209 drivers that the race's involuntarily terminated drivers comprises (i.e., 1 of 209 for Caucasians).

**Table 5 – Terminations For Violating Pace's Policies**

| Race | [1] Involuntarily Terminated Drivers | [2] Percentage Of Total Involuntary Terminations | [3] Percentage Of That Race's Drivers | [4] Percentage Of Total Drivers |
|---|---|---|---|---|
| Caucasian (White) | 1 | 3.85% | 1.75% | 0.48% |
| African American (Black) | 24 | 92.31% | 17.65% | 11.48% |
| Hispanic | 0 | 0% | 0% | 0% |
| Asian | 1 | 3.85% | 33.33% | 0.48% |

16. Combining information from Tables 1-5 reveals the pattern of outcomes for African Americans compared to Caucasians under Defendants' disciplinary process as the severity of punishment increases, as shown in Table 6 below.

**Table 6 – Comparing Caucasians to African Americans Under Defendants' Disciplinary Process**

| Disciplinary Action | Caucasians | African Americans |
|---|---|---|
| Percentage of Drivers | 27.27% | 65.07% |
| Written Warnings | 26.86% | 62.96% |
| Suspensions | 20.09% | 73.36% |
| Multi-Day Suspensions | 16.66% | 79.17% |
| Terminations | 3.85% | 92.31% |

**Promotions – January 1, 2019 to March 31, 2019**

17. Defendants' Human Resources Data shows that between January 1, 2011 and March 31, 2019 there were 75 promotions for drivers from part-time operator to full-time operator. (PowerSource designation "Hir – PT to FT" or Oracle designations "PTF"). The number of those promotions by race and percentage of that race's overall number of such promotions (i.e., total of promotions received by drivers of a specific race divided by total of such promoted drivers) are reflected in Table 7 below (at Columns one [1] and two [2]). For drivers who worked between January 1, 2011 and March 31, 2019, Defendants' Human Resources Data reflects that there were

7

12 promotions other than from part-time operator to full-time operator (PowerSource designation "SAL-Promotion" or Oracle designation "Promotion"). The number of those promotions by race and percentage of that race's overall number of such promotions (i.e., total of promotions received by drivers of a specific race divided by total of such promoted drivers) are reflected in Table 7 below (Columns three [3] and four [4]).

Table 7 – Promotions

| Race | [1] PT To FT Operator Promotions | [2] Percentage Of Such Promotions | [3] Other Driver Promotions | [4] Percentage Of Driver Promotions |
|---|---|---|---|---|
| Caucasian (White) | 20 | 26.67% | 6 | 50.00% |
| African American (Black) | 48 | 64.00% | 5 | 41.67% |
| Hispanic | 6 | 1% | 1 | 8.33% |
| Asian | 2 | 2.67% | 0 | 0.00% |

**Other Information**

18. Murry and/or Klafeta reduced "miss outs" to "instances of absence" under Pace's Attendance Policy for non-African American employees. (*See, e.g.,* PACE 036520-21, PACE 036527; PACE 055392, PACE 055487-88; PACE 064491-92). For drivers employed between January 1, 2011 and March 31, 2019, Murry and/or Klafeta also excused 126 absences for Caucasian employees. ("Source Material" Columns K to YE).