**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE NELSON & CHRISTI MARSHALL, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No: 17-cv-7697 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| PACE SUBURBAN BUS, MARGARET | ) | |
| MURRY, in her individual capacity and in her | ) | |
| Official capacity of Division Manager of Pace | ) | |
| Suburban Bus – Heritage Division, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' LOCAL RULE 56.1(B)(2) RESPONSE TO**
**DEFENDANTS' LOCAL RULE 56.1(B)(1) STATEMENT OF FACTS**

Plaintiffs Maurice Nelson ("Nelson") and Christi Marshall ("Marshall"), by and through

their attorneys, The Wood Law Office, LLC and Osborne Employment Law, and pursuant to Local

Rule 56.1(b)(2), respond to Defendants' Statement of Facts (ECF No. 173), as follows:

**Local Rule 56.1(b)(2) Response To Defendants' Statement of Material Facts**

**A. Pace's Heritage Division Provides Safe and Efficient Transportation Options to Chicago's Southwest Suburbs.**[1]

1.    Pace provides public transit covering 3,446 square miles of Chicago's suburbs, serving

residents of 284 municipalities in Cook, Will, DuPage, Kane, Lake, and McHenry

Counties. (Murry Dec., Ex. 1, ¶ 2.) Pace has several geographical divisions. (*Id*., ¶ 3.) The

Heritage Division covers the southwest suburbs, including Joliet. (*Id*.) Vehicles servicing

the Heritage Division are stored and maintained at a 55,000 square foot facility in Joliet

("Heritage Garage"). (*Id*., ¶ 4.)

---

[1] Unlike other headings Defendants use, which identify topics, this heading arguably asserts a fact Defendants may contend is material.  To the extent Defendants intend to assert a material fact, Plaintiffs dispute it as unsupported by cited evidence as required by LR 56.1(d)(2).

**Plaintiffs' Response:** Undisputed, but immaterial except to the extent it describes Pace as a unit of local government operating within this judicial district for jurisdictional and venue purposes and facts about the Heritage Garage.

2. Murry has been the Division Manager of Heritage Garage since 2001. (*Id*., ¶ 5.) She directly supervises the Superintendent of Transportation, who at all relevant times was David Dines, an African-American, and the Safety and Training Manager, who at all relevant times was Anthony Caputo. (*Id*. ¶ 7.) Murry is supervised by Mark Klafeta, the Regional Manager at all relevant times. (*Id*. ¶ 12.)

**Plaintiffs' Response:** Undisputed, except that Plaintiff disputes that "at all relevant times" David Dines was the Superintendent of Transportation, that "at all relevant times" Anthony Caputo was the Safety and Training Manager, and to the extent Defendants seek an inference Defendant Murry *only* directly supervised Dines or Caputo. Defendant Murry also supervised others in the Heritage Garage. (Ex. 33-Murry 30(b)(6) 14:4-15:6; ECF No. 173-17, Ex. 17-Marshall 17:25-20:12). Caputo began working as the Safety and Training Manager in May 2015. (ECF No. 173-13, Ex. 13-Caputo 40:3-5); Dines began working as the superintendent of Transportation at the Heritage Garage in May 2015. (ECF No. 173-14, Ex. 14-Dines 38:7-10). Jackie Gerasch, a female Caucasian, previously performed some of Caputo's and Dines duties. (ECF No. 173-13, Ex. 13-Caputo 33:11-12; 36:7-37:5). [2]

3. Superintendent of Transportation Dines supervises four Dispatch Supervisors (at all relevant times: Kathleen Clemmer, Maurice Shelton, Roberta Fews, and Norvell Clark, Delois Jenkins, and Sheldon Gray each African-American). (*Id*., ¶¶ 7, 8). The Dispatch

---

[2] Defendants' use of "*id.*" in its citations refers back to Defendants' prior fact paragraph, not Plaintiffs' response.

Supervisors directly oversee all bus operators responsible for driving Pace buses and other vehicles on fixed routes in the Heritage Division ("Operators"). (*Id.*, ¶¶ 8, 9.)

**Plaintiffs' Response:** Disputed in part.  Plaintiffs admit Dines supervised Dispatch Supervisors but dispute any inference that *only* Dines supervised Dispatch Supervisors; Dines also supervised bus drivers, including Plaintiffs.  (ECF No. 173-17, Ex. 17-Marshall 17:25-20:12; ECF No. 173-14, Ex. 14-Dines 41:13-43:4).  Plaintiffs also admit Clemmer, Shelton, Fews, Clark, Jenkins, and Gray are African American and, at some points in time, worked as Dispatch Supervisors, but Plaintiffs dispute each was a Dispatch Supervisors "at all relevant times," that some were a Dispatch Supervisor at any relevant time, or that Dines supervised all six at any one time.  (Ex. 84-Dispatch Supervisor Work Records) (excerpted from Defendants' production of personnel files and HRIS data produced).  Each worked as a Dispatch Supervisor for different periods of time, only some of which are relevant to each Plaintiff's claim.  (Ex. 84-Dispatch Supervisor Work Records) (showing positions held for Clark – August 16, 2000 to at least 2019 [*Id.* at 7.]; Jenkins – February 28, 2002 to May 2018 [*Id.* at 8.]; Gray – August 30, 2002 to October 11, 2016 [*Id.* at 9.]; Clemmer – February 17, 2016 to at least 2019 [*Id.* at 4.]; Shelton – January 17, 2017 to at least 2019 [*Id.* at 5]); Fews – June 14, 2018 to at least 2019 [*Id.* at 6.]).  Plaintiffs also dispute any inference that *only* Dispatch Supervisors "directly oversee" all bus operators responsible for driving Pace buses and other vehicles on fixed routes in the Heritage Division "at all relevant times."  Others – including Murry, Dines and Caputo – directly supervised drivers. (Ex. 33-Murry 30(b)(6) 14:4-15:6; ECF No. 173-17, Ex. 17-Marshall 17:25-20:12; ECF No. 173-14, Ex. 14-Dines 41:13-43:4; ECF No. 173-13, Ex. 13-Caputo 44:8-45:23). Finally, Plaintiffs dispute that Dines supervise four Dispatch Supervisors.  Dispatch Supervisors reported

directly to Murry until May 2015, at which time the Superintendent of Transportation position was created and subsequently filled by Dines. (Ex. 33-Murry 30(b)(6) 17:19-18:5).

4. Employees in the Maintenance Department of Heritage Garage include service workers, helpers, a foreman (who is a supervisor), and the Superintendent of Maintenance, who has near-total authority over Maintenance Department personnel. Murry's supervision over the Superintendent of Maintenance is limited to reviewing and approving or disapproving his disciplinary recommendations. (Murry Dec., Ex. 1, ¶ 11.)

**Plaintiffs' Response:**  Undisputed, except that Plaintiffs dispute the Superintendent of Maintenance has near-total authority over Maintenance Department personnel and dispute that Murry's supervision over the Superintendent of Maintenance is limited to reviewing and approving or disapproving his disciplinary recommendations.  (Ex. 33-Murry 30(b)(6) 33:15-35:1; ECF No. 173-6, Ex. 6-2011-2017 CBA; ECF No. 173-7, Ex. 7-2017-2022 CBA; 89:7-90:3; ECF No. 173-10, Ex. 10-General Rule Book, 90:4-12, 118:14-21 [ECF No. 173-2, Ex. 2-Absenteeism Policy], 90:13-91:14 [ECF No. 173-5, Ex. 5-SOPs], 138:10-141:15 [Ex. 47-Handbook], 143:2-21 [Ex. 48-Accident Grading Policy]).

**B. Pace's Policies, Procedures, and Rules for Bus Operators**

5. Pace has an Absenteeism Policy (Ex. 2), Pace Miss Out Policy (Ex. 3), and (Pace Street Miss Out Policy (Ex. 4), each of which concern attendance. Dispatch Supervisors are primarily responsible for initially monitoring compliance with the Absenteeism and Miss Out Policies. (Murry Dec., Ex. 1, ¶¶ 23, 27, 30, 31, 34.) When an Operator appears to have violated one of those policies, the Dispatch Supervisor is responsible for reporting the infraction to Murry and covering the late or absent Operator's route with a another [sic] Operator. (*Id*., ¶¶ 23, 33.)

**Plaintiffs' Response:**  Undisputed.

6. After an absence is reported, Regional Manager Klafeta investigates its circumstances and may ask the Operator for more information. (*Id.*, ¶¶ 24, 25, 37.) Klafeta has authority to excuse the infraction for a number of reasons, whereas Murry's authority to excuse an absence or Miss Out is limited to absences occasioned by an Operator's child's school-related activity. (*Id.*, ¶ 24.) Under the Miss Out Policy, Operators who incur two Miss Outs during a rolling 12-month period are subject to a suspension. (Miss Out Policy, Ex. 3.)

**Plaintiffs' Response:**  Disputed.  Klafeta *may* investigate circumstances of an absence if an employee asks for it to be excused but does not do so for each instance or any instance not involving a request for excuse or disciplinary action.  (ECF No. 173-8, Ex. 8-Klafeta 29:18-30:10, 51:3-53:17, 149:19-150:8).  According to policy, Murry has discretion to implement or excuse disciplinary action differently than Defendants describe. (Ex. 33-Murry 30(b)(6) 115:9-22; ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2; ECF No. 173-8, Ex. 8-Klafeta 28:10-17).

7. The Standard Operating Procedures define how Operators must safely operate Pace vehicles, including: turns; merging; changing lanes; passing; expressway operations; backing up; and railroad crossings. (Murry Dec., Ex. 1, ¶ 45; Pace Standard Operating Procedures, Ex. 5.) Safety and Training Manager Caputo helps enforce Pace's safety standards by conducting accident investigations. (Murry Dec., Ex. 1, ¶ 53.) Superintendent of Transportation Dines also investigates some accidents. (*Id.*, ¶ 53.)

**Plaintiffs' Response:**  Undisputed, except Plaintiffs dispute any inference that Caputo helps enforce Pace's safety standards *only* by conducting accident investigations; Caputo also oversees certain training.  (ECF No. 173-13, Ex. 13-Caputo 44:8-15).

8. Operators must report all accidents and incidents to Pace. (*Id*., ¶ 64.) Operators who fail to report an accident or incident are "subject to immediate dismissal, unless … shown conclusively that … the employee did not [know] or could not have [known] … of the occurrence." (*Id*., ¶ 65; 2011-2017 CBA, Ex. 6, 2017-2022 CBA, Ex. 7).

**Plaintiffs' Response:** Disputed. Defendants' policy regarding failure to report states: an employee "may be subject to immediate dismissal" if they fail to report an accident or incident unless "it can be conclusively shown" that the employee did not or could know about the accident at the time it occurred. (ECF No. 173-6, Ex. 6-2011-2017 CBA, pp. 8-9; ECF No. 173-7, Ex. 7-2017-2022 CBA, pp. 12-13). Plaintiffs also dispute any inference that all operators who fail to report (immediately or otherwise) an accident are terminated. *See* Plaintiffs' Response to Statement of Fact ("ROSF") ¶¶ 45, 47, 49, 54-55 and evidence cited therein. Hispanic operator Sosa failed to report what would have been his fourth preventable accident, but was not terminated. When Defendant Murry suspended Marshall and recommended Marshall's termination, Murry knew Marshall had *requested* to see the video *and* had reported other preventable accidents; despite that, Murry still believed Marshall was lying when denying knowledge of the alleged September 1, 2016 accident. (ECF No. 173-9, Ex. 9-Murry Ind. 149:7-150:20; Ex 62-Marshall 2016 Termination Letter).

9. Under the collective bargaining agreement between Pace Heritage Division and the Union ("Labor Contract"), there is a difference between failing to report an accident or incident and failing to report it promptly, in that the former is more generally more reprehensible and warrants a higher level of discipline. (Murry Dec., Ex. 1, ¶ 65.) Klafeta testified during his deposition he does not believe he has ever terminated a Pace employee for failure to

immediately report, *i.e.*, a delay in reporting, an accident or incident. (Klafeta Dep., Ex. 8, 106:23-107:4.)

**Plaintiffs' Response:** Disputed. The Labor Contract, in full, states: "When an employee fails or neglects to report any accident or incident, that employee may be subject to immediate dismissal, unless it can be shown conclusively that at the time of the accident or incident that the employee did not or could not have had any knowledge of the occurrence." (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 9; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 12). Murry claimed to have no discretion and always terminated for any violation of this policy. (Ex. 33-Murry 30(b)(6) 139:2-140:17). However, she did not. *See* RSOF ¶¶ 8, ¶¶ 45, 47, 49, 54-55 and evidence cited therein. Plaintiffs admit Klafeta testified as described, but a jury is not required to believe Klafeta's testimony because Klafeta approved Murry's recommendation for Nelson's immediate suspension for failure to report soon after the "accident" in which Nelson allegedly engaged (i.e., his parking the bus). (ECF No. 173-8, Ex. 8-Klafeta 97:22-99:6). Defendants did not afford Nelson time to return from his break, examine the parked bus, and discover he had engaged in a purported "accident" (assuming that one even occurred). (ECF No. 173-9, Ex. 9-Murry Ind. 187:2-191:25; ECF No. 173-13, Ex. 13-Caputo 122:8-125:11).

10. If Pace learns of an accident or incident from a source other than the involved Operator, then Murry, Regional Manager Klafeta, or Dines may interview the Operator and/or review video of the incident. (Murry Dec., Ex. 1 ¶ 66; Klafeta Dep., Ex. 8, 85:13-19.) Based on this evidence and all the circumstances, one or more of them will form a judgment about whether the Operator did not know or could not have known of the occurrence. (*Id.*)

**Plaintiffs' Response:** Disputed. Klafeta testified he only becomes involved after Murry has recommended disciplinary action and may or may not review video. (ECF No. 173-8, Ex. 8-Klafeta 28:10-17, 58:5-59:2; 85:13-85:22). Dines testified he has no role in disciplinary actions involving suspension or termination. (Ex. 33-Murry 30(b)(6) 203:13-204:15; ECF No. 173-14, Ex. 14-Dines 47:9-12, 55:5-18). *See* RSOF ¶¶ 8 and 9 and evidence cited therein. Only Murry can issue disciplinary actions that involve suspension and she usually does so alone. (Ex. 33-Murry 30(b)(6) 133:14-135:4, 166:18-169:9, 173:17-174:6, 203:13-204:15). Murry has authority to recommend termination of drivers who are "probationary employees" for any reason during their first 120 days. (Ex. 33-Murry 30(b)(6) 135:8-136:19). As best Defendant Murry could recall, Klafeta never rejected Murry's recommendations for termination; Klafeta never encouraged Murry to terminate someone she had not already recommended for termination and only learns about termination recommendations from Murry, paperwork or the union. (ECF No. 173-9, Ex. 9-Murry Ind. 213:19-214:5; ECF No. 173-8, Ex. 8-Klafeta 58:5-59:2).

11. Six decision-making bodies or individuals may participate in the final grading of an accident. (Murry Dec., Ex. 1, ¶¶ 59-61). Grading an accident requires the decision-maker to analyze the individual facts and circumstances of a particular accident under Pace's Standard Operating Procedures, considering all available evidence (video, photographs, testimonial). (Murry Dec., Ex. 1, ¶¶ 56, 57, 61; Murry Dep., Ex. 9, 157:20-158:1).

**Plaintiffs' Response:** Disputed. Murry testified often only she, Dines or Caputo are involved in grading accidents, subject to Klafeta's review; but Klafeta is only involved in grading if staff comes to him with questions. (Ex. 33-Murry 30(b)(6) 164:8-166:17; ECF No. 173-8, Ex. 8-Klafeta 66:17-67:13). Defendant Pace collects significant information about operation of its buses electronically, including video on buses and within Pace's Heritage Garage facilities,

"DriveCam," Pace's "Intelligent Bus System" (which automatically collects information about the bus), at least some of which may not be considered in assessing job performance (because Defendant Murry does not know what those systems measure). (Ex. 33-Murry 30(b)(6) 77:5-82:23, 92:13-95:19, 159:6-160:6, 194:21-1954:4).

12. Operators are subject to conduct standards including ethical standards, responsibility for property, maintaining a valid driver's license, drug/alcohol use, using best judgment, and accident reporting and assistance. (Murry Dec., Ex. 1, ¶ 46; Pace General Rule Book Governing Bargained-For Employees, Ex. 10.)

**Plaintiffs' Response:** Undisputed, except that Plaintiffs dispute any inference these are the *only* conduct standards to which Operators are held or that Defendants apply these conduct standards consistently or without regard to race. Murry suspended African American drivers more frequently and more severely than their Caucasian counterparts and virtually never terminated Caucasians. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶12-16). No Caucasian driver has been suspended for longer than 3 days; by contrast, African Americans have been suspended longer than 3 days six different times, up to 7.5 days. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 13-14). The only type of disciplinary action Caucasian drivers receive at approximately the same ratio as African Americans is a written warning. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 11). But as the stages of Defendants' disciplinary process progress, African Americans fare worse and worse. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 10-16). between 2012 and 2017, Defendants did not terminate any non-probationary Caucasian drivers for violating Pace's policies, but terminated at least 20 African Americans. (Ex. 35-Murry's 2017 Spreadsheet, p. 1; Ex. 42, Human Resources Data Terminated Employees 2011-2017; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 15.) Murry

admitted the methods she used to administer Defendants' disciplinary system had the same effect as someone who would have been intentionally discriminating against African Americans. (ECF No. 173-9, Ex. 9-Murry Ind. 65:14-67:4; Ex. 35-Murry's 2017 Spreadsheet, p. 2). *See also* RSOF ¶¶ 5-9, and 11 and evidence cited therein.

13. Pace learns of incidents or other violations of the conduct standards from sources including citizen complaints, monitors (who observe and report on Operator performance), self-reports, Supervisor Violation Reports, and other Operators' reports. (Murry Dec., Ex. 1, ¶¶ 50-52.) Depending on the nature of the infraction, violation of the Standard Operating Procedures or conduct standards may result in discipline. (*Id*., ¶ 47; Pace General Rule Book Governing Bargained-For Employees, Ex. 10.)

**Plaintiffs' Response:** Undisputed, except that Plaintiffs dispute any inference that: (a) the sources always refer to violations as compared to *alleged* violations; (b) *only* violations of Standard Operation Procedures or conduct standards result in discipline; or (c) Pace applies the Standard Operation Procedures or conduct standards consistently or without regard to racial stereotypes or bias.

14. General Teamsters Local 179 ("Union") reviews and approves operator policies involving subjects about which Pace is obliged to bargain. (Murry Dec., Ex. 1, ¶ 20.) Discipline issued to non-probationary Operators is subject to the policies and procedures in Labor Contract. (*Id*., ¶¶ 73-77.) Non-probationary Operators' rights under the Labor Contract include: no Operator shall be disciplined without cause; and discipline may be disputed through a three-step grievance process. (*Id*., ¶ 73; Pace 2011-2017 CBA, Ex. 6; Pace 2017-2022 CBA, Ex. 7) Steps one and two include meetings with Murry and then Klafeta, respectively, to dispute the discipline. (Murry Dec., Ex. 1 ¶¶ 75, 76.) If the meetings with

Murry and Klafeta fail to resolve the grievance, the matter can proceed to step three, binding arbitration. (*Id.*, ¶ 77.)

**Plaintiffs' Response:** Undisputed, but immaterial and Plaintiffs dispute any inference Defendants attempt to draw that this constitutes a "layer of review" that would insulate Defendants' decisions from discriminatory animus; they are reviewing their own decisions. (Ex. 33-Murry 30(b)(6) 153:1-22; ECF No. 173-8, Ex. 8-Klafeta 58:5-59:2).

15. From 2011 until the time both Plaintiffs were terminated, only one Operator, Plaintiff Marshall, has grieved a termination through a step three arbitration hearing. (*Id.*, ¶77.)

**Plaintiffs' Response:** Disputed. The Union (not operators) controls the grievance process; bus operators (like Nelson) may have wished to pursue grievances further but the Union refused. (ECF No. 173-15, Ex. 15-Nelson 168:2-11).

16. As an additional layer of review, Operators may appeal Pace's determination that an accident was preventable to the National Safety Council, a non-profit organization with expertise in road safety investigations. (*Id.*, ¶ 80.) The National Safety Council's decision about whether an accident was preventable is binding on Pace. (*Id.*, ¶ 81.)

**Plaintiffs' Response:** Undisputed.

**C. Pace is an Equal Opportunity Employer with Zero-Tolerance Anti-Discrimination Policies and Procedures.**[3]

17. Pace is an equal opportunity employer. (Excerpt of Pace EEO Program, Ex. 11.) At all relevant times, Pace enforced an Equal Employment Opportunity (EEO) Program whose objectives were to:

---

[3] Unlike other headings Defendants use, which identify topics, this heading arguably asserts a fact Defendants may contend is material. To the extent Defendants intend to assert a material fact, Plaintiffs dispute it as unsupported by cited evidence as required by LR 56.1(d)(2).

ensure that applicants are equitably selected for employment, and that during employment, employees are treated fairly without regard to race, color, religion, sex, national origin, military status, family status, age or disability, sexual orientation or any other protected characteristic defined under Federal and State laws. The provisions of this plan are implemented by management within Pace's organization.

The EEO Program has a written-complaint filing procedure intended to minimize discrimination in the workplace. (*Id.* at 15-16; Ex. D.) The procedure provides that "Pace strongly disapproves of any act of discrimination and will not tolerate its occurrence." (*Id.* at 15.)

**Plaintiffs' Response:** Undisputed that Defendant Pace had an Equal Employment Opportunity (EEO) Program. Otherwise, disputed as unsupported by the cited portions of the record; particularly as to the contention Defendants "enforced" the EEO program, "implemented" *all* provisions of the plan, treated employees "fairly without regard to race or color" or that the program had any effect on how Murry implemented processes for discipline or termination at the Heritage Garage. (Ex. 33- Murry 30(b)(6) 182:19-183:13, ECF No. 173-9, Ex. 9-Murry 67:18-68:7). African Americans' experience at Pace show it is not an equal opportunity employer. According to Defendants' African American Dispatch Supervisors: (a) Defendant Murry had favorites - "white drivers who – who missed out and [Murry] didn't discipline them." (ECF No. 173-15, Ex. 15-Nelson 61:20-63:25); (b) with respect to discipline, Defendant Murry would "get rid of ours [African Americans] for – for anything, but she looks out for her own [Caucasians]" (ECF No. 173-15, Ex. 15-Nelson 181:13-184:6); and (c) African Americans in the Heritage Garage were often targeted or perceived as "a problem." (ECF No. 173-15, Ex. 15-Nelson 31:1-32:25, 184:9-185:25, 190:23-192:6, 198:2-199-20, 207:22-209:6; 201:14-204:7). Defendants EEO Program had no impact on Defendant Murry's administration of discipline or terminations. (Ex. 33-Murry 30(b)(6) 182:19-183:13). Defendants failed to track disciplinary

decisions by race or analyze that practice for disparate impact, before or after an FTA 2006 audit found its failure to do so was a deficiency. (Ex. 73-2016 EEO Audit, pp. 1, 24-25; Ex. 76-Gordon 30(b)(6) 100:11-16). Defendant Pace failed to evaluate managers like Defendant Murry on compliance with Pace's EEO policy the same way as their performance on Defendant Pace's other goals. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 5; Ex. 36, April 2016 FTA Compliance Review, p. 22). Even after the FTA Compliance Review noted this deficiency, and after this lawsuit was filed, Pace did not include EEO compliance as an element of Defendant Murry's performance review. (Ex. 74-Murry Jan 2017 Performance Evaluation). Despite repeated allegations of discrimination against African Americans, Murry's supervisors never asked her whether she discriminated against them. Klafeta never asked whether Defendant Murry discriminated against any of them or African Americans generally. (ECF No. 173-8, Ex. 8-Klafeta 30:20-35:1; ECF No. 173-9, Ex. 9-Murry 25:1-33:4, 99:1-4). *See also* RSOF ¶¶ 12, 20-26, 28, 31, 33-39, 45, 47, 49, 51, 52, 54, 55, 63-66 and evidence cited therein.

**D.  Plaintiff Maurice Nelson**

18. Pace employed Nelson from October 20, 2014 to approximately October 26, 2016, as a full-time Operator at the Heritage Garage. *See* Answer, DKT. 74, ¶ 7.

**Plaintiffs' Response:**  Undisputed.

19. On March 7, 2015, Nelson was suspended because he did not have a valid driver's license and returned to work once he submitted proof of a valid license. (Excerpts of M. Nelson Personnel File, Ex. 12., pp. 3-4)

**Plaintiffs' Response:**  Undisputed, but Plaintiffs dispute any inference Defendants were allowed to consider this conduct in terminating Plaintiff's Nelson's employment in 2016 under its Collective Bargaining Agreement. (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 8; ECF No. 7, Ex.

7-2017-2022 CBA, p. 11) ("Past records of employees shall not be considered for disciplinary purposes if pre-dated more than one (1) year…").

20. On May 19, 2015, Nelson was suspended for one day because he incurred two full Miss Outs during a rolling 12-month period. (*Id*. at pp. 5-6.) Sheldon Gray was the Dispatch Supervisor on duty who discussed the infraction with Nelson and helped complete the incident report. (*Id*.)

**Plaintiffs' Response:**  Undisputed, but Plaintiffs dispute any inference Defendants were allowed to consider this conduct in terminating Plaintiff's Nelson's employment in 2016 under its Collective Bargaining Agreement. (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 8; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 11) ("Past records of employees shall not be considered for disciplinary purposes if pre-dated more than one (1) year…").

21. On July 11, 2016, Nelson was suspended for one day because on July 5, 2016, he failed to report that he had traveled approximately 25 miles in the wrong direction, attempted a U-turn at an intersection, and backed his bus into traffic. (*Id*. at pp. 7-12.)

**Plaintiffs' Response:**  Undisputed that Plaintiff was suspended for one day and Defendants claimed the reason related to Plaintiff Nelson's conduct on July 5, 2016; otherwise disputed. Plaintiff Nelson's route included a detour, and at some point Plaintiff Nelson realized he was travelling in the wrong direction. (ECF No. 173-15, Ex. 15-Nelson 87:6-14). Plaintiff called in to dispatch when he was uncertain where he was going. (ECF No. 173-15, Ex. 15-Nelson 87:6-14). In addition, Plaintiff did not back into traffic when performing a U-turn.  (ECF No. 173-15, Ex. 15-Nelson 87:15-20). Rather, traffic was clear when Plaintiff turned the bus around. (ECF No. 173-15, Ex. 15-Nelson 87:15-20).  Plaintiffs also dispute any inference Defendants were allowed to consider this conduct in terminating Plaintiff's Nelson's employment in 2016 under its

Collective Bargaining Agreement. (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 8; ECF No. 173-7,

Ex. 7-2017-2022 CBA, p. 11) ("Past records of employees shall not be considered for

disciplinary purposes if pre-dated more than one (1) year…")

22. On September 13, 2016, Nelson was suspended for one day because he had two full Miss

Outs in a rolling 12-month period. (*Id*. at pp. 13-15.) Kathleen Clemmer was the Dispatch

Supervisor on duty who helped complete the incident report. (*Id*.)

**Plaintiffs' Response:** Undisputed.

23. On October 20, 2016, Safety and Training Manager Caputo observed the front bumper of

the Pace bus Nelson had operated touching the rear bumper of another Pace bus while

parked at Heritage Garage. (Caputo Dep., Ex. 13, 120:10-25; Excerpts of M. Nelson

Personal File, Ex. 12., pp. 20-21)

**Plaintiffs' Response:** Disputed. Nelson testified his bus did not make contact with another, and

he had been following instructions by Dispatch Supervisors Norvell Clark and Kathleen

Clemmer to park buses as closely as possible to allow more buses to fit into the garage. (ECF

No. 173-15, Ex. 15-Nelson 146:1-19). When reviewing photographs of the alleged incident,

Caputo acknowledged he could not identify where the bus Nelson had operated was in contact

with another Pace Bus. (ECF No. 173-13, Ex. 13-Caputo 120:9-25, 138:16-139:2, 148:13-

151:6). Nor could Caputo identify any damage to bus from pictures he took. (ECF No. 173-13,

Ex. 13-Caputo 149:5-13).

24. Caputo and Dispatch Supervisor Shelton photographed Nelson's bus and saw damage on

its front. (*Id*.) Superintendent of Transportation Dines also investigated the accident and

observed the buses touching. (Dines Dep., Ex. 14, 150:2-21.) Based on the investigation,

including meeting with Nelson, the accident was graded preventable. (Excerpts of M. Nelson Personal File, Ex. 12., pp. 3-4, 16-19)

**Plaintiffs' Response:**  Undisputed that Nelson's bus was photographed or that Defendant graded the alleged accident as preventable; otherwise disputed.  The cited portion of testimony from Dines does not state he observed the buses touching.  (ECF No. 173-14, Ex. 14-Dines 150:2-21). Nelson testified his bus did not make contact with another, and he had been following instructions to park buses as closely as possible to allow more buses to fit into the garage. (ECF No. 173-15, Ex. 15-Nelson 146:1-19). When reviewing photographs of the alleged incident, Caputo acknowledged he could not identify where the bus Nelson had operated was in contact with another Pace Bus.  (ECF No. 173-13, Ex. 13-Caputo 120:9-25, 138:16-139:2, 148:13-151:6).  Murry met with Nelson and claimed the buses had made contact, causing damage to the buses.  (ECF No. 173-15, Ex. 15-Nelson 158:3-23).  Caputo could not identify any damage to bus from pictures he took.  (ECF No. 173-13, Ex. 13-Caputo 149:5-13). Defendants could not state whether the bus was taken out of service for repairs or otherwise corroborate Defendant Murry's claims of damage. (ECF No. 173-13, Ex. 13-Caputo 121:4-7, 147:9-148:1; ECF No. 173-14, Ex. 14-Dines 162:25-168:25; ECF No. 173-9, Ex. 9-Murry 208:15-209:2).

25. Nelson did not report the accident to Pace. (Klafeta Dep., Ex. 8, 108:12-13.)

**Plaintiffs' Response:**  Disputed.  Plaintiffs dispute any accident that could have been reported occurred.  (ECF No. 173-15, Ex. 15-Nelson 146:1-19, 158:3-23; ECF No. 173-13, Ex. 13-Caputo 120:9-25, 121:4-7, 138:16-139:2, 148:13-151:6; ECF No. 173-14, Ex. 14-Dines 150:2-21, 162:25-168:25; ECF No. 173-9, Ex. 9-Murry Ind. 208:15-209:2).

26. Regional Manager Klafeta reviewed video of the accident, showing Nelson's bus making contact with the parked bus in front of him and Nelson exiting his bus to confirm it touched

the adjacent bus. (*Id.*, 86:9-87:2, 97:24-99:6.)   Klafeta decided to terminate Nelson because Kafeta believed that Nelson could not credibly deny knowledge of the accident. (*Id.*; *see also id.*, 108:7-19.)

**Plaintiffs' Response:**  Disputed.  Nelson testified his bus did not made contact with another, and he had been following instructions to park buses as closely as possible to allow more buses to fit into the garage. (ECF No. 173-15, Ex. 15-Nelson 146:1-19).  When reviewing photographs of the alleged incident, Caputo acknowledged he could not identify where the bus Nelson had operated was in contact with another Pace Bus.  (ECF No. 173-13, Ex. 13-Caputo 120:9-25, 138:16-139:2, 148:13-151:6).  Klafeta approved Defendant Murry's suspension of Nelson before Defendant Murry had even spoken with Plaintiff Nelson about the incident.  (ECF No. 173-9, Ex. 9-Murry Ind. 187:2-191:11; Ex. 58-Klafeta Email re Nelson Oct 20, 2016).  Klafeta could not recall when or where he reviewed the video, or who may have been with him when he did so, and only met with Nelson and reviewed after Nelson had been terminated.  (ECF No. 173-8, Ex. 8-Klafeta 85:23-89:18).

27. Nelson filed a grievance, but Pace denied it and the Union declined to pursue the grievance through arbitration. (*Id.*, 142:20-143:1.)

**Plaintiffs' Response:**  Disputed in part.  Plaintiffs dispute that Pace denied Nelson's grievance as unsupported by the evidence cited.

28. During his deposition, Nelson testified he was aware of Pace's anti-discrimination policy, but did not make any complaints of discrimination under that policy during his employment with Pace. (Nelson's Dep., Ex. 15, 40:10-12, 42:3-7).

**Plaintiffs' Response:**  Undisputed that Plaintiff Nelson was aware Defendant Pace had an anti-discrimination policy; otherwise disputed.  Plaintiff Nelson testified he was not aware of

Defendant Pace's internal complaint procedures. (ECF No. 173-11, Ex. 11-Excerpts from Pace

EEO Program pp. 15-16; ECF No. 173-15, Ex. 15-Nelson 40:10-12, 42:3-7). Plaintiffs dispute

any inference Defendants seek that, because he did not utilize a procedure of which he was not

aware, he did not believe Defendants' conduct was racially discriminatory.

### E. Plaintiff Christi Marshall

29. Marshall was employed by Pace from October 19, 2015 to approximately October 17,

2017, as a full-time bus operator at the Heritage Garage. *See* Answer, DKT 74, ¶ 8.

**Plaintiffs' Response:** Undisputed.

30. On September 1, 2016, Marshall asked Safety and Training Manager Caputo to review

video of her having difficulty merging during her shift earlier that day. (*Id*., ¶ 63.) When

Caputo watched the video, he concluded it showed Marshall was involved in an accident

that she failed to report. (Caputo Dep., Ex. 13, 110:6-112:20; 114:7-117:14.)

**Plaintiffs' Response:** Undisputed.

31. After meeting with Marshall, Caputo decided Marshall's explanation of why she could

not have known of the accident lacked credibility. (Excerpts of M. Marshall Personnel

File, Ex. 16, p. 7, 10-11). Murry and Regional Manager Klafeta conferred and agreed,

resulting in Marshall's termination on or about September 14, 2016. (Murry Dep., Ex. 9,

148:23-25, 151:11-13, 152:23-153:1.)

**Plaintiffs' Response:** Disputed that Caputo decided Marshall's explanation of why she could

not have known of the accident lacked credibility as unsupported by the cited portion of the

evidence; inferring this fact is true from a business record requires drawing an inference against

Plaintiff. (ECF No. 173-13, Ex. 13-Caputo 101:24-111:7, 117:23-118:6; ECF No. 173-8, Ex. 8-

Klafeta 79:15-80:15). Additionally, before Caputo even reviewed the video, Caputo did not

believe Marshall's claim that no one would let her merge. (ECF No. 173-13, Ex. 13-Caputo 105:4-19). Plaintiffs also dispute any inference that Marshall's failure to report the accident was the basis for Marshall's 2016 termination. When Defendant Murry suspended Marshall and recommended Marshall's termination, Murry knew Marshall had *requested* to see the video *and* had reported other preventable accidents; despite that, Murry still believed Marshall was lying when denying knowledge of the alleged September 1, 2016 accident. (ECF No. 173-9, Ex. 9-Murry Ind. 149:7-150:20; Ex 62-Marshall 2016 Termination Letter). Klafeta admitted Defendants' contention that Plaintiff Marshall requested to review video for a day she knew she had an unreported accident "makes no sense." (ECF No. 173-8, Ex. 8-Klafeta 79:23-80:15). Murry's termination letter for Marshall stated her "whole work record" was the basis for her termination. (ECF No. 173-9, Ex. 9-Murry Ind. 165:13-168:10; Ex. 62-Marshall Term Letter, Sept 14, 2016). Defendants offered shifting explanations in the arbitration process, and the Arbitrator found the proffered reason – Marshall's failure to report an accident of which she was aware – was not worthy of credence. (ECF No. 173-16, Ex. 16-Marshall Personnel File, pp. 13-22 [Arbitration Award, pp. 11-20, describing shifting explanations offered to justify termination, and concluding Plaintiff Marshall was truthful in denying knowledge of the accident]).

32. Marshall was reinstated with back pay on June 17, 2017, following the Union's grievance arbitration. *See* Answer, DKT 74, ¶¶ 70; (Excerpts of M. Marshall Personnel File, Ex. 16, p. 22).

**Plaintiffs' Response:** Undisputed.

33. On July 5, 2017, Marshall received a written warning for a preventable accident that occurred on June 30, 2017—three days after her reinstatement. (Excerpts of M. Marshall Personnel File Ex. 16, p. 23) Superintendent of Transportation Dines was involved in the

investigation and Dispatch Supervisor Delois Jenkins wrote the service interruption report. (*Id*. at pp. 24-30.)

**Plaintiffs' Response:**  Undisputed that Marshall received a written warning, purportedly for an accident that was graded preventable that occurred on June 30, 2017; but disputed that the accident was preventable or that it was the basis for the disciplinary action.  Murry assigned Plaintiff Marshall to operate a Pulse bus on which she had received a total of thirty minutes of training. (ECF No. 173-17, Ex. 17-Marshall 127:8-16).  Plaintiffs do not dispute that Dines was "involved" in the investigation but deny that is material.  (ECF No. 173-14, Ex. 14-Dines 223:25-224:16; Ex. 43-Marshall Grievance Oct 20, 2017).

34. On July 27, 2017, Marshall was suspended pending an investigation into a July 25, 2017 collision of a bus Marshall was operating. (Excerpts of M. Marshall Personnel File Ex. 16., p. 31) On July 28, 2017, Marshall was suspended for one day because she failed to report the collision on July 25, 2017, which was graded preventable. (*Id*. at 32.)

**Plaintiffs' Response:**  Undisputed that, on July 27, 2017, Marshall was suspended pending an investigation of events on July 25, 2017; otherwise, disputed.  Plaintiffs dispute that Marshall failed to report the collision on July 25, 2017. The NOPA makes clear that Marshall was only given a second preventable accident and makes no mention whosoever of failing to report an accident; this "incident" did not involve a "collision;" she merely ran over the curb.  (Ex. 67-Marshall NOPA July 28, 2017).  Plaintiff reported the "incident" on July 25, 2017 on the day it occurred. (ECF No. 173-17, Ex. 17-Marshall 60:15-17). On that occasion, Plaintiff Marshall was assigned to drive a Pulse bus, and contacted the curb when making a turn. (ECF No. 173-17, Ex. 17-Marshall 58:18-21). Plaintiff contacted the curb due to inconsistent training related to the Pulse bus. (ECF No. 173-17, Ex. 17-Marshall 60:9-11, 129:4-11; Ex. 65-Marshall Memo).

35. Superintendent of Transportation Dines was involved in the investigation of the July 25, 2017, collision and Dispatch Supervisor Jenkins wrote the service interruption report associated with the collision. (*Id*. at pp. 33-35.)

**Plaintiffs' Response:**  Disputed.  The cited portion of the record shows only that Dines attended a disciplinary meeting and signed a NOPA, not that he was involved in investigation of the alleged accident.  Defendants cite no evidence providing context or facts to authenticate those records or the "Service Interruption Report," which purports to have been created by "JENKDE" or what that report means.   (ECF No. 173-16, Ex. 16-Excerpts from Marshall Personnel File, pp. 34-35.)  Plaintiffs note, however, the report specifically states that "OPERATOR REPORTED TO DISPATCH AT THE WINDOW UPON RET GARAGE, THAT SHE MADE CONTACT WITH THE CURB…" (ECF No. 173-16, Ex. 16-Excerpts from Marshall Personnel File, pp. 34-35).

36. On October 3, 2017, Marshall was involved in a preventable collision, which was her third preventable accident in a rolling 12-month period. (*Id*. at p. 36.)

**Plaintiffs' Response**:  Disputed that Marshall was involved in a preventable collision/accident on October 3, 2017. On that day, a man approached her bus and said something to the effect of "my mirror was hit." (ECF No. 173-17, Ex. 17-Marshall 65:8-12). Marshall parked the bus and observed the other's driver had glass missing from the side mirror, but there was no glass on the ground in the area. (ECF No. 173-17, Ex. 17-Marshall 143:1-5). Marshall and the passengers on board did not hear, feel, or see an accident. (ECF No. 173-17, Ex. 17-Marshall 64:20-22). Despite video cameras on the side of the bus, no such video has been produced showing the alleged accident. Marshall reported the incident later that day at the transfer point. (ECF No. 173-17, Ex. 17-Marshall 65:13-19).

37. Following meetings with Marshall, she was terminated from employment on October 17, 2017 because she had three preventable accidents in a rolling 12-month period. (Excerpts of M. Marshall Personnel File, Ex. 16, pp. 24-25, 45, 37-44 ; *See* Answer, DKT 74, ¶ 77) Marshall grieved her second termination; this time, unsuccessfully. (Excerpts of M. Marshall Personnel File, Ex. 16., p. 46)

**Plaintiffs' Response:** Plaintiff does not dispute that Defendants claim that Marshall had three preventable accidents, and Defendants claim she was terminated for having three preventable accidents within a one-year period. Disputed in that Marshall had three three preventable accidents within a one-year period. *See* RSOF ¶¶ 31-34, 36 and evidence cited therein. Accepting Murry approved Marshall's termination for the reasons stated is true requires weighing evidence, making credibility determinations and drawing inferences against Plaintiffs.

38. Either Murry or Regional Manager Klafeta recommended to Marshall that she ask the National Safety Council to review the accident; she did not do so. (Murry Dep., Ex. 9, 171:4-13.)

**Plaintiffs' Response:** Disputed, to the extent Defendants seek to infer Plaintiff Marshall could have done so without incurring additional expense. (ECF No. 173-17, Ex. 17-Marshall Dep. 242:13-20). Marshall did not appeal because it involved having to pay money which she did not have. (ECF No. 173-17, Ex. 17-Marshall Dep. 242:3-20).

39. Marshall understood Pace's procedure for making complaints of discrimination and understood that discrimination was "not tolerated" at Pace." (*Id*. at 69:17-73:5; Marshall Dep., Ex17, 70:5-71:15; Excerpt of Pace EEO Program, Ex. 11.) Marshall did not make any complaints of discrimination during her employment with Pace. (*Id*.)

**Plaintiffs' Response:** Undisputed, except to the extent Defendants seek to infer: (a) Plaintiff Marshall admitted "discrimination 'was not tolerated' at Pace" or (b) the fact Plaintiff Marshall did not complain internally using Pace's procedures means she did not believe she was being discriminated against based on her race. Testimony from Plaintiff Marshall cited shows she understood Defendant Pace's *policy* stated discrimination was "not tolerated" at Pace. **(**ECF No. 173-17, Ex. 17-Marshall 70:8-18). By the time Plaintiff Marshall was terminated the second time (10/17/17), Plaintiffs' EEOC charges were already filed and pending since April 17, 2017. (Ex. 85-Nelson EEOC Charge; Ex. 86-Marshall EEOC Charge).

**F.     Comparable Employees:  Jacob Mack and John Porro**

40. Pace hired employee Jacob Mack (Caucasian) as a part-time Operator at the Heritage Garage on March 9, 2015, and he was promoted to full-time operator on July 26, 2015. (Excerpts of J. Mack Personnel File, Ex. 18.)

**Plaintiffs' Response:** Undisputed.

41. On January 3, 2017, Mack had his first preventable accident, which resulted in a written warning and retraining. (*Id*.) On July 27, 2017, Mack had his second preventable accident and second in a rolling 12-month period, resulting in a one-day suspension. (*Id*.) Mack had no other preventable accidents at all relevant times.

**Plaintiffs' Response:** Undisputed.

42. John Porro (Caucasian) was employed by Pace in the building maintenance department at Heritage Garage from on or about December 22, 2002, until his termination on November 2, 2011, during which time he periodically operated Pace buses, similar to Operators. (Excerpt of J. Porro Personnel File, Ex. 19.)

**Plaintiffs' Response:** Undisputed.

43. Murry approved Porro's termination, as recommended by the Superintendent of Maintenance. (*Id*.) On November 2, 2011, Pace terminated Porro because he had three preventable accidents in a rolling 12-month period. (*Id*.)

**Plaintiffs' Response:**  Disputed in part.  Plaintiffs dispute that Porro's termination was recommended by the Superintendent of Maintenance or that Porro had *only* three preventable accidents in less than 12 months as unsupported by any evidence cited.  Plaintiffs further dispute any inferences to be drawn in Defendants favor from the evidence cited or facts described. Accepting that Murry approved Porro's termination for the reasons stated is true from a business record requires weighing evidence, making credibility determinations and drawing inferences against Plaintiff.

**G.  Allegedly Comparable Employees**

44. Pace hired Raymond Ulrich (Caucasian) as an Operator on November 8, 2010. (Excerpt of R. Ulrich Personnel File, Ex. 20; Plaintiffs' 4/25/2018 R. 26 Disclosures, ¶ 1C, Ex. 21.)

**Plaintiffs' Response:**  Undisputed.

45. On March 28, 2016, Ulrich had a reportable incident concerning a passenger. (*Id*.) Ulrich reported the incident to dispatch immediately, but did not prepare a written report the same day. (Klafeta Dep., Ex. 8, 95:1-96:8.)

**Plaintiffs' Response:**  Disputed, including as unsupported by admissible evidence cited.  Klafeta lacks first-hand knowledge of the facts described and, accordingly, his testimony is inadmissible hearsay.  (Ex. 40-Ulrich Accident Report; Ex. 39-Klafeta Email re Ulrich Apr 1, 2016). Ulrich was not terminated despite failing to report an incident with a passenger that required police to be called and falsifying his overtime slip; even though both offenses should result in immediate termination, Murry did not recommend termination to Klafeta. (ECF No. 173-14, Ex. 14-Dines

176:4-25, 180:4-181:15; ECF No. 173-9, Ex. 9-Murry Ind. 81:6-84:12; ECF No. 173-8, Ex. 8-

Klafeta 95:9-96:8, 101:10-102:22; Ex. 39-Murry April 2016 Email Exchange with Klafeta

Regarding Ulrich).

46. Pace hired Romeo Zamudio (Hispanic) as an Operator on March 3, 1993. (Excerpt of R.
Zamudio Personnel File, Ex. 22; Klafeta's Dep. Ex._103:2-3.)

**Plaintiffs' Response:**  Undisputed.

47. On or around August 28, 2012, Zamudio had an incident where a passenger fell while
Zamudio was operating a bus. (*Id*.). Zamudio resumed his route after the incident and
reported the incident immediately after resuming his route. (*Id*.) However, he received a
written warning and retraining because he did not report the incident before resuming his
route. (*Id*.)

**Plaintiffs' Response:**  Disputed, including as unsupported by admissible evidence cited.  Klafeta

lacks first-hand knowledge of the facts described and, accordingly, his testimony is inadmissible

hearsay.  (ECF No. 173-8, Ex. 8-Klafeta 104:6-16; ECF No. 173-14, Ex. 14-Dines 117).

48. Pace hired Michael Rooney (Caucasian) as an Operator on September 27, 2010 . (Excerpt
of M. Rooney Personnel File, Ex. 23; Plaintiffs' 4/25/2018 R. 26 Disclosures, ¶ 1C, Ex.
21.)

**Plaintiffs' Response:**  Undisputed, except that Plaintiffs dispute Defendants can rely on

Plaintiffs' Rule 26 disclosures as evidence to overcome summary judgment.  *See* Fed. R. Civ. P.

56(c)(2).

49. On August 3, 2012, Rooney had a preventable accident. (*Id*.; Murry Aug. 6, 2012 Email
Re Rooney, Ex. 24) He resumed his route and reported the accident using his cell phone
while in transit. (*Id*.) He received a write-up for failing to report the accident immediately

and was suspended for talking on his cell phone while operating the bus. (*Id.*; Excerpt of M. Rooney Personnel File, Ex. 23.)

**Plaintiffs' Response:**     Undisputed, except Plaintiffs dispute any inference that Murry's determination of discipline for Rooney was or without regard to racial stereotypes or bias.  Murry testified that use of a cell phone while operating a Pace bus was grounds for immediate termination under Pace's policies. (Ex. 33-Murry 30(b)(6) 136:24-137:3).

50. Pace hired Richard Delgado on November 13, 1995, as an Operator. (Excerpt of R. Delgado Personnel File, Ex. 25.)

**Plaintiffs' Response:**  Undisputed.

51. On August 9, 2018, Delgado (Hispanic) had a preventable accident when backing up a relief vehicle in a curb lane. (*Id.*; Dines Dep., Ex. 14, 192:3-14, 194:1-195:1.) Unlike buses, Pace drivers need not contact dispatch before reversing a relief vehicle. (*Id.*) The vehicle accidentally made contact with a pedestrian while it was moving in reverse. (*Id.*)

**Plaintiffs' Response:**  Undisputed that, on August 9, 2018, Richard Delgado (Hispanic) struck a pedestrian while reversing a relief vehicle. However, Plaintiff disputes the policies cited by Defendants and the application thereof. Delgado hit a pedestrian while reversing a Pace non-revenue relief van against the direction of traffic.  (ECF No. 173-14, Ex. 14-Dines 190:8-195:6; ECF No. 173-9, Ex. 9-Murry Ind. 84:13-85:7).  Delgado remained in reverse for a full block so his co-worker did not have to walk to the vehicle. (ECF No. 173-14, Ex. 14-Dines 192:13-18). It is in violation of Pace operating procedures to back up a van against the direction of traffic. (ECF No. 173-9, Ex. 9-Murry Ind. 84:23-85:1). It severe and significant policy violation when a Pace vehicle strikes a human being (ECF No. 173-9, Ex. 9-Murry Ind. 85:2-4), yet Murry did not

recommend his termination (he was only suspended). (ECF No. 173-9, Ex. 9-Murry Ind. 85:5-7; ECF No. 173-14, Ex. 14-Dines 193:7-10).

52. The accident was Delgado's second preventable accident in a 12-month period, and resulted in an eight-day suspension and retraining. (*Id.*) Pace's policies and practices did not require or suggest an employee should be terminated in such circumstances. (*Id.*)

**Plaintiffs' Response:** Undisputed that Delgado was not terminated for striking a pedestrian while moving his relief vehicle in reverse and, instead, was given an eight-day suspension and retraining. Otherwise, disputed. Murry testified that striking a pedestrian warranted termination, regardless of whether it was an operator's first, second or third preventable accident. (Ex. 33-Murry 30(b)(6) 144:12-17).

53. Pace hired Michael Neilson (Caucasian) as a Service Worker in its Maintenance Department on October 19, 2015, but he also operated Pace buses like Operators. (Excerpt of M. Neilson Personnel File, Ex. 26; Plaintiffs' 4/25/2018 R. 26 Disclosures, ¶ 1C, Ex. 21)

**Plaintiffs' Response:** Undisputed, except that Plaintiffs dispute Defendants can rely on Plaintiffs' Rule 26 disclosures as evidence to overcome summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

54. Neilson had a non-preventable accident during training, where the bus he was operating scuffed against a construction sign, and caused no damage to the bus or the stop sign. (Caputo Dep., Ex. 13, 95:17-97:16.)

**Plaintiffs' Response:** Undisputed that Neilson had an accident during training; otherwise disputed. Immediately after Neilson crashed the bus into a construction sign, Caputo got off the bus and made a phone call, appearing very upset. (ECF No. 173-17, Ex.17-Marshall 102:12-24).

Contrary to Defendants' assertion, there is no documentation contained in Neilson's Personnel File indicating the accident was graded as non-preventable, and his Employee Accident / Incident Record omits the accident altogether. (Ex. 38-Neilson NOPA and Accident Record). In describing the incident, however, Caputo stated Neilson was not watching his speed, and was not following Caputo's direction, and that it was a preventable accident. (ECF No. 173-17, Ex. 17- Marshall 100:14-24).

55. Neilson had two preventable accidents at all relevant times; he received a write-up for the first and was suspended for the second. (Excerpt of M. Neilson Personnel File, Ex. 26.)

**Plaintiffs' Response:** Disputed. Neilson should have been fired for crashing the bus into a construction sign during training or, subsequently, when he had what should have been his third graded preventable accident, but no record of the accident that occurred during training while Marshall was on the bus with him was on his accident record. (ECF No. 173-17, Ex. 17- Marshall 97:11-99:15; 100:14-24; ECF No. 173-9, Ex. 9-Murry Ind. 92:22-93:12; Ex. 38, Neilson Record).

56. Certain former Pace employees filed a federal lawsuit against Pace and Murry on January 7, 2009, styled *Johnson et al. v. PACE Suburban Bus et al.* ("*Johnson*"). (*Johnson* Answer, DKT 14, Case 09 CV 00080 (N.D. Ill.) Ex. 27.)

**Plaintiffs' Response:** Undisputed.

57. None of the 170 paragraphs in the *Johnson* complaint allege any discriminatory application of the same policies that Nelson and Marshall were terminated for violating. (*Id*.)

**Plaintiffs' Response:** Disputed. Defendant Murry acknowledged the allegations of the *Johnson* lawsuit, like Plaintiffs' lawsuit, allege discriminatory application of Pace's disciplinary policies,

including with respect to termination. (ECF No. 173-9, Ex. 9-Murry 25:1-30:8) (Murry: "Q: You're aware all of those individuals alleged discrimination in the application of disciplinary rules and[/]or the termination of employment, right? A: Correct.").

58. In the *Johnson* complaint, Plaintiff Johnson alleged she resigned before she was scheduled to meet with Murry's supervisor, Peter Kommor, because she feared she would be terminated at that meeting for accumulating what she believed were too many miss outs. (*Id*. at ¶¶ 43-46.)

**Plaintiffs' Response:**  Undisputed, except to the extent Defendants seek to infer those were the *Johnson*-Plaintiffs' only allegations in the *Johnson* complaint.

59. In the *Johnson* complaint, Plaintiff Scates alleged she resigned in the belief that she would be terminated for accumulating too many Miss Outs. (*Id*. at ¶¶ 65-69.)

**Plaintiffs' Response:**  Undisputed, except to the extent Defendants seek to infer those were the *Johnson*-Plaintiffs' only allegations in the *Johnson* complaint.

60. In the *Johnson* complaint, Plaintiff Ento alleged she resigned because she was denied a meeting with Murry and a union representative prior to continuing to work a route she believed was not timely assigned to her. (*Id*. at ¶¶ 92-93.)

**Plaintiffs' Response:**  Undisputed, except to the extent Defendants seek to infer those were the *Johnson*-Plaintiffs' only allegations in the *Johnson* complaint.

61. The *Johnson* complaint was not verified, no discovery was conducted in that case and no plaintiff or other witness submitted an affidavit in an effort to substantiate the unsworn allegations.

**Plaintiffs' Response:**  Undisputed that the *Johnson* complaint was not verified; otherwise, disputed.  The parties each produced thousands of pages of documents for fact and liability

discovery and conducted five days of depositions, including at least one Plaintiff (Ento).[4]  (Ex.

80- Agreed Motion to Stay and Extend Discovery; Ex. 81- Letter re Supplemental Production to

Defendants' Initial Disclosures; Ex. 82- Letter re Plaintiff's Supplemental 26(a)(1) Production;

ECF No. 173-9, Ex. 9-Murry Ind. 30:9-31:3).

62. The *Johnson* case was dismissed with prejudice as a result of a settlement in which Pace

admitted no liability or wrongdoing. (*See Johnson* Docket Report, Ex. 28.)

**Plaintiffs' Response:**  Undisputed, except to the extent Defendants attempt to draw an inference

that because they admitted no liability or wrongdoing, that they engaged in no conduct

warranting liability or wrongdoing.

63. In 2015, Pace employee Fonn Moore made an internal complaint of discrimination after

she was terminated for having three preventable accidents in a 12-month time period.

(Gordon Deposition Exhibit 4, Ex. 29 at PACE002808-002810.)

**Plaintiffs' Response:**  Undisputed that, in 2015, Pace employee Fonn Moore made an internal

complaint of discrimination after she was terminated.  Otherwise, disputed.  The third alleged

preventable accident involved a car that side-swiped Moore's bus. (ECF No. 173-29, Ex. 29-

Moore Complaint File, p. 36).  Moore was driving on the highway on the left shoulder lane when

a car in the next lane abruptly encroached into the left shoulder (leaving Moore no place to avoid

contact) and made contact with Moore's bus.  (ECF No. 173-29, Ex. 29-Moore Complaint File,

p. 36).  The driver apologized to Moore, stating he was trying to see how far ahead the brake

lights were up ahead. (ECF No. 173-29, Ex. 29-Moore Complaint File, p. 36).

---

[4] This Court can take judicial notice of matters of public record from other proceedings.  Plaintiffs concede the letters referenced are not in the public record, but they were provided to or originated from Defendants (through its former counsel, Laner Muchin).  Plaintiffs submit consideration of them is appropriate to correct Defendants' misrepresentation of what it contends is a material fact which Defendants knew was demonstrably false.

64. In her internal complaint, Ms. Moore alleged that Murry fired her after she turned in FMLA paperwork related to her need for leave to care for her daughter, retaliated against her for declining to learn how to drive a downtown route, and refused to provide her training. (Gordon Deposition Exhibit 4, Ex. 29 at PACE002815.)

**Plaintiffs' Response:**  Undisputed, except to the extent to which Defendants seek an inference those were the *only* allegations in her internal complaint.  Moore alleged Defendants' conduct in wrongfully disciplining her was racially motivated.  (ECF No. 173-29, Ex. 29-Moore Complaint File, pp. 9-12).

65. In her internal complaint, Ms. Moore alleged that: (a) Mr. Caputo yelled at her in front of her coworkers while she was eating lunch and wrote her up for refusing to look at pictures of a vehicle accident (Gordon Deposition Exhibit 4, Ex. 24 at PACE002816); and (b) Mr. Klafeta accused her of lying, refused to listen to her and treated her rudely during meetings. (Gordon Deposition Exhibit 4, Ex. 24 at PACE002817.)

**Plaintiffs' Response:**  Undisputed, except to the extent to which Defendants seek an inference those were the *only* allegations in her internal complaint.  Moore alleged Defendants' conduct was racially motivated.  (ECF No. 173-29, Ex. 29-Moore Complaint File, pp. 9-12).

66. Pace terminated an Operator for incurring three and one-half Miss Outs in a rolling 12-month period; however, the Operator and Pace entered into a last chance agreement whereby the Operator was reinstated and agreed that if she incurred another Miss Out within the 12-month period, she would be terminated without recourse to the grievance arbitration process. (Confidential Personnel Records, Ex. 30, PACE004378-82.) Within four weeks thereafter, the Operator incurred another Miss Out and voluntarily resigned. (*Id.*, PACE004392.)

**Plaintiffs' Response:** Undisputed that Defendant Pace has records showing the facts it describes; but Plaintiffs dispute this fact is material because Defendants have not identified the race of the Confidential Employee (Clarissa Biddle). (ECF No. 173-30, Ex. 30-Confidential Records). Plaintiffs dispute any inference of the Confidential Employee's race, or any inference Defendants seek to draw about this situation in its favor.

67. A probationary Operator was not terminated after having an accident during training and failing to complete an accident report. (Murry Dep., Ex. 9, 92:16-96:8.) Safety and Training Manager Caputo was on the bus when the accident occurred and determined a formal report was not needed; Caputo's decision was not reviewed by Murry or anyone else at Pace. (*Id*.)

**Plaintiffs' Response:** Undisputed that a probationary Operator Michael Neilson, Jr. was not terminated after having an accident during training and failing to complete an accident report. Otherwise, disputed. Under Pace's rules, accidents during training was grounds for immediate termination. (ECF No. 173-17, Ex. 17-Marshall 97:11-99:15). Immediately after the crash, Caputo got off the bus and made a phone call, appearing very upset. (ECF No. 173-17, Ex. 17-Marshall 102:12-24). Murry testified that Neilson's accident during training should have been included in Neilson's accident record; it was not. (ECF No. 173-9, Ex. 9-Murry Ind. 92:22-93:12; Ex. 38, Neilsen Accident Record, p. PACE012223).

68. An Operator grieved the grading of an accident as preventable, resulting in the Union and Pace agreeing to send the investigation to Department Manager of Safety/Training Pappas, who changed the grading to not preventable. (Dines Dep., Ex. 14, 185:10-186:24.)

**Plaintiffs' Response:** Undisputed, but Plaintiffs dispute it is material because Defendants do not identify the Operator's race or the timeframe in which the events described occurred in relation

to Plaintiffs lawsuit. Plaintiffs also dispute any inference Defendants attempt to draw in their favor based on the facts described.

**H. Admissible Opinions of Plaintiffs' Experts**

69. Plaintiffs [sic] expert witness, Ann B. Plunkett, has offered two admissible opinions in this matter, as follows:

(i)    "The Defendant, Pace, failed to meet the threshold standards required by the FTA as detailed in the Pace Suburban Bus EEO Compliance Review Final Report dated April 2016."

(ii)   "Defendant Pace failed to make any efforts to identify, correct or remediate possible race discrimination after multiple allegations of race discrimination in disciplinary and termination decisions were made against Defendant Murry, in accordance with EEOC Enforcement Guidance."

(Plunkett Expert Report, Ex. 31.) DKT. 168 at 7.

**Plaintiffs' Response:**  Undisputed, except as to the any inference Defendant seeks to draw that Plunkett has offered *only* two admissible opinions in this matter.  Plunkett also opined that: (a) Defendant Pace failed to take care to prevent race discrimination in the workplace in accordance with EEOC Enforcement Guidance or in accordance with reasonable and customary Human Resources standards; and (b) failed to take care to prevent Defendant Murry from engaging in discriminatory conduct in handling discretionary disciplinary and termination decisions.  (ECF No. 173-31, Ex. 31-Plunket Rep. p. 6, ¶ 4 and p. 3, ¶ 1).[5]

70. Plaintiffs [sic] expert witness, Destiny Peery, has offered opinions in this matter, which are admissible to the extent that she can: "testify generally on the impact of bias and stereotyping on workplace disciplinary decisions, the types of policies that can foster bias

---

[5] Plaintiffs acknowledge this Court's order prohibiting Plunkett from testifying as to whether Defendant Pace exercised "reasonable care" (ECF No. 168, pp. 9-10); but Plaintiffs believe the fact is supported by opinions without reference whether the care was "reasonable."

and stereotyping, and whether such policies were in effect at Pace." DKT. 168 at 6 (Order

on Defendants' Motion to Exclude Plaintiffs' Experts).

**Plaintiffs' Response:**  Undisputed that Plaintiff's expert, Dr. Destiny Peery, has offered

opinions in this matter which are admissible consistent with the Court's order as quoted above;

otherwise disputed.  Defendants dispute Dr. Peery's opinions, claiming they are unreliable (but

Plaintiffs object to their reliance on their untimely rebuttal expert). (Ex. 75-Peery Report, pp. 5-

11; *see generally* Ex. 79-Blanton Rebuttal Report).[6]

<div style="margin-left:40%">

Respectfully submitted for Plaintiffs,

By:    /s/ J. Byran Wood

One of Plaintiffs' Attorneys

</div>

Attorneys for Plaintiffs:
J. Bryan Wood (No. 6270845)              Quinton Osborne (No. 6319417)
THE WOOD LAW OFFICE, LLC                  Osborne Employment Law LLC
303 W. Madison St., Ste. 2650             799 Roosevelt Road, Suite 3-201
Chicago, Illinois 60606                   Glen Ellyn, IL 60137
Telephone: (312) 554-8600                 Telephone:  (331) 702-1538
Facsimile: (312) 577-0749                 Facsimile:  (331) 465-0450
bryan@jbryanwoodlaw.com                   Quinton@OsborneEmploymentLaw.com

---

[6] Plaintiffs rely on this evidence from Defendants' proffered rebuttal experts for purposes of overcoming summary judgment subject to and without waiving their objections to Defendants' untimely and improper attempts to disclose them (specifically, the testimony and reports of Z. Wayne Johnson and Dr. Hart Blanton).  (*See generally* ECF No. 186.) Plaintiffs contend the Court can and should deny Defendants' motion for summary judgment without consideration of that improper evidence; however, should the Court consider it, Plaintiffs believe it highlights disputed material facts.

*Nelson et al. v. Pace Suburban Bus et al.*
U.S. D.C., N.D. Ill. 17-cv-7697
Plaintiffs' Additional Summary Judgment Exhibits

| No. | Exhibit Description |
|-----|---------------------|
| **33** | Rule 30(b)(6) Deposition of Margaret Murry (October 17, 2018) |
| **34** | Rule 30(b)(6) Deposition of Joshua Fedewa (October 16, 2018) |
| **35** | Email from Murry to Klafeta with Murry's 2017 Termination Spreadsheet (November 8, 2017) |
| **36** | Federal Transit Administration EEO Compliance Review (April 2016) |
| **37** | Email from Klafeta to Murry re Nelson & Marshall Fed Lawsuit (November 2, 2017) |
| **38** | Michael Neilson Notice of Personnel Action and Accident Incident Record (December 19, 2019) |
| **39** | Email from Klafeta to Murry Regarding Raymond Ulrich Suspension (April 1, 2016) |
| **40** | Raymond Ulrich Incident Report (March 28, 2016) |
| **41** | Email from Murry to Klafeta re Michael Rooney Suspension (August 2012) |
| **42** | Human Resources Data Terminated Employees 2011-2017 |
| **43** | Marshall Grievance Report (October 20, 2017) |
| **44** | Organization Chart reflecting Heritage Garage (Revised June 26, 2018) |
| **45** | Defendants' Answer and Affirmative Defenses to Second Amended Complaint (December 14, 2018) |
| **46** | Defendants' Amended Answers to Plaintiffs' First Set of Interrogatories (verified by Defendant Murry) |
| **47** | Excerpts from Professional Bus Operator Handbook |
| **48** | Accident Grading Policy in Memorandum from Division Manager Kommer (June 19, 1989) |
| **49** | Plaintiffs' Summary of Voluminous Job Title Evidence (Drivers Positions) |

| No. | Exhibit Description |
|---|---|
| 50 | David Sosa Accident Report (April 7, 2017) |
| 51 | David Sosa Accident Report (April 14, 2017) |
| 52 | Termination Letter from Murry to Nelson (October 25, 2016) |
| 53 | Nelson's Grievance regarding His Denial of Promotion to Full-Time Operator (August 17, 2015) |
| 54 | Notice of Personnel Action for Suspension of Nelson (May 19, 2015) |
| 55 | Notice of Personnel Action for Suspension of Nelson (July 12, 2016) |
| 56 | Notice of Personnel Action Suspending Nelson Pending Investigation (October 20, 2016) |
| 57 | Defendant Murry's from NOPA meeting for Nelson Suspension (October 20, 2016) |
| 58 | Email from Murry to Klafeta re her Suspension of Nelson (October 20, 2016) |
| 59 | Dines' Notes of Second Step Grievance Meeting of Nelson's Termination (November 16, 2016) |
| 60 | Dines' Meeting Notes for Ulrich, Delgado, Perry, Nash, Smith, Thurmond, Betts |
| 61 | Grievance Report for Nelson's Termination (October 27, 2016) |
| 62 | Termination Letter from Murry to Marshall (September 14, 2016) |
| 63 | Notes by Murry during Suspension Meeting for Marshall (September 12, 2016) |
| 64 | *INTENTIONALLY OMITTED* |
| 65 | Memorandum from Marshall to Pace regarding Inconsistent Training (July 7, 2017) |
| 66 | Notice of Personnel Action for Marshall due to First Preventable Accident (July 5, 2017) |
| 67 | Notice of Personnel Action Warning & Suspension of Marshall (July 28, 2017) |

36

| No. | Exhibit Description |
|:---:|:---|
| 68 | Grievance Report by Marshall re her Termination (October 20, 2017) |
| 69 | Termination Letter from Murry to Marshall (October 17, 2017) |
| 70 | Marshall's Accident/Incident Record (October 3, 2017) |
| 71 | Deposition of Z. Wayne Johnson (June 2, 2022) |
| 72 | Rebuttal Expert Report of Z. Wayne Johnson (April 26, 2022) |
| 73 | EEO Utilization Analysis Report (September 2016) |
| 74 | Performance Evaluation of Margaret Murry (January 2017) |
| 75 | Expert Report of Dr. Destiny Peery (March 8, 2021) |
| 76 | Rule 30(b)(6) Deposition of Collette Thomas Gordon (February 4, 2019) |
| 77 | Pace Equal Employment Opportunity Program 2016-2019 |
| 78 | Pace Equal Employment Opportunity Program 2013-2016 |
| 79 | Rebuttal Expert Report of Hart Blanton (April 22, 2022) |
| 80 | *Johnson, et al. v Pace, et al.*, Case No. 09-cv-80 N.D. Ill. – ECF No. 18, Agreed Motion to Stay and Extend Discovery (February 3, 2010) |
| 81 | Laner Muchin Letter to Wood Law re Supplemental Production to Defendants' Initial Disclosures (August 11, 2009) |
| 82 | Wood Law Letter to Laner Muchin Law Firm re *Johnson* Discovery (December 11, 2009) |
| 83 | Personnel File of Fonn Moore (Excerpts) |
| 84 | Dispatch Supervisor Work Records |
| 85 | EEOC Charge of Discrimination filed by Nelson (April 17, 2017) |
| 86 | EEOC Charge of Discrimination filed by Marshall (April 17, 2017, and Amended February 7, 2018) |
| 87 | IDHR Materials |

Case: 1:17-cv-07697 Document #: 191 Filed: 08/25/22 Page 38 of 38 PageID #:4117

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 25, 2022, a copy of the foregoing Plaintiffs' Local Rule 56.1(B)(2) Response to Defendants' Local Rule 56.1(b)(1) Statement of Facts was served upon all counsel of record via the Court's electronic filing system.

Respectfully submitted

/s/ J. Bryan Wood