Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE NELSON AND CHRISTI MARSHALL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 17-cv-7697 |
| | ) | |
| PACE SUBURBAN BUS AND MARGARET | ) | Judge John Z. Lee |
| MURRY, in her individual capacity and in her | ) | |
| official capacity of Division Manager of Pace | ) | |
| Suburban Bus – Heritage Division | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
<u>DEFENDANTS' MOTIONF OR SUMMARY JUDGMENT</u>**

<u>Attorneys for Plaintiffs:</u>
J. Bryan Wood (ARDC # 6270845)
The Wood Law Office, LLC
303 W. Madison St., Suite 2650
Chicago, IL 60606
Office: 312-554-8600
bryan@jbryanwoodlaw.com

Quinton Osborne
Osborne Employment Law
799 Roosevelt Road, Suite 3-201
Glen Ellyn, IL 60137
(331) 702-1538 Phone
(331) 465-0450 Fax
quinton@osborneemploymentlaw.com

# TABLE OF CONTENTS

**Section / Heading**                                                                                    **Page**

**Table of Contents** ...................................................................................................................i

**Table of Authorities** ........................................................................................................... iii

**Introduction** ........................................................................................................................1

**Argument** ............................................................................................................................4

  **I.  Defendants' Memorandum Misstates Legal Standards
This Court Should Apply.** ...........................................................................................4

    A.  Defendants Mischaracterize Plaintiffs' Claims................................................................4

    B.  Plaintiffs Need Only Address Arguments Defendants Raise............................................6

    C.  Defendants Misstate Legal Standards Applicable To Plaintiffs' Claims..........................6

    D.  Defendants Mischaracterize Rule 56 Standards...............................................................7

  **II.  Defendants Have Not Established They Must Prevail As A Matter Of
Law On Plaintiffs Unintentional Discrimination Claims.** ...........................................8

    A.  Plaintiffs' Evidence Raises Fact Questions About Whether
Defendants' Practice Of Discretionary Discipline Caused A
Disparate Impact Under Title VII. ..................................................................................8

      1.  Title VII permits disparate impact challenges to
discretionary decisionmaking. ...................................................................................8

      2.  Disputed facts exist over whether the challenged practice
caused the disparities. ..............................................................................................10

    B.  Defendants Waived The Title VII Statutory Affirmative Defense It Asserts. ...............14

    C.  Plaintiffs Can Prevail On Their ICRA Unintentional Discrimination Claims. ..............16

  **III. Defendants Have Not Established They Must Prevail As A Matter Of
Law On Plaintiffs' Intentional Discrimination Claims.** .............................................17

    A.  Defendants Reasons For Plaintiffs' Treatment Are Not Supported By Evidence A
Jury Is Required To Believe. ........................................................................................19

    B.  A Jury Could Find Defendants' Treatment Of Marshall Was Discriminatory. ..............20

      1.  Defendants' explanation for Marshall's first termination was not credible. ............20

2.  Defendants treated others outside the protected class more favorably. ....................21

3.  Ample circumstantial evidence points towards discriminatory motive. ..................24

4.  A jury could find Marshall's subsequent disciplinary actions and termination would not have occurred if she were Caucasian. ......................................................24

C.  A Jury Could Find Defendants' Treatment Of Nelson Was Discriminatory. .................26

D.  Defendants Misapply The *McDonnell Douglas* Framework, Under Which Plaintiffs' Claims Also Should Proceed To Trial. ..........................................................28

1.  Plaintiffs can satisfy the proper *prima facie* elements of *McDonnell Douglas*. ........28

2.  Plaintiffs provide evidence Defendants' stated reasons were pretextual. .................29

E.  Plaintiffs Raise Questions About Whether A Pattern Or Practice Existed. ...................31

IV. Defendants' Only Argument Regarding Plaintiffs' IHRA Unintentional Discrimination Claims Is Unsupported By Evidence Or Law; Accordingly, Those Claims Must Proceed To Trial. ......................................................32

A.  Defendants Waived Their "Failure To Exhaust" Affirmative Defense. ........................33

B.  Evidence Shows Plaintiffs Exhausted IHRA Administrative Remedies. .......................34

C.  Dismissal For Failure To Exhaust Must Be Without Prejudice, Allowing Cure. ..................................................................................................................35

Conclusion ....................................................................................................................................35

## Table of Authorities

**Cases**                                                                                              **Pages**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................... 8
*Anfeldt v. United Parcel Serv., Inc.*,
  No. 15 C 10401, 2016 WL 1056670 (N.D. Ill. Mar. 17, 2016) ............................. 13
*Bellaver v. Quanex Corp.*,
  200 F.3d 485 (7th Cir. 2000) ................................................................................. 8
*Bland v. Edward D. Jones & Co., L.P.,* ,
  2020 WL 7027595 (N.D. Ill. Nov. 30, 2020) ....................................................... 13
*Celotex Corp v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 8
*Chaidez v. Ford Motor Co.*,
  937 F.3d 998 (7th Cir. 2019) ............................................................................... 13
*Coates v. Johnson & Johnson*,
  756 F.2d 524 (7th Cir. 1985) ......................................................................... 10, 13
*Coleman v. Donahoe*,
  667 F.3d 835 (7th Cir. 2012) ......................................................................... 24, 25
*Curry v. Menard, Inc.*,
  270 F.3d 473 (7th Cir. 2001) ............................................................................... 29
*Davis v. Fort Bend Cnty.*,
  893 F.3d 300 (5th Cir. 2018) ............................................................................... 35
*Doe v. R.R. Donnelley & Sons Co.*,
  42 F.3d 439 (7th Cir. 1994) ................................................................................... 8
*Dothard v. Rawlinson*,
  433 U.S. 321 (1977) ............................................................................................. 13
*E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*,
  38 F.3d 872 (7th Cir. 1994) ..................................................................... 12, 14, 32
*Franklin v. City of Evanston*,
  384 F.3d 838 (7th Cir. 2004) ................................................................................. 7
*Hackett v. City of S. Bend*,
  956 F.3d 504 (7th Cir. 2020) ................................................................................. 9
*Harris v. Sec'y, U.S, Dep't of Veterans,*
  *Affs.*, 126 F.3d 339 (D.C. Cir. 1997) .................................................................... 35
*Hasan v. Foley & Lardner LLP*,
  552 F.3d 520 (7th Cir. 2008) ............................................................................... 20
*Hobgood v. Illinois Gaming Bd.*,
  731 F.3d 635 (7th Cir. 2013) ............................................................................... 22
*Int'l Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977) ............................................................................................. 33
*Jones v. Mukasey*,
  565 F. Supp. 2d 68 (D.D.C. 2008) ...................................................................... 35
*Lau v Abbott,*
  *Lab'ys*, 2019 IL App (2d) 180456, ¶¶ 39 ...................................................... 18, 19

*Lewis v. City of Chicago, Ill.*,
  560 U.S. 205 (2010) .................................................................................................. 9, 15
*Luster v. Ill. Dep't of Corr.*,
  652 F.3d 726 (7th Cir. 2011)................................................................................. 18
*Malhotra v. Cotter & Co.*,
  885 F.2d 1305 (7th Cir. 1989)................................................................................ 7
*Martin v. F.E. Moran, Inc.*,
  2017 WL 1316255 (N.D. Ill. Apr. 10, 2017) .................................................... 34
*Mattenson v. Baxter Healthcare Corp.*,
  438 F.3d 763 (7th Cir. 2006)................................................................................ 20
*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) .............................................................................................. 31
*McHale v. McDonough*,
  41 F.4th 866 (7th Cir. 2022).................................................................................. 36
*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012)................................................................................. 9
*Morris v. BNSF Ry. Co.*,
  969 F.3d 753 (7th Cir. 2020)........................................................... 18, 19, 24, 32
*Mozee v. Am. Com. Marine Serv. Co.*,
  940 F.2d 1036 (7th Cir. 1991).............................................................................. 10
*Mozee v. Jeffboat, Inc.*,
  746 F.2d 365 (7th Cir. 1984)........................................................................... 19, 20
*Nelson v. Pace Suburban Bus*,
  No. 17 C 7697, 2020 WL 6565241 (N.D. Ill. Nov. 9, 2020) .................................. 9
*Oest v. Ill. Dep't of Corr.*,
  240 F.3d 605 (7th Cir. 2001)................................................................................ 29
*Ortiz v. Werner Enterprises, Inc.*,
  834 F.3d 760 (7th Cir. 2016).................................................................... 19, 20, 27
*Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*,
  464 F.3d 659 (7th Cir. 2006)................................................................................ 20
*Reed v. Columbia St. Mary's Hosp.*,
  915 F.3d 473 (7th Cir. 2019)................................................................................ 16
*Reeder-Baker v. Lincoln Nat. Corp.*,
  649 F. Supp. 647 (N.D. Ind. 1986)...................................................................... 21
*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ................................................................. 8, 21, 22, 31
*Rodgers v. White*,
  657 F.3d 511 (7th Cir. 2011)................................................................................ 30
*Salas v. Wisconsin Dep't of Corr.*,
  493 F.3d 913 (7th Cir. 2007)................................................................................ 34
*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011) .............................................................................................. 32
*Sublett v. John Wiley & Sons, Inc.*,
  463 F.3d 731 (7th Cir. 2006)................................................................................. 7
*Teal v. Potter*,
  559 F.3d 687 (7th Cir. 2009) ( ............................................................................ 36

*Troupe v. May Dep't Stores Co.*,
    20 F.3d 734 (7th Cir. 1994) .............................................................................. 20
*Vega v. Chicago Park District*,
    954 F.3d 996 (7th Cir. 2020) ..................................................................... passim
*Vitug v. Multistate Tax Comm'n*,
    88 F.3d 506 (7th Cir. 1996) .............................................................................. 12
*Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*,
    410 F.3d 387 (7th Cir. 2005) .............................................................................. 8
*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................... 10
*Wards Cove Packing Co. v. Antonio*,
    490 U.S. 642 (1989) ......................................................................................... 12
*Watson v. Fort Worth Bank & Tr.*
    487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) ............................ 10, 12
*Wright v. West*,
    505 U.S. 277 (1992) ......................................................................................... 22
*Yatvin v. Madison Metro. Sch. Dist.*,
    840 F.2d 412 (7th Cir. 1988) ............................................................................ 20

## Statutes

42 U.S.C. § 1981 ................................................................................................ 5, 7
42 U.S.C. § 1983 .................................................................................................... 6
42 U.S.C. § 2000e-2(k) ............................................................................ 5, 6, 11, 15
740 Ill. Comp. Stat. Ann. 23/1 ............................................................................... 6
740 Ill. Comp. Stat. Ann. 23/5 .......................................................................... 6, 17
775 Ill. Comp. Stat. Ann. 5/1-101 .......................................................................... 6
775 Ill. Comp. Stat. Ann. 5/2-102(A) ..................................................................... 6

## Regulations

29 C.F.R. § 1607.4(d) ........................................................................................... 14

## Other Authorities

Seventh Circuit Pattern Instruction 1.13 ................................................................ 21

In opposition to Defendants' motion for summary judgment on Plaintiffs' claims (ECF No. 172) and Defendants' memorandum of law supporting its motion (ECF No. 180), Plaintiffs Maurice Nelson and Christi Marshall – by and through their attorneys, The Wood Law Office, LLC and Osborne Employment Law – state as follows:[1]

## <u>INTRODUCTION</u>

Defendants' motion and supporting materials fail to describe the evidence in light most favorable to Plaintiffs. Defendants' conflicting records show that over six years (2012-2017), Murry never terminated a non-probationary Caucasian employee, but terminated over 20 African Americans (and additional minorities). (ASOF ¶¶ 35.) That was Murry's pattern *after* she had been sued for race discrimination – a pattern the African American supervisors who worked with her knew well. (ASOF ¶¶ 34-35, 40-43, 45, 77.) Defendants' Dispatch Supervisors warned Plaintiff Nelson to watch out because Defendant Murry was coming after him because he was African American; one told Plaintiff Marshall that Caputo – who saw Marshall as a "problem" he was "going to take care of" – had "lied on" Plaintiff Nelson and another African American driver. (ASOF ¶¶ 57, 71.) Consistent with that pattern, Defendant Murry disciplined Plaintiffs more harshly than Caucasians, eventually terminating them. (ASOF ¶¶ 58, 64, 76, 105-118.)

Without meaningful oversight, Defendant Murry applied discretionary standards in a shifting way, resulting in a pattern even she concedes a jury could infer was discriminatory. (ASOF ¶¶ 28-37.) Defendant Murry admits the way she administered Pace's disciplinary system had the same effect as someone intentionally discriminating against African Americans:

Q. … Is it  -- is it correct that the criteria and methods you used to administer Pace's disciplinary system had the same effect as someone who would have been

---

[1]  Plaintiffs refer the their Local Rule 56.1(b)(2) response to Defendants' statement of facts as "RSOF ¶¶ ___" and their additional statement of facts as "ASOF ¶¶ ___."

intentionally discriminating against individuals based on their race? [Objections Omitted]

A. It could be.

Q. That would be a reasonable inference based on the spreadsheet [of terminated employees] you prepared, Pace 95829? [Objection omitted]

A. Correct.

(ASOF ¶ 36.)

Unsurprisingly, given the persistence of stereotypes against African Americans and potential for bias in subjective, discretionary decision making like that in which Defendants engaged, disparities in rates of disciplinary action and terminations existed. (ASOF ¶¶ 29-35, 96-99.) As each stage of Defendants' progressive disciplinary process, African Americans fared worse and worse:

| Disciplinary Action | Caucasians | African Americans |
|---|---|---|
| Percentage of Drivers | 27.27% | 65.07% |
| Written Warnings | 26.86% | 62.96% |
| Suspensions | 20.09% | 73.36% |
| Multi-Day Suspensions | 16.66% | 79.17% |
| Terminations | 3.85% | 92.31% |

(ASOF ¶¶ 97-99, 28-37, 33, 102.)

Contrary to Defendant Pace's obligations as an affirmative action employer, it did not analyze terminations or disciplinary actions for adverse impact (or even collect data about disciplinary actions). (ASOF ¶¶ 95.) In fact, Defendant Murry testified that Defendant Pace's EEO Program had no bearing whatsoever on discipline or termination she administered. (ASOF ¶¶ 81.) Evidencing Defendants' careless disregard of African Americans' rights to equal treatment, Defendant Murry's managers never inquired whether the disciplinary actions were, in fact, discriminating against African Americans after repeated allegations. (ASOF ¶¶ 88-95.)

Plaintiffs Nelson and Marshall were victims of Defendants' discriminatory pattern. (ASOF ¶¶ 38-76.) Defendants accused both of having "accidents" they did not know about – but, consistent with the age-old stereotype that African Americans are untrustworthy – assumed Plaintiffs were lying when they denied knowing about the accidents. (ASOF ¶¶ 50-51, 65.) Defendant Murry's supervisor, Regional Manager Mark Klafeta, approved Plaintiff Marshall's first termination for that very reason, despite admitting the circumstances underlying it – in his words – "makes no sense." (ASOF ¶¶ 68, RSOF ¶¶ 31.) Unsurprisingly, an arbitrator reversed that decision – finding Plaintiff Marshall did not, in fact, know about the purported "accident" for which she was terminated. (ASOF ¶¶ 67, RSOF ¶¶ 32.)

A jury in this case could make the same determination for Plaintiff Nelson. That is particularly true given the innumerable examples of non-African American drivers being disciplined less harshly for conduct of comparable seriousness. (ASOF ¶¶ 105-118.) Defendants terminated Plaintiff Nelson for failing to immediately report an "accident" inside Defendant's garage that was so minor, Defendants' own witness could not identify where buses touched from his own photographs. (ASOF ¶¶ 55, RSOF ¶¶ 24.) In contrast, other drivers were not terminated when they failed to immediately report striking a pedestrian or an incident requiring police involvement, or engaged in other conduct Murry claimed warranted immediate termination. (ASOF ¶¶ 107-117 , RSOF ¶¶ 45, 49, 51, 67 .)

Defendant Murry's and others' inconsistent testimony, along with substantial deviations from stated policies, is just some of the evidence a jury could rely on to find the purported reasons for Plaintiff Marshall's *second* termination (three purportedly preventable accidents within a 12-month period) were pretextual. Disputed facts about those allegedly "preventable" accidents abound. (ASOF ¶¶ 72-76, RSOF ¶¶ 33-37.)

Indeed, given numerous disputed facts, examples of other non-African Americans being treated more leniently for similar alleged misconduct, Defendants' essential abandonment of its EEO Program as it related to discipline, and the overall environment Plaintiffs described existing at the Heritage Garage, a factfinder could readily conclude Defendants engaged in unlawful intentional discrimination and unintentional discrimination. Holding Plaintiffs could not as a matter of law, on this record, would require weighing evidence, crediting evidence a factfinder could reject, and drawing inferences against Plaintiffs, none of which this Court can do at this stage of proceedings. Accordingly, Defendants' motion should be denied as to all counts.

## ARGUMENT

### I. Defendants' Memorandum Misstates Legal Standards This Court Should Apply.

#### A. Defendants Mischaracterize Plaintiffs' Claims.

Counts I and II of Plaintiffs' Second Amended Complaint (ECF No. 69) allege Defendants violated Section 1981 of The Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), which prohibits employers from subjecting employees to discrimination with respect to terms, conditions, benefits, or privileges of employment based on race or color. In short, Count I challenges Plaintiffs' disciplinary actions and Count II challenges Plaintiffs' terminations. Section 1981(c) expressly prohibits discrimination by individuals done "under color of State law," making the claim against Defendant Murry appropriate.

Counts III and IV allege Defendant Pace violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), which makes it an unlawful employment practice to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1) and 2000e-2(m). Count III challenges Plaintiffs'

disciplinary actions and Count IV challenges Plaintiffs' terminations, both of which Plaintiffs contend resulted from intentional *and* unintentional discrimination. Under Title VII "unintentional" discrimination occurs when an employment practice causes a "disparate impact." 42 U.S.C.A. § 2000e-2(k)(1).

Count V alleges Defendants violated the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection") and Sections 1981, 1985, and/or 1986 of the Civil Rights of 1866 through 42 U.S.C. § 1983 ("Section 1983"), which prohibits individuals acting under color of State law from denying employees equal treatment on the basis of race or color.

Counts VI and VII allege Defendant Pace violated the Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/1-101 *et seq.* ("IHRA"), which prohibits employers from denying employees equal employment opportunities with respect to terms, conditions, benefits, or privileges of employment based on their race or color and from terminating employment based on race or color. 775 Ill. Comp. Stat. Ann. 5/2-102(A). Count VI challenges Plaintiffs' disciplinary actions and Count VII challenges Plaintiffs' terminations. As with Title VII, Plaintiffs challenge both discipline and terminations as unlawful intentional and unintentional discrimination.

Count VIII alleges Defendant Pace violated the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. Ann. 23/1 *et seq.* ("Illinois Civil Rights Act"), which prohibits any unit of Illinois government from: "(1) … subject[ing] a person to discrimination under any program or activity on the grounds of that person's race…; or (2) utilize[ing] criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race…" 740 Ill. Comp. Stat. Ann. 23/5(a). Plaintiffs assert claims under both provisions.

### B. Plaintiffs Need Only Address Arguments Defendants Raise.

At this stage, Plaintiffs need not prove their claims. Rather, Plaintiffs need only address arguments in Defendants' memorandum – not every possible defense Defendants could have raised. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision"). As noted below, Defendants' flawed arguments fail to establish they are entitled to judgment on any of Plaintiffs' claims.

### C. Defendants Misstate Legal Standards Applicable To Plaintiffs' Claims.

Defendants' memorandum is riddled with misstatements about legal standards applicable to Plaintiffs' claims. For example, in arguing for summary judgment on Plaintiffs' "disparate impact" claims (ECF No. 180, p. 5), Defendants invoke Section 1981 even though unintentional discrimination is not actionable under Section 1981. *See Franklin v. City of Evanston*, 384 F.3d 838, 848 (7th Cir. 2004) ("§ 1981 claims, require a showing of discriminatory treatment and cannot be supported by proof of disparate impact"). Similarly, in arguing causation on Plaintiffs' "disparate impact" claims (ECF No. 180, p. 8), Defendants cite authority addressing intentional discrimination standards, including "pretext" – evidence that rebuts a legitimate non-discriminatory reason proffered under the *McDonnell Douglas* burden-shifting framework. Given Defendants' sloppiness, the Court should be leery of Defendants' arguments, and evaluate Plaintiffs' claims under legal standards that would apply to them at trial.

### D. Defendants Mischaracterize Rule 56 Standards.

Defendants also misstate and misapply Rule 56 procedural standards. Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact *and* the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Defendants cannot merely claim no evidence exists. Rather, **"[t]he burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case."** *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994) (noting "added scrutiny" applied in discrimination cases because "intent and credibility" are involved) (*citing Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986)) (emphasis added).

The Court **"must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."** *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492–93 (7th Cir. 2000) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (emphasis added). The Court's "role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe*, 42 F.3d at 443 (*citing Anderson*, 477 U.S. at 249).

As the Supreme Court explained, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge; thus, **although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."** *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000) (emphasis added).

All evidence must be considered in determining what inferences that can be drawn, not just any one piece or part of it. *See Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*, 410 F.3d 387,

394 (7th Cir. 2005) ("The key consideration is the totality of these 'pieces of evidence [,] none conclusive in itself'"). As the Seventh Circuit recently explained, "[i]n fact-intensive cases, credibility traps abound, and courts must be alert to avoid them." *Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020) (employment discrimination case under USERRA).[2]

## II. Defendants Have Not Established They Must Prevail As A Matter Of Law On Plaintiffs' Unintentional Discrimination Claims.

Like its arguments on other claims, Defendants' arguments regarding Plaintiffs' disparate impact claims apply incorrect legal standards, asserts a defense it waived, and ignore disputed material facts which should be resolved at trial.

### A. Plaintiffs' Evidence Raises Fact Questions About Whether Defendants' Practice Of Discretionary Discipline Caused A Disparate Impact Under Title VII.

As Title VII clearly states and the Supreme Court has explained, "a plaintiff establishes a prima facie disparate-impact claim by showing that the employer 'uses a particular employment practice that causes a disparate impact' on one of the prohibited bases." *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 212 (2010) (quoting Section 2000e2(k)(1)(A)(i)). None of Defendants' arguments establish they *must* prevail on Plaintiffs' Title VII disparate impact claims.

1. Title VII permits disparate impact challenges to discretionary decisionmaking.

Title VII does not define "employment practice." *Lewis*, 560 U.S. at 212. Defendants acknowledge Plaintiffs challenge discretionary decision-making in Defendants' disciplinary

---

[2] The Court's decision denying class certification described certain facts as "undisputed unless otherwise noted." *See Nelson v. Pace Suburban Bus*, No. 17 C 7697, 2020 WL 6565241, at *1 (N.D. Ill. Nov. 9, 2020). Under authority governing Rule 23 motions, the Court was obligated to resolve disputed facts before ruling. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("If there are material factual disputes, the court must receive evidence ... and resolve the disputes before deciding whether to certify the class") (internal quotation omitted). Here, however, the Court must interpret all the evidence in light most favorable to Plaintiffs, as a jury might. Thus, the Court cannot weigh and interpret ambiguous evidence against Plaintiff, such as Defendant Murry's admissions. *See Nelson*, *7, n. 2.

process, which Defendant Murry admittedly used.  (ECF No. 180, p. 6.)  But Defendants argue Plaintiffs cannot prevail because they failed to identify "a specific employment policy or practice" that caused a disparate impact.  (ECF No. 180, p. 6).  But Defendants ignore Supreme Court and statutory authority that permit Plaintiffs to challenge Defendants' subjective decision-making process.

As the Supreme Court explained in *Watson v. Fort Worth Bank & Tr.*:

disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices.

487 U.S. 977, 990 (1988).  The Supreme Court recognized use of the theory as important to end barriers to equal opportunity, explaining:

even if one assumed that any such discrimination can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain.

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. at 990.

Controlling Seventh Circuit authority which Defendants cite confirms that "basing a disparate impact claim on subjective employment practices was expressly accepted by the Supreme Court in *Watson.*"  *Mozee v. Am. Com. Marine Serv. Co.*, 940 F.2d 1036, 1042 (7th Cir. 1991), *opinion supplemented on denial of reh'g,* 963 F.2d 929 (7th Cir. 1992) (evaluating results of trial on disparate impact claims) (citation omitted). (ECF 180, p. 7.)[3]

Nothing about Title VII's codification of the disparate impact theory in 1991 changed the Court's holding in *Watson*.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011)

---

[3] Defendants rely heavily on *Mozee,* as well as *Coates v. Johnson & Johnson*, 756 F.2d 524, 544 (7th Cir. 1985).  Neither of those cases involved summary judgment; both involved bench trials before Title VII was amended through the Civil Rights Act of 1991.  Importantly, as Defendants note, *Coates* explains disciplinary systems cannot be "administered in a way that … has a disparate impact on a definable group." (ECF No. 180, p. 11.)

(affirming that "giving discretion to lower-level supervisors [like store managers] can be the basis of Title VII liability under a disparate impact theory"). In fact, Title VII now expressly permits challenges to decisionmaking process in situations like this one, where elements of it are not well-documented or separable. *See* 42 U.S.C. 2000e-2(k)(1)(B)(i) (eliminating the need to identify "specific employment practice" and stating that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

Defendants fault Plaintiffs for not isolating things for further analysis, but Defendants themselves were required to keep and analyze disciplinary actions for disparate impact by race as part of their compliance with FTA EEO expectations and could not (or did not) do so. (ASOF ¶¶ 94-95.) Those facts provide evidence to conclude Defendants' subjective decisionmaking process was not capable of separation for analysis. Indeed, drawing all inferences in Plaintiffs favor from those facts and others (*e.g.,* Defendants' poor recordkeeping and admissions from Murry and Klafeta that Defendants' policies were frequently violated without disciplinary action), Plaintiffs' evidence shows Defendant Murry's discretionary decisionmaking – *i.e.,* how and when she chose to enforce Defendants' rules and the punishment she recommended – is an employment practice Plaintiffs can challenge. (ASOF, ¶¶ 77-80, 38-76, 94-95, 105-118.)

2. <u>Disputed facts exist over whether the challenged practice caused disparities.</u>

As noted above, Defendants disciplinary process resulted in significantly worse outcomes for African Americans than Caucasians. (ASOF ¶¶ 28-37.) Plaintiffs describe the disparities above, showing African Americans fare worse at each stage of Defendants' progressive discipline process. (ASOF ¶¶ 33.) African Americans were disproportionately more likely to be suspended than their white counterparts and *only* African Americans receive suspensions over 3 days. (ASOF

¶¶ 28-37.)  But the full picture is worse.  Between 2012 and 2017 (six years), Defendants never terminated a non-probationary Caucasian driver for violating Pace's policies but at least 20 African Americans were terminated during that span. (ASOF ¶¶ 35.)

The fact that no Caucasians were terminated for so long, and only African Americans received suspensions over three days are statistics akin to the "inexorable zero" the Supreme Court and this Circuit have held sufficient to infer *intentional* discrimination and unintentional discrimination.  *See E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 877–879, n.9 (7th Cir. 1994) (noting "even use of the most forgiving variables" could not account for failure to hire *any* African Americans, and holding that evidence was sufficient to infer *intentional* discrimination and a pattern-or-practice of discrimination).[4]

Based on that evidence, a factfinder could conclude "the subjective and arbitrary [disciplinary] procedure … has a disproportionately negative effect" on African Americans, which is all they must show.  *See Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513–14 (7th Cir. 1996) (affirming summary judgment for employer regarding disparate impact in promotions of Asians, but only because plaintiffs provided no evidence of comparisons of promotion rates of Asians at defendant's workplace to representation of Asians in the workforce).

Here, Plaintiffs provide comparisons of rates in disciplinary action and terminations. Defendants cite no facts refuting the disparity or showing that analyzing it differently by considering what other variables would eliminate it.  (ECF No. 180, p. 5, 7.)  Nor was such evidence ever proffered in discovery.  Plaintiffs inquired about potential alternative causes or

---

[4]  The district court in *O&G Spring and Wire* also found the "inexorable zero" sufficient to support a *prima facie* case of disparate impact, but reconsidered that decision in light of the Supreme Court's decision in *Wards Cove  Packing Co. v. Antonio*, 490 U.S. 642 (1989), which the 1991 Civil Rights Act was enacted to overrule.  *See O & G Spring and Wire,* 38 F.3d at 875 (noting impact of *Ward's Cove* and "business necessity" defense prior to 1991 amendments to Title VII).

factors that might explain the disparity, but Defendants offered none. Defendants simply contended no disparities existed. (ASOF ¶¶ 102).

Now, Defendants claim Plaintiffs failed to rule out other *possible* causes using statistical analysis. (ECF No. 180, p. 7.) But as the Supreme Court explained, "[o]ur formulations … have never been framed in terms of any rigid mathematical formula" but instead emphasized disproportionate treatment sufficient to infer causation, such as "'disqualifying substantially disproportionate numbers of blacks.'" *Watson*, 487 U.S. at 994–95 (collecting cases, and quoting *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977)).

Thus, contrary to Defendants' claims, more robust statistical analysis is not required; rather, "[d]isparate-impact plaintiffs are permitted to rely on a variety of statistical methods *and comparisons* to support their claims." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1007 (7th Cir. 2019) (emphasis added); *see also Anfeldt v. United Parcel Serv., Inc.*, No. 15 C 10401, 2016 WL 1056670, at *2 (N.D. Ill. Mar. 17, 2016). Plaintiffs can demonstrate "an employment policy's disproportionate effect with percentages, statistics, or data" or, alternatively, "rely on a variety of statistical methods and comparisons to support her claims." *See, e.g., Bland v. Edward D. Jones & Co., L.P.*, 18-CV-03673, 2020 WL 7027595, at *15 (N.D. Ill. Nov. 30, 2020). No one method is required, and Plaintiffs need not account for every potential explanation for the disparity. *See Coates*, 756 F.2d at 544 ("plaintiffs need not account for a potentially biased factor in establishing their prima facie case").

Here, Plaintiffs comparisons akin to the "inexorable zero" (i.e., complete absence of Caucasians terminated or suspended when compared to African Americans) proves the disparity. Defendants' criticisms of Plaintiffs' evidence inappropriately ask this Court to weigh evidence and draw inferences against Plaintiffs, which this Court cannot do at this stage, nor should it given

12

Defendant Murry's admissions there are no reasons the policies should apply differently to African Americans. (ASOF ¶¶ 36.)[5]

As to causation (i.e., whether Defendants' use of the practice caused the disparity), it is axiomatic that but for Defendants' decisionmaking in that process, no disparity would exist. The virtual absence of negative treatment of Caucasians is sufficient to infer causation, not only for Plaintiffs unintentional claims but also their intentional discrimination claims. *See, O&G Spring and Wire*, 38 F.3d at 878. Consistent with how the Supreme Court has acknowledged subjective decisionmaking can be influenced by stereotypes and bias, Plaintiffs have offered evidence from experts about how discretionary standards like those applied in this case allowed unintentional discrimination to occur (*e.g.*, through discretionary policies, shifting criteria or specific biases, and Pace's utter failure to monitor that discretionary decisionmaking to reduce bias, even after allegations about it were raised repeatedly). (ASOF ¶¶ 96- 99.) Plaintiffs also offer evidence that more structured processes – which included Human Resources oversight which were measured under Pace's EEO Program – did not create employment barriers for African Americans. (ASOF ¶¶ 81-95.)

Taken as a whole, Plaintiffs' evidence raises material fact questions about whether Defendants' use of the challenged practice caused the disparities they report, satisfying Plaintiffs' *prima facie* case for disparate impact under Title VII. That claim should proceed to trial.

---

[5] Defendants attempted reliance on the "80% rule of thumb" is misguided in two respects. (ECF No. 180, p.9, n.1.) First, that rule of thumb was derived for selection (i.e., hire and promotion), which involves candidates being chosen from a pool of applicants for a *positive* employment outcome, not a negative one like discipline. Second, Defendants lump all non-African Americans into one category, and compare African Americans to them, contrary to how the "rule of thumb" should apply. *See* 29 C.F.R. § 1607.4(d) (requiring comparison of selection rate for a race group to "the rate for the group with the highest rate").

**B. Defendants Waived The Title VII Statutory Affirmative Defense It Asserts.**

Defendants devote much of the opposition to arguing their disciplinary actions were "job related and consistent with business necessity" or that Plaintiff failed to offer evidence of a "less discriminatory" alternative. (ECF No. 180, pp. 10-13.) But Defendants waived that statutory defense by failing to assert it prior to their motion for summary judgment.

Title VII makes clear Defendants can defeat a disparate impact claim by proving Plaintiffs' "challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). But the Supreme Court has clearly explained Defendants have an obligation to plead that two-pronged affirmative defense: "[u]nless and until the defendant *pleads* and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements." *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 213, 130 S. Ct. 2191, 2198, 176 L. Ed. 2d 967 (2010) (emphasis added).

Here, Defendants never "plead" the statutory affirmative defense to Plaintiffs disparate impact claims. (ASOF ¶¶ 100, 101.) Hoping to clarify that issue, Plaintiffs reminded Defendants they "failed to allege any affirmative defenses to Plaintiffs' unintentional discrimination claims" or "disparate impact claims in their Answer" early in the litigation; in response, Defendants did not refute Plaintiffs' contention. (ECF No. 37, pp. 1-3; ECF No. 40.) Subsequently, when Defendants answered Plaintiffs' amended complaint, Defendants *again* failed to assert the affirmative defense. (ASOF ¶¶ 100, 101.) Defendants could have explained facts in support of its defense in responding to Plaintiffs' interrogatory about causation, but – as noted above – Defendants offered no facts (it claimed only disparities existed). (ASOF ¶¶ 102.)[6]

---

[6] Nor did Defendants contest waiver or seek leave to amend its defenses when Plaintiffs pointed out their waiver in briefing class certification. (ECF No 110, p. 21; ECF No. 126; ECF No. 133.)

Defendants' conduct throughout the litigation made clear it waived the defense. Plaintiffs have been prejudiced by Defendants' assertion of it now. Had Plaintiffs known Defendants intended to assert this statutory defense to disparate impact claims, they would have sought and developed different evidence during discovery.

Employers are not permitted to sandbag plaintiffs by raising statutory affirmative defenses for the first time after discovery at summary judgment; the Seventh Circuit has held permitting that conduct was an abuse of discretion. *See Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482–8 (7th Cir. 2019) (explaining it was abuse of discretion for district court to consider statutory affirmative defense – there, a religious exemption under the Rehabilitation Act – where the employer failed to plead it or explain its failure to do so, had facts within its control to establish the defense if it wished to do so, and only deployed the defense after close of discovery). The only meaningful difference between this case and *Reed* is that prior to Defendants submitting its controlling answer and affirmative defenses, Plaintiffs noted Defendants' initial waiver, which should have triggered Defendants to raise the defense earlier. Thus, the affirmative defense Defendants waived is not grounds to grant Defendants' motion, and Plaintiffs need not rebut it with evidence that a "less discriminatory alternative existed." 42 U.S.C. § 2000e2(k)(1)(A)(ii).[7]

Assuming the Court rejects Plaintiffs' waiver argument, the Court should still permit Plaintiffs' Title VII disparate impact claims to proceed to trial. Evidence exists from which a factfinder could determine that less discriminatory alternatives – namely, increased oversight and monitoring of Defendants' discretionary decision making and/or effective implementation of

---

[7] In addition to waiving this defense, Defendants' motion fails to describe or cite to any facts or evidence to support its contentions the policies are "consistent with Pace's business needs to prove safe and timely public transit services." (ECF No. 180, p. 11-12, citing only evidence about how the policies applied to Plaintiffs, not evidence explaining why Defendant Murry's discretionary decision-making was necessary for that goal.) Concluding Defendants established the affirmative defense thus requires drawing inferences against Plaintiff, which the Court cannot do at this stage.

recommendations in the 2016 FTA Audit – would have reduced the disparity. (ASOF ¶¶ 96-99.) Indeed, the same evidence on which Plaintiffs rely to establish causation – particularly differences in outcomes for the hiring/promotion process, in which Human Resources is involved and which is more closely monitored under Pace's EEO Program, as well as Plaintiffs' expert testimony – suggests that reducing Defendant Murry's discretion and providing meaningful oversight may have prevented the terminations of so many African Americans. (ASOF ¶¶ 28-37, 81-95.)

### C. Plaintiffs Can Prevail On Their ICRA Unintentional Discrimination Claims.

Defendants' arguments regarding Plaintiffs' disparate impact claims assume the Illinois Civil Rights Act text is identical to that of Title VII despite important textual differences which render Defendants' arguments inapplicable. Based on Defendant Murry's admissions, a fact-finder could infer the methods and criteria she used to administer discipline had the same effect as someone intentionally discriminating, those claims must proceed to trial. (ASOF ¶¶ 36.)

Unlike Title VII, the Illinois Civil Rights Act does not contain the "specific employment practice" language Defendants rely upon. *Compare* 42 U.S.C. § 2000e-2(k) *with* 740 Ill. Comp. Stat. Ann. 23/5(a)(2)740 Ill. Comp. Stat. Ann. 23/5(a)(2). Rather, the Illinois Civil Rights Act expressly prohibits "utilize[ing] criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race…" 740 ILCS § 23/5(a)(2). Additionally, the text of the act does not include the Title VII business-necessity affirmative defense under that Defendants waived here. The fact the state legislature chose to use different language which permits Plaintiffs to challenge different conduct (methods of administration, not a singular method) cannot be ignored; if the legislature simply wanted to mirror Title VII's disparate impact provisions, it would have done so.

Even if the Court finds differences in plain texts of the statutes at issue (both of which should be interpreted as broadly as possible given their remedial goals) do not matter, Plaintiffs have shown methods of administration that caused a disparity in discipline (including termination) for African Americans at Pace's Heritage Garage (as set forth above in discussing Title VII disparate impact). Thus, like their Title VII disparate impact claims, Plaintiffs' ICRA unintentional discrimination claims should proceed to trial so a factfinder can decide whether, as Defendant Murry admitted, her method of administering disciplinary actions had the same effect as someone intentionally discriminating against them based on their race. (ASOF ¶¶ 36.)

## III. Defendants Have Not Established They Must Prevail As A Matter Of Law On Plaintiffs' Intentional Discrimination Claims.

Defendants correctly note that whether summary judgment is appropriate on Plaintiffs' intentional discrimination claims under different statutes are analyzed under the same frameworks. (ECF No. 180, p. 14.) *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (affirming trial verdict for plaintiff, and explaining "[w]e can consider Morris's claims under Title VII and Section 1981 together, though, because both statutes have the same liability standards") (internal quotation omitted); *see also Lau v Abbott Lab'ys*, 2019 IL App (2d) 180456, ¶¶ 39, 62 (acknowledging *Ortiz v. Werner Enterprises* and *McDonnell Douglas* frameworks apply to IHRA claims). Defendants, however, grossly misstate and misapply those frameworks.

Plaintiffs' theory of liability for intentional discrimination in disciplinary actions is well established:

> Disparate discipline is a theory of liability rooted, as its name conveys, in proving different treatment for discriminatory reasons—here, as [plaintiff] alleged, through the imposition of more severe discipline when compared with the discipline non-black employees received for committing similar violations of BNSF's safety standards. *See Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011) (explaining that Title VII protects workers who violate workplace rules but receive harsher discipline because of their protected status).

*Morris*, 969 F.3d at 758; *see also Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 370 (7th Cir. 1984) (explaining one "could readily infer discrimination against blacks" from a situation like one where white employees were given a less severe penalty for violating the same rules).

For terminations, the Seventh Circuit explained the "'sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if she he had a different [protected status], and everything else had remained the same.'" *Morris*, 969 F.3d at 763 (quoting *Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020)).

The Seventh Circuit abandoned the concept of "direct" and "indirect" evidence in explaining a plaintiff in a discrimination case need only provide evidence from which a jury could infer race motivated Defendants' adverse action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (acknowledging ability to use *McDonnell Douglas* method to infer discrimination, but other types of evidence as well). Regardless of the framework, the Court must consider the evidence as a whole. *Ortiz*, 834 F.3d at 765 (courts should ask whether the evidence considered as a whole would permit a jury to find that the plaintiff suffered an adverse action based on their race); *see also Lau*, 2019 IL App (2d) 180456, ¶¶ 39, 62 (reversing summary judgment under IHRA, adopting *Ortiz* and explaining a plaintiff is "entitled to simply list all of her evidence of discriminatory intent—both direct and circumstantial—and ask the court to consider whether it raised a sufficient inference of such intent").

Contrary to Defendants' claim, Plaintiffs are not limited to three types of evidence. (ECF No. 180, p. 17.) Rather, a jury can rely on a wide variety of circumstantial evidence, including ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, evidence (though not only statistical evidence) that similarly situated employees outside the protected class received systematically better treatment, evidence the

employer's stated reason for a decision or difference in treatment is unworthy of belief, evidence that an employer is engaged in a pattern-or-practice of discrimination, and evidence of a culture, work environment, or supervisor that is biased or engages in stereotypes. *See generally Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527–28 (7th Cir. 2008), *as corrected* (Jan. 21, 2009); *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 770–771 (7th Cir. 2006); *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665–66 (7th Cir. 2006); and *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

Likewise, evidence an employer failed to take steps designed to prevent discrimination that most employers take (which the employer promised or was obligated to take) is evidence from which a jury can infer it intended to permit it. *See, e.g., Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 416–17 (7th Cir. 1988) (evidence an employer failed to comply with voluntary affirmative action plan, although not a violation, could be evidence of a discrimination); *Mozee v. Jeffboat, Inc.*, 746 F.2d at 374 (whether employer "lived up to its affirmative action obligation … will need to be addressed at a new trial" as part of evidence about racial discrimination in discipline).

As noted in *Ortiz*, discrimination cases are "factually complex and require sifting through ambiguous pieces of evidence." *Ortiz*, 834 F.3d at 765. But at each turn, the Court must assume the jury will determine all ambiguities in Plaintiffs' favor. Considering all the evidence, Plaintiffs can prevail on their intentional discrimination claims.

## A. Defendants Reasons For Plaintiffs' Treatment Are Not Supported By Evidence A Jury Is Required To Believe.

Stunningly, key paragraphs of Defendants' Local Rule 56.1 statement *do not cite testimony from decisionmakers* explaining their decisions. (RSOF ¶¶ 19-24, 31, 33-37.) Rather, Defendants repeatedly refer only to records (some of which conflict with other records) from which they ask

this Court to infer that what is stated on the records actually happened – often when there is a wealth of evidence a jury could use to reject that inference. (RSOF ¶¶ 19-24, 31, 33-37.) Rather than offer testimony from decisionmakers, Defendants repeatedly ask this Court to make inferences about its explanations and accept them wholesale, which this Court cannot do – particularly in light of conflicts in testimony permitting a jury to reject *all* of Defendants' witnesses testimony. *See Reeves*, 530 U.S. at 134; *see also* Seventh Circuit Pattern Instruction 1.13 (allowing jury to accept or reject testimony).

These circumstances alone preclude granting Defendants' motion. *See Reeder-Baker v. Lincoln Nat. Corp.*, 649 F. Supp. 647, 658–659 (N.D. Ind. 1986), *aff'd,* 834 F.2d 1373 (7th Cir. 1987) (finding after bench trial that the defendant's explanation for disciplining the plaintiff for disrupting her work unit was "simply not worthy of credence" because the defendant offered no testimony from anyone with first-hand knowledge of disruption).

**B. A Jury Could Find Defendants' Treatment Of Marshall Was Discriminatory.**

1. Defendants' explanation for Marshall's first termination was not credible.

Defendants describe how they terminated Marshall in 2016. (RSOF ¶¶ 30-31.) In a nutshell, Defendants contend Caputo, Murry and Klafeta all concluded Marshall was lying when she claimed she was unaware of the accident Caputo claims he saw on video Marshall asked to review with Caputo. (*Id.*) Defendants further acknowledge she was reinstated "following a grievance arbitration finding that she did not know about the accident." (ECF No. 180, ¶ 4.) Thus, after hearing evidence and testimony about this event, an arbitrator concluded Defendants and their key witnesses were wrong and there was no just cause for her termination; the arbitrator found Plaintiff Marshall's denial was credible, in part because Defendants offered shifting justifications

for its actions – all of which were based on circumstances even Klafeta agreed "makes no sense." (RSOF ¶¶ 31-32; ASOF ¶¶ 67-68.)

Even though the arbitrator (a factfinder) already has done so, Defendants claim no rational jury could reject their reason for Marshall's 2016 termination, notwithstanding the Supreme Court's explanation in *Reeves* that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 134, *citing Wright v. West*, 505 U.S. 277, 296 (1992).

That is an appropriate inference here, given Defendants repeated refusal to consider or believe Plaintiffs' explanation that she was not aware of any accident to report. *See Vega*, 954 F.3d at 1005 (jury could infer pretext based on plaintiff's "side of the story" and could find employer's "lack of interest in [plaintiff's] side of the story as similarly significant"); *see also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (summary judgment because evidence suggested plan to terminate plaintiff "even if it meant deviating from so basic and sound a standard policy as refraining from pre-judging").

### 2. Defendants treated others outside the protected class more favorably.

Here, a jury could conclude Defendants would not have terminated Marshall if she were not African American because Murry treated non-African Americans more favorable, and not only with respect to disciplinary decisions and terminations. Caucasians were able to move out of the Heritage Garage through promotion or transfer more easily than African Americans. (ASOF ¶ 7, 33, 37.) Nelson and Marshall were both given harder routes and assignments by Defendant Murry. (ASOF ¶ 44, 72, 74.) But more tellingly, Defendant Murry did not terminate innumerable other employees who failed to report accidents or engaged in conduct of comparable seriousness (i.e., conduct Murry said warranted termination). (RSOF ¶¶ 44-50, 53-55; ASOF ¶¶ 107-117.)

21

In one situation, a non-African American (Romeo Zamudio) failed to immediately report an accident to dispatch, but suffered no consequences whatsoever. He resigned without any investigation or suspension. (ASOF ¶ 177.) Another non-African American (Richard Delgado) struck a pedestrian while moving a vehicle in reverse – just so a coworker would not have to walk as far. (ASOF ¶ 115.) Murry did not recommend termination for this policy violation despite claiming striking a pedestrian was serious enough to warrant immediate termination. (ASOF ¶¶ 22, 115.)

Caucasian employee (Michael Rooney) was not terminated even though he failed to immediately report an accident; about 30 minutes after the accident, he used a cell phone while driving with passengers on the bus to notify Pace – which was itself conduct warranting immediate termination according to Murry. (ASOF ¶¶ 22, 114.) Ultimately, however, Murry only recommended he be suspended one day for *both* policy violations. (*Id.*)

Neither Murry nor Klafeta recommended termination for Caucasian operator Ray Ulrich, even though he failed to report that a passenger fell asleep on his bus, resulting in Ulrich having to call police. Ulrich did not complete the accident/incident report about the incident at all on the day it occurred. Defendant Murry apparently believed his explanation about the situation when confronted about it with his union representation, even though Murry had other reasons to suspect he was lying (his falsified timesheets). (ASOF ¶¶ 110-113; RSOF ¶¶ 44-45.)

Defendants' treatment of a Caucasian driver who trained with Marshall (Nielson, Jr.) is particularly telling. The son of another Caucasian who worked at the Heritage Garage, Neilson had a preventable accident he failed to report in accordance with Defendants' policies. (RSOF ¶¶ 53-55; ASOF ¶¶ 107-109.) Not only was he not terminated immediately, the accident was never graded (had it been appropriately, he would have been terminated later when he had his third

preventable accident). (RSOF ¶¶ 54; ASOF ¶¶ 107-109.) This occurred even though Nielson, Jr. also violated other rules Defendants claimed warranted termination (tardiness during training). (ASOF ¶¶ 107.)[8]

Given these examples, a jury could find Defendants would not have terminated if she were not African American because – as a Dispatch Supervisor described – Murry "takes care of her own." (ASOF ¶¶ 43.) All these examples involve "conduct of comparable seriousness" (often worse conduct than Plaintiffs) with less or no discipline. *See Coleman v. Donahoe*, 667 F.3d 835, 851–52 (7th Cir. 2012) (discussing standard and collecting cases); *see also Morris*, 969 F.3d at 761 (comparators who engaged in different conduct under different circumstances but were accused of breaking the same policies and disciplined under same process could support a jury verdict).

Defendants argue none of these individuals could be "similarly situated" to Plaintiffs because, unlike Plaintiff Marshall, they reported accidents. (ECF No. 180, pp. 16-19.) But who is "similarly situated" is a question for the fact-finder, not one this Court should decide at summary judgment. Federal courts have explained the search is for "comparators, not clones" and "[s]o long as the distinctions between the plaintiff and the proposed comparators are not 'so significant they render the comparison effectively useless,' the similarly-requirement is satisfied." *Coleman*, 667 F.3d at 846–52 (internal quotation omitted) (explaining that who is a similarly situated employee is "usually a question for the fact-finder," that comparators need not be identical in every conceivable way").

As the Seventh Circuit explained, "[s]o long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively

---

[8] Defendants effectively concede maintenance employees like Nielson, Jr. can be proper comparators by pointing to Porro as one. (ECF No. 180, p. 16; RSOF ¶¶ 42-43.)

useless,' the similarly-situated requirement is satisfied." *Coleman*, 667 F.3d at 846–47 (explaining the key similar characteristics typically require only that the employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or employer's treatment of them"). Here, each of the key factors from *Coleman* is satisfied for each of the drivers referenced above, albeit based on disputed facts the jury must resolve. (RSOF ¶¶ 44-68; ASOF ¶¶ 77-80, 105-118.)

3. <u>Ample circumstantial evidence points towards discriminatory motive.</u>

Notably, that evidence is supported with other evidence pointing towards that conclusion – such as: (a) evidence Caputo was "out to get" Marshall (ASOF ¶¶ 46); (b) admissions by Defendants' Dispatch Supervisors that Defendant Murry used the disciplinary process to target African Americans and protect Caucasians like herself (ASOF ¶¶ 41-46); (c) a clear pattern of African Americans being subjected to harsher and more severe discipline (ASOF ¶¶ 38-76, 77-80, 105-118); (d) the fact that over 6 years, Murry never terminated Caucasians, but fired over 20 African Americans (ASOF ¶¶ 35); (e) Murry's termination letter was inconsistent with the shifting reasons for termination offered here and in arbitration, and even considered conduct not permitted to be reviewed under Pace's collective bargaining agreements (ASOF ¶¶ 66-67); (f) Defendants' failure to live up to its affirmative action obligations (ASOF ¶¶ 81-95); and (f) Defendants' failure to implement policies or take steps that would have prevented discrimination (even after being placed on notice). (ASOF ¶¶ 81-95.)

Defendants' attacks on Plaintiffs' evidence are not ones a jury would be required to accept; nor must the Court find for Defendants based on Porro and Mack. *See Vega*, 954 F.3d at 1004–06 (simple comparison of termination rates of Hispanics helped support discrimination claims, as did

evidence of treatment of other Hispanics and non-Hispanics, despite employers contention it had terminated others under similar circumstances because "the jury could reject the [defendant's] contention that [they] were appropriate comparators").

As noted above, all this is evidence of the type a jury could rely on to conclude that Defendants would have believed Marshall (when she said she did not know about the accident they found in video she asked them to review) if she were not African American, or at least would not have fired her for failing to report the accident. Indeed, considered in light of Plaintiffs' expert evidence about how bias affects perceptions and the persistence of stereotypes against African Americans, and how Defendants treated Nelson (discussed below), a jury could easily reach that conclusion.[9]

> 4.   <u>A jury could find Marshall's subsequent disciplinary actions and termination would not have occurred if she were Caucasian.</u>

Defendants also claim it was justified in suspending Plaintiff for preventable accidents after her reinstatement. Defendants overstate their evidence and draw inferences in their own favor in describing Plaintiff Marshall running over the curb as a "collision." (RSOF ¶¶ 34.) Plaintiffs dispute whether those accidents were "preventable" (and, therefore, warrant discipline) given that Defendant Murry assigned Plaintiff to drive a bus on which she was not adequately trained. (ASOF ¶¶ 72-74; RSOF ¶¶ 33-34.) Additionally, as with the accident prior to her termination, Marshall did not notice her bus making contact, and circumstances around it (like absence of glass for the mirror) raise questions about that situation. (ASOF ¶¶ 75.) Notably, too, Defendants have not produced video of those accidents (as with Marshall's 2016 alleged "failure to report") even

---

[9] The fact Defendants reinstated Marshall does not insulate Defendant from liability for that act; Plaintiff can still recover compensatory and other relief on her claims related to it.

though these accidents occurred *after Plaintiffs' EEOC Charges were pending* and Plaintiffs' lawsuit was filed within days of Marshall's 2017 termination.  (RSOF ¶¶ 39; ECF No. 1.)

Combined with all the other evidence discussed above, a jury could infer Marshall's 2017 termination would not have occurred if she were not African American.  *See Ortiz*, 834 F.3d at 765 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself").  A jury could conclude that, if she where Caucasian no accident report or grade may have been necessary (like it was for Nielson, Jr.'s accident during training).  (RSOF ¶ 54; ASOF ¶ 109.)

**C.  A Jury Could Find Defendants' Treatment Of Nelson Was Discriminatory.**

As with Marshall, a jury could infer Defendants' treatment of Plaintiff Nelson was discriminatory (i.e., that he would not have been disciplined as severely or terminated if he was not African American).  In addition to all the evidence described above, factors unique to Nelson's situation help him show motive (*e.g.,* evidence other than the Dispatch Supervisors admissions Defendant Murry was harassing him through discipline because he was African American). (ASOF ¶¶ 40-46; RSOF ¶¶ 17-28.)

Like Marshall's allegedly unreported accident, Plaintiff Nelson's accident caused no perceptible damage; Defendant's Safety Manager Caputo could not even identify where Nelson's bus made contact from his own photographs.  (ASOF ¶¶ 47-53; RSOF ¶ 26.)  Like Marshall, Plaintiff Nelson disputes knowing any accident occurred and, therefore, could not report it.  Like Marshall, Plaintiff Nelson would not have been terminated had he reported the accident (it would only have been Nelson's second "preventable," while Marshall's would have been only her first "preventable").  Thus, just as the arbitrator did with Plaintiff Marshall, a jury could reject

Defendants' justification and credit Plaintiff Nelson's testimony he could not have reported an accident he did not know occurred. (ASOF ¶¶ 51, 52, 61, 63, 65, 67-68; RSOF ¶¶ 24, 26, 31.)

Defendants claim Marshall's and Nelson's conduct was worse than others' conduct, because others only failed to "immediately" report an accident (as compared to failing to report it at all). (ECF No. 180, p. 16). But a reasonable jury could reject that explanation based on the fact Defendants never gave Plaintiff Nelson a chance to report. Defendant Murry did not even let Nelson return to his bus after his break, at which time he may have seen the alleged accident and reported it. Rather, Murry sought to suspend Nelson within hours of his alleged "accident," long before he finished his shift for the workday (which Defendant Murry described as the "standard" for a failure to report incident). (ASOF ¶¶ 25, 49-50.)

Unlike with another employee accused of similar violations (Ulrich), Defendant Murry did not afford Defendant union representation when suspending him, which supports Plaintiffs' claims. (RSOF ¶ 45; ASOF ¶¶ 50, 111-113.) *See Vega*, 954 F.3d at 1004 (noting union agreement deviations in stating "unexplained or systematic deviations from established policies or practices can be probative of discriminatory intent") (internal quotation omitted). Indeed, along with the ample other circumstantial evidence discussed above, Defendants' conduct in rushing to judgment regarding Nelson's conduct is evidence a jury could credit in finding Defendants discriminated against him. *See Vega*, 954 F.3d at 1004–1006.

Considering the evidence as a whole, a jury could reasonably conclude Defendant Murry treated Nelson differently because he was African American, just as the Dispatch Supervisors admitted was happening and, therefore, did not only suspend him (like Rooney) or overlook the situation altogether (as with Neilson, Jr.) (RSOF ¶¶ 10-17, 49-54, 55; ASOF ¶¶ 40-46.) A jury could conclude that if Plaintiff Nelson were Caucasian, he would not have become another driver

in the long line of African Americans treated more harshly under Pace's discretionary disciplinary system. Given the reasonableness of that conclusion, Defendants' motion on Plaintiff Nelson's intentional discrimination should be denied.

### D. Defendants Misapply The *McDonnell Douglas* Framework, Under Which Plaintiffs' Claims Also Should Proceed To Trial.

Defendants contend Plaintiffs cannot prevail under the *McDonnell Douglas* framework, conceding only that Plaintiffs are in a protected class and suffered adverse actions (though exactly which ones are unclear). (ECF No. 180, pp. 14-15.) Defendants argue Plaintiffs cannot satisfy the second and fourth elements of their *prima facie* burden because they cannot show they were meeting Defendants' "*legitimate* business expectations" or that *similarly situated* employees were treated more favorably (*i.e.*, the second and forth elements of the *prima facie* showing under *McDonnell Douglas*) and cannot show pretext. (*Id.*, emphasis added.) Defendants vastly overstate Plaintiffs' burdens on those elements, and completely ignore disputed facts and evidence permitting Plaintiffs' claims to proceed to trial under this framework.

### 1. Plaintiffs can satisfy the proper *prima facie* elements of *McDonnell Douglas*.

This Circuit has long understood the futility of an element requiring a showing of "satisfactory job performance" in cases like this one. *See Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001) ("where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it makes little sense ... to discuss whether she was meeting her employer's reasonable expectations") (internal quotation omitted); *see also Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n. 3 (7th Cir. 2001) (explaining that the "legitimate expectations" prong of the prima facie test is not necessary to the analysis, where the people judging the plaintiff's performance were the same people she accused of discriminating against her).

Indeed, "[w]hen a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements of the indirect method merge." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) (reversing grant of summary judgment based on evidence others engaged in similar or worse conduct).

As discussed above, numerous drivers a jury could find were similarly situated were treated more favorably than Plaintiffs with respect to their purported "failure to report accidents" and conduct of comparable seriousness. (ASOF ¶¶ 105-118; RSOF ¶¶ 44-45.) Even with respect to Defendants' so-called "three preventable accidents" rule, Plaintiffs identify a driver outside the protected class who was not terminated even after his third preventable accident (Sosa) and another whose accident was never graded (Nielson, Jr.). (ASOF ¶ 116.) Based on these facts, and Murry's and Klefeta's admissions there were rule violations that went without any discipline whatsoever, Plaintiffs can satisfy their *prima facie* case. (ASOF ¶ 106.)

### 2. Plaintiffs provide evidence Defendants' stated reasons were pretextual.

In claiming Plaintiffs cannot show pretext, Defendants make bold unsupported claims. First, Defendants claim is enforcement of disciplinary rules should stand because "Pace applied those rules equally" to other drivers." (ECF No. 180, p. 16.) For a jury to conclude that fact is true, it would have to assume – contrary to Defendant Murry's own testimony – that African Americans actually violate disciplinary rules at wildly greater rates than Caucasians, despite specific examples of leniency offered to non-African Americans. A jury may eventually reject Plaintiffs' evidence at trial, but the Court cannot ignore it here. It amply demonstrates pretext.

Second, Defendants claim Plaintiffs do not "seriously dispute that Defendants honestly believed they disciplined Plaintiffs for valid, job-related reasons." (ECF No. 180, p. 19.) Plaintiffs do, in fact, dispute that – specifically by contending they were falsely accused of conduct they did

not engage in (failing to report accidents they dispute ever occurred) as well as with evidence Defendant Murry used the disciplinary process to target African Americans and "take care of her own" (as Dispatch Supervisors described). That evidence, along with inconsistencies in Murry's explanation and application of rules she expects drivers to follow, raise questions about Defendant Murry's veracity.

As the Supreme Court explained, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (noting "[s]uch an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt")(internal quotation omitted). Plaintiffs have that, in the form of the arbitrator's rejection of Defendants' shifting explanations for Marshall's 2016 termination. Based on rejection of that testimony, a jury is not required to believe Defendants' explanations for its other actions – for Marshall or Nelson.

Plaintiffs also dispute whether they would have been disciplined for the same conduct *if they were not African American*, or whether their alleged violations were mere pretext. Defendants pattern of disciplinary actions disfavoring African Americans shows pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973) (patterns of treatment of those within the protected class is evidence that can establish pretext). Here, that evidence is persuasive because it is buttressed with evidence Defendants failed to prevent discrimination or even meaningfully assess or investigate whether it was occurring, all of which suggest Defendants stated reasons were not its real motivation. (RSOF ¶¶ 12, 17; ASOF ¶¶ 81-94.) But for Plaintiffs' race, Defendants would have believed them, not assigned them difficult routes or a bus on which they had not been

trained, and otherwise found ways for their employment to continue or advance (as Defendants did for Caucasians). (ASOF ¶¶ 28-37, 41-46, 72-74.)

Admittedly, Defendants Dispatch Supervisors did not make admissions suggesting Klafeta would "lie on" African Americans or, like Murry, was harassing them with discipline *because they were African American.* (ASOF ¶¶ 40-46, 71.) But the fact Klafeta reviewed Murry's decisions does not insulate Defendants from liability here. *See Morris*, 969 F.3d at 763–64 (a biased individual's role initiating the path of formal discipline was sufficient to establish causation for discrimination claim). Here, Defendant Murry's recommendation was essential, as Klafeta conceded he only addresses situations Murry brought to his attention; facts show Klafeta never rejected Murry's recommendations (i.e., for six years Klafeta only approved terminations for African Americans drivers). (RSOF ¶¶12, 17; ASOF ¶¶ 13-14, 30-35.)[10]

### E. Plaintiffs' Raise Questions About Whether A Pattern Or Practice Of Existed.

Defendants contend a jury could not conclude Defendants engaged in a pattern or practice of discrimination, relying primarily on the Court's decision denying class certification. (ECF No. 180, p. 20-21.) But Defendants also confuse Plaintiffs' disparate impact theory with this *intentional* discrimination theory and, more importantly, rely on *highly* disputed facts about others who alleged discrimination in discipline and termination. (RSOF ¶¶ 17, 61, 63.)

Defendants claim Plaintiffs' evidence of disparities is insufficient, despite case law holding that evidence akin to that Plaintiff presented (*i.e.*, with an *inexorable* zero number of Caucasians

---

[10] "[A] 'biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, *apart from the supervisor's recommendation*, entirely justified.'" *Vega*, 954 F.3d at 1007 (emphasis added) (affirming Title VII verdict and explaining that regardless of who is the final decisionmaker is, "the dispositive question is whether the discriminatory animus" of others was a "proximate cause of the termination decision") (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

negatively impacted by terminations or lengthy suspensions) was sufficient infer discriminatory motive and the pattern-or-practice theory at trial. *O&G Spring and Wire*, 38 F.3d at 877-879, n.9. Unlike at class certification, Plaintiffs have buttressed their pattern and practice evidence with specific stories from Plaintiffs and others' about how Defendants – and particularly Defendant Murry – used Defendants' disciplinary system to discriminate as a matter of course since she arrived at the Heritage Garage. (ASOF ¶¶ 15, 29-37, 40-46, 57, 77-99, 105-118.)

Based on that evidence, a jury could find Defendants' standard operating procedure was to disfavor African Americans in its disciplinary process, particularly with respect to terminations. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 337 (1977). Accordingly, Plaintiffs' claims should proceed to trial under that theory as well.[11]

## IV. Defendants' Only Argument Regarding Plaintiffs' IHRA Unintentional Discrimination Claims Is Unsupported By Evidence Or Law; Accordingly, Those Claims Must Proceed To Trial.

Defendants address Plaintiffs' IHRA unintentional claims (Counts VI and VII) in a single paragraph. (ECF No. 180, pp. 24-25.) Defendants *only* argument for summary judgment on those claims is that Plaintiffs "failed to exhaust their administrative remedies under Illinois law" by not obtaining a "right to sue" from the Illinois Department of Human Rights ("IDHR"). (ECF No.

---

[11] Defendants' argument – that other African Americans were forced to resign and, therefore, are dissimilar from Plaintiffs who were terminated (ECF No. 180, p. 23) – does not help its case. Rather, drawing inferences in Plaintiffs' favor, those facts suggest Plaintiffs' comparisons may not capture the full breadth of Defendants' discriminatory practice.

180, pp. 24-25.)[12]  Defendants also seek dismissal of Plaintiffs' IHRA intentional discrimination claims on those grounds.[13]  But Defendants' argument fails on multiple fronts.

### A.  Defendants Waived Their "Failure To Exhaust" Affirmative Defense.

"A plaintiff's failure to exhaust administrative remedies is an affirmative defense."  *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007) (explaining because "evidence was inconclusive at best, the tie must go to the plaintiff" on summary judgment).  This matter has been pending since 2017.  (ECF No. 1.)  At no point prior to its motion for summary judgment did Defendants raise concerns over Plaintiffs' administrative exhaustion.  Defendants' most recent answer does not assert it as an affirmative defense.  (ASOF ¶¶ 100-101.)

Defendants waived that defense by not raising it in its answer and affirmative defenses or at any point earlier in the litigation.  *Martin v. F.E. Moran, Inc.*, 13 C 03526, 2017 WL 1316255, at *8 (N.D. Ill. Apr. 10, 2017) (finding defense asserted for the first time at summary judgment untimely).  Had Defendants raised it earlier, Plaintiffs could have sought to address it (and will do so if Defendants belated efforts are successful).

Indeed, because Defendants failed to raise the defense for five years, Defendants should be estopped from asserting it now based on *laches* or waiver, consistent with other courts' approaches.  *See, e.g., Vaughan v. Capital City Protective Servs., II,* Civil Action 20-2932 (RC), at *5 (D.D.C.

---

[12]  Defendants' other arguments about "disparate impact" are expressly limited to claims under "Title VII, § 1981, and the Illinois Civil Rights Act" (of 2003) and make no reference to the Illinois Human Rights Act.  (ECF No. 180, pp. 5-14, Heading III.A.)  To the extent the Court believes Defendants' arguments do address unintentional discrimination under the IHRA, those arguments fail for the same reasons as Defendants' arguments regarding Title VII.

[13]  Notably, Defendants do not contend Plaintiffs:  (a) failed to request to have that their EEOC charges be cross-filed with the state fair employment practices agency; or (b) that those charges were not actually cross-filed.  Rather, Defendants' only contention (without support to LR 56.1 facts) is that the IDHR did not issue the appropriate notice authorizing Plaintiffs to proceed.  (ECF No. 180, pp. 24-25.)

June 27, 2022) ("Because Capital City did not include failure to exhaust administrative remedies as an affirmative defense in either its motion to dismiss or its answer, it forfeited the availability of the sole defense raised in its summary judgment motion"); *see also Hancock v. Securitas Sec. Servs. U.S.*, No. SA-20-CV-00785-ESC, 2021 WL 2864884 at *5 (W.D. Tex. July 7, 2021) (finding employer waived its defense that employee failed to exhaust EEOC remedies where employer failed to raise defense, and time for amending affirmative defenses had long passed).[14]

### B. Evidence Shows Plaintiffs Exhausted IHRA Administrative Remedies.

Even if Defendants did not waive that defense, evidence shows Plaintiffs satisfied their obligations by having their charges cross-filed with the IDHR and receiving notifications from the IDHR explaining no further action on Plaintiffs' part was required. Plaintiff Nelson (like Pace) received a "right to sue" dated March 26, 2018. (ASOF ¶ 104.) After filing her amended charge, Plaintiff Marshall received a notice dated May 29, 2018, on which the Court could find she reasonably relied, explaining she did not need to do anything to preserve her ability to pursue claims under the IHRA based on the conduct allege in the charge. (ASOF ¶ 103.) When Plaintiffs received notices from the IDHR, their claims had already been pending in this Court for months; Defendants had even answered the first amended complaint without raising failure to exhaust as an affirmative defense. (ASOF ¶¶ 100, 103-104; ECF Nos. 1, 8, 24.) As noted in *Salas*, the Court must deny summary judgment when the evidence is inconclusive, as it is here.

---

[14] *See also Davis v. Fort Bend Cnty.*, 893 F.3d 300, 307 (5th Cir. 2018), *aff'd sub nom. Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 204 L. Ed. 2d 116 (2019) (district court erred in dismissing case for employee's failure to exhaust EEOC remedies because employer waived such argument by waiting five years before raising the argument); *Harris v. Sec'y, U.S, Dep't of Veterans Affs.*, 126 F.3d 339, 345 (D.C. Cir. 1997) ("In order to preserve the notice purpose of Rule 8(c) and the discretionary structure of Rule 15(a), we hold that Rule 8(c) means what it says: a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion."); *see also Jones v. Mukasey*, 565 F. Supp. 2d 68, 74 (D.D.C. 2008) ("[I]t is improper for defendant to raise [failure to exhaust administrative remedies] for the first time in his summary judgment motion.").

**C.  Dismissal For Failure To Exhaust Must Be Without Prejudice, Allowing Cure.**

Even if the Court finds Defendants' belated defense meritorious, it is not grounds for summary judgment against Plaintiffs.  "When a plaintiff fails to exhaust administrative remedies, her complaint must be dismissed without prejudice."  *McHale v. McDonough*, 41 F.4th 866 (7th Cir. 2022) (noting granting summary judgment would lead to reversal for instructions to dismiss without prejudice); *see also Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009) ("Because Teal failed to exhaust administrative remedies, her complaint must be dismissed without prejudice").

Because Defendants' lone argument regarding Plaintiffs' IHRA claims (Counts VI and VII) fails to support the relief Defendants seek, Defendants' motion should be denied and Plaintiffs' claims should proceed to trial.[15]

**CONCLUSION**

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request the Court deny Defendants' motion for summary judgment in its entirety.

Respectfully submitted for Plaintiffs,

By**:**  /s/ J. Bryan Wood
              One of Plaintiffs' Attorneys

Dated:  August 25, 2022

---

[15] Defendants cite *Baranowksa* to argue "Plaintiffs' IHRA claims (Counts VI and VII) must be dismissed *with* prejudice" (ECF No. 180, p. 25, emphasis added) despite that decision's application of *Teal v. Potter*, mandating dismissal *without* prejudice.  Defendants also cite *Hankins* (ECF No. 180, p. 25), which is distinguishable based on the notice Marshall received, explaining the IDHR would close her case even if she did not notify the IDHR of the EEOC's findings.  (ASOF ¶ 103.)  Indeed, reliance on either decision is questionable, because it describes IHRA procedures in effect in 2011 or 2020, not when Plaintiffs charges were cross-filed.