# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE NELSON & CHRISTI MARSHALL, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No: 17-cv-7697 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| PACE SUBURBAN BUS, MARGARET | ) | |
| MURRY, in her individual capacity and in her | ) | |
| Official capacity of Division Manager of Pace | ) | |
| Suburban Bus – Heritage Division, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' LOCAL RULE 56.1(B)(3) STATEMENT OF ADDITIONAL FACTS

Plaintiffs Maurice Nelson ("Nelson") and Christi Marshall ("Marshall"), by and through their attorneys, The Wood Law Office, LLC and Osborne Employment Law, and pursuant to Local Rule 56.1(b)(3), set forth additional facts in opposition to Defendants' motion for summary judgment (ECF Nos. 172-173) as follows:

**A. Defendant Pace And Its Heritage Garage**

1.      Defendant Pace Suburban Bus ("Pace") is a regional governmental body created, operated, and funded pursuant to state and federal law, including the Regional Transportation Authority Act (70 ILCS 3515/1.01 *et seq.*); it provides bus and transportation service throughout Chicago's suburbs from 11 different locations. (ECF No. 74, Ex. 45-Answer ¶¶ 10-11).

2.      Plaintiffs Maurice Nelson (African American) and Christi Marshall (African American) worked as drivers at Pace's Heritage Division Garage under Defendant Margaret Murry, who oversaw daily operations at that location. (ECF No. 74, Ex. 45-Answer ¶¶ 7-8, 18; Ex. 33-Murry 30(b)(6) 9:13-22, 12:1-13:1, 13:10-21).

1

3.     Defendant Margaret Murry (Caucasian) has worked for Pace since October 1994 and has been the Division Manager at the Heritage Division Garage since approximately September 1999.  (ECF No. 74, Ex. 45-Answer ¶¶ 15-16).  Murry's duties require her "to ensure the safe operation of the fixed routes in Joliet and in Chicago … to hire the employees, discipline the employees, oversee the drug and alcohol procedures, policies, ensure all Pace Policies are adhered to." (Ex. 33-Murry 30(b)(6) 9:13-22; ECF No. 74, Ex. 45-Answer ¶ 18).

4.     The non-supervisory positions at Heritage Garage with job duties that move or operate buses (i.e., "drivers") are: part-time operator, full-time operator, demand response shuttle driver, mechanic, mechanic helper, master mechanic, servicer, and building maintenance.  (Ex. 33-Murry 30(b)(6) 12:1-13:21; Ex. 34-Fedewa 30(b)(6) 17:12-18:6, 21:7-20; Ex. 49-Job Title Summary; ECF No. 74, Ex. 45-Answer ¶ 79).  Pace's Human Resources data shows that from January 1, 2011 through March 31, 2019, 209 individuals have held driver positions at some point; of those, 57 (27.27%) are Caucasian, 136 (65.07 %) are African American, 13 (6.22%) are Hispanic and 3 (1.44 %) are Asian. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 10).

5.     As of October 17, 2018, the Heritage Garage management staff reporting to Murry included: (a) Brian Findlay (Caucasian), the Superintendent of Maintenance (a position he held since at least January 1, 2011); (b) Anthony Caputo (Caucasian), the Safety and Training Manager (a position he held since approximately May 2015); (c) David Dines (African American), the Superintendent of Transportation (a position he held since approximately May 2015); and (d) several Dispatch Supervisors.  (Ex. 33-Murry 30(b)(6) 15:10-16:16, 17:10-19:6, 20:1-3, 41:22-42:2; ECF No. 173-14, Ex. 14-Dines 38:4-10; Ex. 44-Heritage Org. Chart).  Jackie Gerasch (Caucasian), served as the Safety and Training Manager from before January 1, 2011 to May 2015 and performed duties that are now split between Caputo and Dines or that were not performed at

2

the Heritage Garage. (Ex. 33-Murry 30(b)(6) 15:10-16:16, 88:1-88:12; ECF 173-13, Ex. 13-Caputo 33:11-12). The racial makeup and reporting structure of Dispatch Supervisors changed during the relevant time period; initially, they reported directly to Murry but have reported to Dines since his hiring. (Ex. 33-Murry 30(b)(6) 16:17-18:5; ECF No. 173-9, Ex. 9-Murry Ind. 118:16-119:5; ECF 173-13, Ex. 13-Caputo 33:1-18).

6.      Murry has reported to Regional Manager Mark Klafeta (Caucasian) since approximately June 2008; Klafeta, who has worked for Pace since 1995, oversees multiple divisions. (Ex. 44-Heritage Org. Chart; ECF No. 173-8, Ex. 8-Klafeta 11:12-18, 15:18-21; Ex. 33-Murry 30(b)(6) 52:9-12). Since June 2008, Klafeta typically has worked out of his office at Heritage Garage two to four days per month. (ECF No. 173-9, Ex. 9-Murry Ind. 204:10-14, 205:13-22; ECF No. 173-8, Ex. 8-Klafeta 19:12-17). Klafeta has reported to Deputy Executive Director Melinda Metzger (Caucasian), who has been employed by Pace since approximately 1985 and in the same role since at least 1995. (ECF 173-8, Ex. 8-Klafeta 26:16-27:1; Ex. 34-Fedewa 30(b)(6) 47:22-48:5; Ex. 44-Heritage Org. Chart).

7.      Murry decides when operators are promoted from part-time to full-time. (Ex. 33-Murry 30(b)(6) 38:6-8). For those promotions, Murry considers length of employment and suspensions because any employee who was suspended within the prior 12 months is not eligible for any promotion. (Ex. 33-Murry 30(b)(6) 38:9-39:4; Ex. 34-Fedewa 30(b)(6) 63:24-65:6).

8.      For hiring new employees and other types of promotions, pursuant to Pace's EEO policy, Pace's Human Resources representative (always an African American) identifies which candidates Murry will interview, and Murry must provide a written explanation for her candidate selection. (Ex. 33-Murry 30(b)(6) 25:13-26:4, 236:16-237:3).

**B. Murry's Role In Implementing Pace's Disciplinary Process**

9. As they have since well before Plaintiffs' employment, Defendants maintain written policies regarding performance, discipline, bus accidents or moving violations, absenteeism and tardiness. (ECF No. 74, Ex. 45-Answer ¶ 23). Some of those policies are found in the two collective bargaining agreements in effect during the relevant time period. (ECF No. 173-6, Ex. 6-2011-2017 CBA; ECF No. 173-7, Ex. 7-2017-2022 CBA). Others are found in policy memoranda, all of which pre-date the relevant time-period (January 1, 2011 to the present). (ECF No. 173-10, Ex. 10-General Rule Book; ECF No. 173-5, Ex. 5-SOPs; Ex. 47-Handbook; ECF No. 173-2, Ex. 2-Absenteeism Policy; Ex. 48-Accident Grading Policy). All these policies have applied uniformly to drivers since at least January 1, 2011. (Ex. 33-Murry 30(b)(6) 33:15-35:1 [ECF No. 173-6, Ex. 6-2011-2017 CBA; ECF No. 173-7, Ex. 7-2017-2022 CBA], 89:7-90:3 [ECF No. 173-10, Ex. 10-General Rule Book], 90:4-12, 118:14-21 [ECF No. 173-2, Ex. 2-Absenteeism Policy], 90:13-91:14 [ECF No. 173-5, Ex. 5-SOPs], 138:10-141:15 [Ex. 47-Handbook], 143:2-21 [Ex. 48-Accident Grading Policy]).

**1. Decision-Making Under Defendants' Disciplinary Process**

10. The CBA states "No employee will be disciplined without cause." (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 7; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 11). Pace utilizes a progressive disciplinary process for its employment rules, policies, or procedures (written warning, written warning with a suspension, and then termination). (Ex. 33-Murry 30(b)(6) 127:24-129:4).

11. Only Murry can issue disciplinary actions that involve suspension. (Ex. 33-Murry 30(b)(6) 203:13-204:15). Dines can only give a verbal warning or a coaching without first consulting Murry; Dines has no authority to issue or determine the length of a suspension or recommend termination without Murry's approval. (ECF No. 173-14, Ex. 14-Dines 47:9-12, 55:5-

18).  Klafeta acknowledged he had no input on Murry's decisions to implement discipline not involving terminations (including suspending drivers by removing them from service). (ECF No. 173-8, Ex. 8-Klafeta 28:10-17).

12.     Murry explained she usually does not consult with anyone in deciding what disciplinary action to give employees; she prepares a notice of personnel action form ("NOPA") and provides a copy to the union (Ex. 33-Murry 30(b)(6) 133:14-135:4, 166:18-169:9, 173:17-174:6). Murry claims she follows the "past practice" of progressive discipline for what others received for the same violations (e.g., for length of suspension); but Murry acknowledged she is not given any guidelines for following this "past practice," and it is not described by the collective bargaining agreements. (Ex. 33-Murry 30(b)(6) 127:24-129:18).

13.     Under Pace's disciplinary process, Murry recommends employment terminations for drivers (including for probationary employees), which are subject to Klafeta's final approval. (Ex. 33-Murry 30(b)(6) 145:7-146:8, 174:21-175:21; ECF No. 173-14, Ex. 14-Dines 58:5-8). Murry has authority to recommend termination of drivers who are "probationary employees" for any reason during their first 120 days. (Ex. 33-Murry 30(b)(6) 135:8-136:19).  As best Defendant Murry could recall, Klafeta never rejected Murry's recommendations for termination; Klafeta never encouraged Murry to terminate someone she had not already recommended for termination. (ECF No. 173-9, Ex. 9-Murry Ind. 213:19-214:5).

14.     Klafeta admitted he is only informed about termination recommendations from Murry, the notices of personnel action forms she prepares, or the union. (ECF No. 173-8, Ex. 8-Klafeta 58:5-59:2).  If Klafeta approves Murry's recommendation, Murry signs the letter notifying the employee of termination and identifies which of Pace's rules the employees violated.  (Ex. 33-

Murry 30(b)(6) 174:12-177:25; Ex. 52-Nelson Termination Letter; Ex. 69-Marshall 2017 Termination Letter).

15.     Unlike with hiring and promotions, Murry's implementation of Pace's disciplinary system (including termination) does not involve or require review or approval from Pace's Equal Employment Opportunity ("EEO") office or Human Resources.  (ECF No. 173-9, Ex. 9-Murry Ind. 67:7-68:11; ECF No. 173-13, Ex. 31-Plunkett Report, p. 5).

**2. Absences And Miss-Outs**

16.     Pace's uses progressive discipline for its absenteeism policy.  According to the policy: (a) an employee receives a caution notice for their first and second instances of absence; (b) an employee receives counselling sessions for their third and fourth instances; (c) a suspension "may be assessed" for the fifth through seventh instances; and (d) the "[e]mployee may be discharged" and face a hearing for the eighth instance. (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2).  As the language indicates, Pace's absenteeism policy gives Murry virtually unfettered discretion in deciding discipline.  (Ex. 33-Murry 30(b)(6) 115:9-22; ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2) ("Attendance in general is the concern of Pace and the subject of this policy. Abuse over a period of time may require greater disciplinary action for an individual violation than indicated.").

17.     Pace defines an "instance of absence" as "absence from work for any part of a work day, a single work day, or consecutive number of work days" so consecutive missed workdays count as one instance of absence. (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 1).  A "miss out" is an "absence from duty for any reason that is not reported to the dispatcher [at least] thirty minutes before report time, and the employee shows up later or calls."  (ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1; Ex. 33-Murry 30(b)(6) 103:4-10).

18.     Discipline is more severe for a "miss out" than an "instance of absence;" an employee is terminated after their third miss out.  (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2); ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1).   Other Pace employees provide Murry information about these events, but Murry ultimately decides if the employee is given a "miss out" or "instance of absence."  (Ex. 33-Murry 30(b)(6) 105:23-106:12).

19.     Murry also determines the length of a suspension after a second "miss out" and frequently changes "miss outs" to instances of absence, some of which Pace excuses.  (Ex. 33-Murry 30(b)(6) 130:19-131:3; ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 18).   Employees can ask to have an instance of absence or miss-out "excused;" Murry claimed only Klafeta can excuse an instance of absence, except for "something that the employee has to do with their child at school."  (Ex. 33-Murry 30(b)(6) 51:3-18, 64:23-65:16; ECF No. 173-9, Ex. 9-Murry Ind. 203:1-205:12).   Caputo's excused absences allowed him to be promoted.  (ECF No. 173-13, Ex. 13-Caputo 85:17-24, 86:20-24).

### 3. Preventable Accidents

20.     Pace buses are frequently involved in accidents.  (ECF No. 173-14, Ex.14-Dines 204:21-205:24; ECF No. 173-9, Ex. 9-Murry Ind. 96:9-17).   Caputo's job responsibilities (and Gerasch's before him) include "rating" accidents Defendants become aware of as "preventable" (i.e., avoidable by the driver) or "non-preventable" (i.e., not the driver's fault). However, Murry and Dines also are involved in grading accidents and determining grades.  (Ex. 33-Murry 30(b)(6) 150:22-151:4; ECF No. 173-14, Ex. 14-Dines 48:13-52:4, 131:11-25; ECF No. 173-17, Ex. 17-Marshall 131:6-132:12). After any accident or incident (preventable, non-preventable and ungraded), an employee's accident and incident record should be updated.  (*See, e.g.,* Ex. 70-

Marshall Accident/Incident Record; ECF No. 173-8, Ex. 8-Klafeta 121:6-14; ECF No. 173-9, Ex. 9-Murry Ind. 57:13-16, 92:3-93:12).

21.     Murry testified Pace's policy is to terminate an employee after the employee's third "preventable" accident within a 12-month period and claimed the policy was memorialized in a written memorandum.  (Ex. 33-Murry 30(b)(6) 143:2-21).  Pace's actual written policy states a third preventable accident results in "Possible Discharge," giving Murry discretion whether or not to recommend termination.  (ECF No. 173-14, Ex. 14- Dines 46:17-47:3; Ex. 48-Accident Grading Policy).

22.     Murry has discretion to recommend termination if an employee has a "severe accident" before having three preventable accidents, or engages in other serious misconduct; she described she would do so if a driver "hit a pedestrian" or engaged in violations such as "talking on a cell phone while they're operating a bus" or a "physical altercation or threat."  (Ex. 33-Murry 30(b)(6) 136:20-137:16, 143:10-14, 144:6-25; Ex. 48-Accident Grading Policy).

**4. Failure To Report An Accident Or Incident**

23.     Employees who fail to timely report an accident or incident can be terminated immediately. (Ex. 33-Murry 30(b)(6) 136:20-137:5). According to the CBA, an employee "may be subject to immediate dismissal" if they fail to report an accident or incident unless "it can be conclusively shown" that the employee did not or could know about the accident at the time it occurred.  (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 9; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 12).

24.     Per Murry, an accident is "if something comes in contact in, on, or around the bus … or comes into contact with the bus. An incident is … anything unusual that happens in, on, or around the bus."  (Ex. 33-Murry 30(b)(6) 138:20-139:1).

25.     According to Murry, at Pace's Heritage Garage, failure to report means having "an accident or incident that you have failed to report to dispatch before you leave the workplace the day that it happens." (Ex. 33-Murry 30(b)(6) 138:10-14).  But Murry also testified she expected employees to immediately alert dispatch and to accurately complete the reporting form. (Ex. 33-Murry 30(b)(6) 139:2-140:17; ECF No. 173-5, Ex. 5-SOPs, p. 24-1).

26.     Murry claimed that a driver that fails to report an accident or incident is subject to immediate termination. (Ex. 33-Murry 30(b)(6) 139:2-140:17).  However, Murry also acknowledged Pace's written policies grant her discretion to give lesser discipline. (Ex. 33-Murry 30(b)(6) 140:18-141:15; ECF No. 173-5, Ex. 5-SOPs, p. 24-1; Ex. 47-Handbook, p. 90).

### 5. Grievances Of Disciplinary Actions

27.     The CBA allows non-supervisory employees to grieve Murry's decisions, including disciplinary decisions and/or terminations. (ECF No. 173-6, Ex. 6-2011-2017 CBA, pp. 6-8; ECF No. 173-7, Ex. 7-2017-2022 CBA, pp. 9-11).  Murry reviews an employee's grievance of her disciplinary actions, including terminations, as the first step. (Ex. 33-Murry 30(b)(6) 151:5-152:25).  Murry could not recall ever reversing her own initial decision. (Ex. 33-Murry 30(b)(6) 152:22-25). Murry is also involved if the employee takes their grievance to the second step, but Klafeta makes the final decision at the second step. (Ex. 33-Murry 30(b)(6) 153:1-22).

### C.  Defendants' Disciplinary Decision Making Resulted In A Pattern Of Race Discrimination

28.     Murry could name not any Pace policy or procedure that should apply differently to individuals because of their race. (Ex. 33-Murry 30(b)(6) 183:14-184:5).  Defendants contend that "there are no racial disparities between African-Americans and others in rates of discipline, termination, transfer, promotion, or compensation." (Ex. 46-Interrogatory Answers, p. 6, Interrogatory No. 14).

29.     Defendants' human resources data and personnel records, compiled in Plaintiffs' Summary of Voluminous Personnel Records and Human Resources Data, show Murry suspended African American drivers more frequently and more severely than their Caucasian counterparts and virtually never terminated Caucasians. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶12-16).

30.     From 2011 to 2019, only *one* Caucasian was involuntarily terminated for violations of Pace's policies (i.e., 3.85% of the total involuntarily terminated and 1.75% of all Caucasian drivers).  (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15; ECF No. 173-14, Ex. 14-Dines 66:16-20, 68:4-10; ECF No. 173-9, Ex. 9-Murry Ind. 231:23-232:4).  By contrast, during that period, at least 24 African Americans were terminated for violating Pace's policies (92.31% of the total involuntarily terminated and 17.65% of all African American drivers); a summary of Defendants' records Murry prepared for the period 2012-2017 show 26 African Americans were terminated during that more narrow period. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15; Ex. 35-Murry 2017 Spreadsheet, p. 2; ECF No. 173-9, Ex. 9-Murry Ind. 231:6-22).

31.     Collectively, Caucasian drivers have been suspended only 43 times for any length of time (approximately 0.75 suspensions per driver); but African Americans have been suspended 157 times (a ratio of 1.15 per driver).  (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 12).

32.     No Caucasian driver has been suspended for longer than 3 days; by contrast, African Americans have been suspended longer than 3 days six different times, up to 7.5 days. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 13-14).

33.     The only type of disciplinary action Caucasian drivers receive at approximately the same ratio as African Americans is a written warning.  (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 11). But as the stages of Defendants' disciplinary process progress, African Americans fare worse and worse:

| Disciplinary Action | Caucasians | African Americans |
|---|---|---|
| Percentage of Drivers | 27.27% | 65.07% |
| Written Warnings | 26.86% | 62.96% |
| Suspensions | 20.09% | 73.36% |
| Multi-Day Suspensions | 16.66% | 79.17% |
| Terminations | 3.85% | 92.31% |

(ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 10-16).

34.     After learning about Plaintiffs' lawsuit, at Klafeta's request, Defendant Murry prepared a spreadsheet based on Defendant Pace's personnel files identifying Heritage Garage employees who had been terminated and Heritage employees who had resigned or been promoted between 2012 and October 2017; Murry admitted that of the approximately 30 people terminated, only one was white.  (ECF No. 173-9, Ex. 9-Murry Ind. 52:21-56:8, 57:21-58:19, 59:15-60:11, 62:4-62:18; Ex. 35-Murry's 2017 Spreadsheet, p. 2).

35.     Murry's spreadsheet shows different terminations from Pace's human resources data.  (Ex. 35-Murry's 2017 Spreadsheet, p. 1; Ex. 42, Human Resources Data Terminated Employees 2011-2017; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15.)  But Murry's 2017 spreadsheet and Defendant Pace's Human Resources data for terminated employees establish that between 2012 and 2017, Defendants did not terminate any non-probationary Caucasian drivers for violating Pace's policies, but terminated at least 20 African Americans.  (Ex. 35-Murry's 2017 Spreadsheet, p. 1; Ex. 42, Human Resources Data Terminated Employees 2011-2017; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 15.)

36.     As Murry admitted, Defendants administered discipline for violating Pace's rules in manner a jury could infer was discriminatory. (ECF No. 173-9, Ex. 9-Murry 65:14-67:4; Ex. 35-Murry's 2017 Spreadsheet, p. 2).  As Murry testified:

> Q: If someone wanted to discriminate against African Americans in favor of whites, you would expect to see lots of African American terminations and – and virtually no Caucasian terminations, correct?
>
> A. Correct.
>
> Q. And I understand you deny the allegation, but that's essentially what appears on Pace 95829, the – the spreadsheet you preferred, right?
>
> A. Correct.
>
> ***
>
> Q. … Is it -- is it correct that the criteria and methods you used to administer Pace's disciplinary system had the same effect as someone who would have been intentionally discriminating against individuals based on their race? [Objections omitted]
>
> A. It could be.
>
> Q. That would be a reasonable inference based on the spreadsheet [of terminated employees] you prepared, Pace 95829? [Objection omitted]
>
> A. Correct.

(ECF No. 173-9, Ex. 9-Murry Ind. 65:14-67:4; Ex. 35-Murry's 2017 Spreadsheet, p. 2).

37.     For promotions from part-time operator to full-time operator, African Americans and Caucasians were promoted at rates comparable to their representation; but Caucasians sometimes were promoted over African Americans with more seniority. (ECF 173-13, Ex. 13-Caputo 21:12-22:23; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 17).  For other promotions, Caucasians were promoted at much higher rates than African Americans (half of those promotions went to Caucasian drivers, even though they comprise only 28.86% of drivers).  (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶10, 17).

**D.  Plaintiff Nelson's Experience Was Consistent With Defendants' Pattern**

38.     Plaintiff Maurice Nelson worked under Murry's supervision as a part-time bus operator beginning October 20, 2014, was promoted to full-time bus operator on September 14, 2015, and held that position until his termination on October 25, 2016.  (ECF No. 74, Ex. 45-Answer ¶¶ 7, 42, 43, 50).

39.     Murry initially denied Nelson's promotion to full-time bus operator – purportedly because he had a suspension – but Nelson successfully grieved Murry's decision.  (ECF No. 173-15, Ex. 15-Nelson 61:20-64:18, 93:12-94:3, 96:5-102:12; ECF No. 173-8, Ex. 8-Klafeta 143:2-144:6; Ex. 53-Nelson Promotion Grievance).

40.     While employed, Nelson received write-ups and suspensions for alleged violations of Pace's employment policies (including the attendance policy).  (ECF No. 173-15, Ex. 15-Nelson 43:17-58:6, 61:20-64:18; Ex. 54-Nelson 2015 Suspension NOPA; Ex. 55-Nelson 2016 Suspension NOPA).

41.     Plaintiff Nelson's coworkers, including Dispatch Supervisor Sheldon Gray, told Plaintiff Nelson that Defendant Murry would block attempts by African Americans to transfer or promote out of the Heritage Garage.   (ECF No. 173-15, Ex. 15-Nelson 201:14-204:7).

42.     In a conversation with Plaintiff Nelson, Dispatch Supervisors Clark and Gray admitted Defendant Murry had favorites  - "white drivers who – who missed out and [Murry] didn't discipline them."  (ECF No. 173-15, Ex. 15-Nelson 61:20-63:25).

43.     Dispatch Supervisor Delois Jenkins also told Plaintiff Nelson that Defendant Murry was attempting to discipline him wrongfully as a form of harassment, specifically telling Plaintiff Nelson "they sure are watching you – you and [Dion] Lewis" (another African American operator Murry terminated); Dispatch Supervisor Jenkins warned Plaintiff Nelson to "watch [him]self

because Margaret Murry is looking for any reason to – to get rid of – to get rid of you" and stated Defendant Murry would "get rid of ours [African Americans] for – for anything, but she looks out for her own [Caucasians]."  (ECF No. 173-15, Ex. 15-Nelson 181:13-184:6).

44.     Defendant Murry instructed Dispatch Supervisor Jenkins not to allow Plaintiff Nelson to drive routes from Joliet to downtown Chicago, resulting in him driving more difficult local routes that required more work.  (ECF No. 173-15, Ex. 15-Nelson 198:2-199-20).  The more difficult routes exposed Plaintiff Nelson to increased opportunities for discipline.   (ECF No. 173-15, Ex. 15-Nelson 207:22-209:6).

45.     Dispatch Supervisor Jenkins told Plaintiff Nelson repeatedly that Defendant Murry was "only messing with you guys because you guys are black" and gave examples of Caucasian drivers that Defendant Murry did not bother, such as Ray Ulrich, Jacob Mack and Eric Weiss.   (ECF No. 173-15, Ex. 15-Nelson 184:9-185:25).

46.     Dispatch Supervisor Sheldon Gray also warned Plaintiff Nelson while in the parking lot that he better "watch [him]self because Defendant Murry was "out to get" him and Mr. Lewis; subsequently Dispatch Supervisor told Plaintiff Nelson that "you know she [Murry] don't like you guys because you're black" and then described examples based on his (Gray's) years of experience at the Heritage Garage where "he's witnessed her to do this to a number of drivers over the years."   (ECF No. 173-15, Ex. 15-Nelson 190:23-192:6).

47.     On October 20, 2016, Murry suspended Nelson pending investigation for his failure to report an accident that allegedly occurred at approximately 9:38 am; Defendant Murry suspended Plaintiff Nelson *before* the end of his workday and only hours of the alleged accident. (ECF No. 173-15, Ex. 15-Nelson 125:22-126:6; ECF No. 173-9, Ex. 9-Murry Ind. 189:16-193:5;

Ex. 55-Nelson Oct 2016 Suspension Pending Investigation NOPA; ECF No. 74, Ex. 45-Answer ¶¶ 44-47; Ex. 57- October 20, 2016 Notes; Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson).

48.     On the day in question, Nelson parked his bus in the garage as closely as possible to the bus in front of his, as Dispatch Supervisors Norvell Clark and Kathleen Clemmer had instructed, so that more buses would fit in the garage.  (ECF No. 173-15, Ex. 15-Nelson 146:1-19). After Nelson parked the bus, he got out of the bus and confirmed that his bus was not making contact with the bus in front of his; then Nelson went on his break before his afternoon route. (ECF No. 173-15, Ex. 15-Nelson 156:12-157:6).

49.     According to Defendant Murry, Caputo noticed Plaintiff Nelson's bus had made contact within minutes of Plaintiff Nelson exiting (around 10:00 am).  (Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson; ECF No. 173-9, Ex. 9-Murry Ind. 187:2-191:25).  At 11:12 AM that day, about an hour after Plaintiff Nelson parked the bus, Defendant Murry notified Klafeta that she would be suspending Nelson pending investigation.  (Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson).

50.     When Nelson returned from his break, Defendant Murry summoned Nelson into her office at approximately 3:10 pm where Dines also was waiting to meet with Nelson.  (ECF No. 173-15, Ex. 15-Nelson 157:7-13; Ex. 57-October 20, 2016 Notes).  Defendant Murry asked Nelson a slew of vague and accusatory questions, such as is there anything that Nelson should tell Murry. (ECF No. 173-15, Ex. 15-Nelson 157:14-158:2).  Defendant Murry questioned Plaintiff Nelson about rules violations and ultimately suspended Nelson pending investigation, but did not offer Plaintiff Nelson the opportunity to have a Union representative present because, according to her, "[i]t wasn't discipline" (even though a Hispanic employee involved in a similar meeting was afforded Union representation). (Ex. 57-October 20, 2016 Notes; Ex. 33-Murry 30(b)(6) 177:19-

178:3; ECF No. 173-9, Ex. 9-Murry Ind. 193:2-195:17; Ex. 59-Dines Notes re Nelson Second Step Grievance, p. 2).

51.     During the meeting with Plaintiff Nelson, Defendant Murry claimed that Nelson's bus made contact with the bus in front of his.  (ECF No. 173-15, Ex. 15-Nelson 158:3-23).  Murry alleged that Nelson's actions caused damage to the buses.  (ECF No. 173-15, Ex. 15-Nelson 158:3-23). Murry did not show Nelson any photos or videos of the alleged accident at this meeting. (ECF No. 173-15, Ex. 15-Nelson 158:3-7).  During that conversation, Plaintiff Nelson explained to Defendant Murry that if he had made contact, he would have reported it because it would "only be [his] 2nd preventable." (Ex. 61-Nelson Grievance of Term).  But Defendant Murry still suspended Plaintiff Nelson. (ECF No. 173-15, Ex. 15-Nelson 158:15-17; Ex. 56-Nelson Suspension Pending Investigation NOPA).

52.     Dines' notes confirm Nelson explained that he only had one preventable accident on his record at this time, so he had no reason to cover up an accident he actually knew happened; but Murry refused to believe him.  (ECF No. 173-15, Ex. 15-Nelson 160:22-162:12; ECF No. 173-9, Ex. 9-Murry 191:12-193:1; Ex. 61-Dines Notes re Nelson Grievance; Ex. 36, Murry Termination Notes).

53.     On October 25, 2016, Murry sent Nelson a termination letter identifying Pace rules Murry believed Nelson violated. (Ex. 52-Nelson Termination Letter).  Klafeta claimed he reviewed video evidence of Plaintiff Nelson's conduct, but could not recall when or where.  (ECF No. 173-8, Ex. 8-Klafeta 85:8-86:14).  Klafeta was not certain of the number of preventable accidents Plaintiff Nelson had at the time he authorized Nelson's termination. (ECF No. 173-8, Ex. 8-Klafeta 88:7-88:16).

54.     Nelson grieved his termination, arguing he could not report an accident that he was unaware happened, but Murry and Klafeta denied the grievance. (ECF No. 173-15, Ex. 15-Nelson 130:6-23, 160:22-161:8; ECF No. 173-14, Ex. 14-Dines 202:1-203:17; Ex. 61-Nelson Termination Grievance). Klafeta claimed to be able to see the damage to the bus, as well, and knew this accident would not have been Plaintiff Nelson's third "preventable" accident.  (ECF No. 173-8, Ex. 8-Klafeta 87:12-88:25; Ex. 59-Dines Notes re Second Step Grievance).   During the grievance meeting, Klafeta also told Plaintiff Nelson he "could not use ignorance [of the accident] as an excuse," even though the Pace's policies and the collective bargaining agreement allow that excuse (if believed by Defendants).  (ECF No. 173-8, Ex. 8-Klafeta 87:17-91:3).

55.     Caputo was involved in documenting the alleged accident by Plaintiff Nelson; but Caputo admitted from the photographs taken that he could not identify where Nelson's bus damaged the other buss. (ECF 173-13, Ex. 13-Caputo 120:9-25, 138:16-139:2, 148:13-151:6). Neither Murry, Caputo or Dines could not state whether the buses involved in Plaintiff Nelson's alleged accident was taken out of service for repairs. (ECF No. 173-13, Ex. 13-Caputo 121:4-7, 147:9-148:1; ECF No. 173-14, Ex. 14-Dines 162:25-168:25; ECF No. 173-9, Ex. 9-Murry Ind. 208:15-209:2).

**E.  Plaintiff Marshall's Experience Was Consistent With Defendants' Pattern**

56.     Plaintiff Christi Marshall worked under Defendant Murry's supervision at Pace's Heritage Garage from October 19, 2015 to October 17, 2017, initially as a part-time bus operator and then as a full-time bus operator beginning March 7, 2016. (ECF No. 74, Ex. 45-Answer, ¶¶ 8, 18, 56).

57.     At some point before Nelson's termination (in October 2016), Caputo determined Marshall was "going to be a problem" and Caputo was "going to take care of that." (ECF No. 173-15, Ex. 15-Nelson 31:1-32:25).

58.     Defendants terminated Marshall's employment in September 2016, purportedly for failing to report an accident; however, Defendant Pace was forced to reinstate her. (ECF No. 74, Ex. 45-Answer, ¶¶ 8, 18, 56, 67; Ex. 62-Marshall Termination Letter Sept. 14, 2016).

59.     Prior to being terminated in September 2016, Marshall asked Caputo to review video from her September 1, 2016 shift because she wanted feedback on difficulty she had merging that day, among other issues (at that point, she had no preventable accidents within the past year). (ECF No. 173-17, Ex. 17-Marshall 103:19-104:17; ECF No. 74, Ex. 45-Answer ¶ 63; Ex. 70-Marshall Accident/Incident Record; ECF No. 173-13, Ex. 13-Caputo 102:3-12).

60.     Marshall repeatedly asked Caputo to pull the video to review and learn from the situation of cars not letting her merge into a lane. (ECF No. 173-13, Ex. 13-Caputo 102:5-104:2). Before Caputo even reviewed the video, Caputo did not believe Marshall's claim that no one would let her merge. (ECF No. 173-13, Ex. 13-Caputo 105:4-19).

61.     Before being able to review that video, Marshall reported another accident she was involved in on September 9, which was graded non-preventable. (ECF 173-13, Ex. 13-Caputo 118:20-120:2; ECF No. 74, Ex. 45-Answer ¶ 64; ECF No. 173-9, Ex. 9-Murry Ind. 149:11-150:20; Ex. 70-Marshall Accident/Incident Record).

62.     When Caputo and Murry reviewed the video from September 1, 2016, according to them it showed Plaintiff Marshall's bus making contact with another vehicle. (ECF 173-13, Ex. 13-Caputo 110:6-112:20, 114:7-117:14; ECF No. 173-9, Ex. 9-Murry Ind. 149:11-150:20).

63.     Like Nelson, Marshall was unaware of the accident, but Murry suspended Marshall pending investigation on September 12, 2016. (ECF No. 74, Ex. 45-Answer ¶ 65; Ex. 63-September 12, 2016 Notes re Marshall; ECF No. 173-8, Ex. 8-Klafeta 79:1-4; ECF No. 173-17, Ex. 17- Marshall 104:12-17, 115:15-19).

64.     Subsequently, on September 14, 2016, Murry informed Marshall her employment was terminated for failing to report an "accident" during her September 1 shift. (ECF No. 74, Ex. 45-Answer ¶ 67).

65.     When Defendant Murry suspended Marshall and recommended Marshall's termination, Murry knew Marshall had *requested* to see the video *and* had reported other preventable accidents; despite that, Murry still believed Marshall was lying when denying knowledge of the alleged September 1, 2016 accident. (ECF No. 173-9, Ex. 9-Murry Ind. 149:7-150:20; Ex 62-Marshall 2016 Termination Letter).

66.     Defendant Murry admitted her 2016 termination letter for Plaintiff Marshall explaining the reasons for her termination references Plaintiff Marshall's "entire work record" as part of the basis for her termination, which included her attendance record and non-preventable accidents that Defendants could not consider as a basis for Plaintiff Marshall's termination.  (ECF No. 173-9, Ex. 9-Murry 165:13-168:10; Ex. 62-Murry's 2016 Termination Letter Sept. 14, 2016).

67.     Defendant Murry and Klafeta denied Plaintiff Marshall's grievance; subsequently an Arbitrator found no just cause to terminate Marshall, so she was reinstated. (ECF No. 74, Ex. 45-Answer ¶¶ 69-70.)  Defendants offered shifting explanations in the arbitration process, and the Arbitrator found the proffered reason – Marshall's failure to report an accident of which she was aware – was not worthy of credence.  (ECF No. 173-16, Ex. 16-Marshall Personnel File, pp. 13-

22 (Arbitration Award, pp. 11-20, describing shifting explanations offered to justify termination, and concluding Plaintiff Marshall was truthful in denying knowledge of the accident)

68.    Klafeta admitted Defendants' contention that Plaintiff Marshall requested to review video for a day she knew she had an unreported accident "makes no sense." (ECF No. 173-8, Ex. 8-Klafeta 79:23-80:15).

69.    When Plaintiff Marshall described her 2016 termination to Dispatch Supervisor Sheldon Gray, he apologized to her and said "this has been going on for years" and particularly since Defendant Murry came to the Heritage Garage.  (ECF No. 173-17, Ex. 17-Marshall 175:20-177:24).

70.    When Plaintiff Marshall returned from reinstatement in June 2017, Dispatch Supervisor Delois Jenkins admitted that what Defendants "did to [Marshall] was wrong."  (ECF No. 173-17, Ex. 17-Marshall 170:14-172:16.)

71.    On other occasions, Dispatch Supervisor Jenkins admitted to Plaintiff Marshall that Plaintiff Nelson had African American Operator Dion Lewis "both were lied on by Caputo" leading to suspension or termination.  (ECF No. 173-17, Ex. 17-Marshall 172:17-174:2; 174:20-175:13).

72.    Upon reinstatement, Defendant Murry assigned Marshall to drive a different bus (referred to as a "Pulse" bus), even though Marshall received limited training on how to operate it (a total of about 30 minutes). (ECF No. 173-17, Ex. 17-Marshall 124:3-21, 126:20-130:4; Ex. 65-Marshall July 7, 2017 Memo; ECF No. 74, Ex. 45-Answer ¶ 71).

73.    After her first allegedly preventable "accident" (June 30, 2017), Marshall asked to have the grade changed because she was only trained for a total of thirty minutes of training on the "Pulse" bus. (ECF No. 173-17, Ex. 17-Marshall 127:8-16), but Murry refused. (ECF No. 173-17,

Ex. 17-Marshall 128:24-130:4; Ex. 66-Marshall 1st Preventable NOPA; Ex. 65-Marshall July 7, 2017 Memo; ECF No. 74, Ex. 45-Answer ¶ 76).

74.     On July 27, 2017, Plaintiff ran over the curb while making a right turn due to inconsistent training related to the Pulse bus. (ECF No. 173-17, Ex. 17-Marshall 60:9-11). When she was initially trained to drive a Pulse bus by Dines, she was instructed to angle the bus out when turning right to gain more clearance. (ECF No. 173-17, Ex. 17-Marshall 129:4-11). After Marshall's first accident in the Pulse Bus, Caputo instructed Marshall to not angle out when making turns, but she was to simply pull out further when making turns. (ECF No. 173-17, Ex. 17-Marshall 129:4-11). Defendants suspended Plaintiff Marshall based on this allegedly preventable accident. (Ex. 67-Marshall 2nd Preventable Suspension NOPA.)

75.     On October 3, 2017, while Marshall was operating her bus, a man approached the bus and said something to the effect of "my mirror was hit." (ECF No. 173-17, Ex. 17-Marshall 65:8-12). Marshall parked the bus, and observed the other driver's vehicle had glass missing from the side mirror, but there was no glass on the ground in the area. (ECF No. 173-17, Ex. 17-Marshall 143:1-5). Marshall and the passengers on board did not hear, feel, or see an accident. (ECF No. 173-17, Ex. 17-Marshall 64:20-22). Marshall reported the incident later that day at the transfer point. (ECF No. 173-17, Ex. 17-Marshall 65:13-19).

76.     Defendants terminated Plaintiff Marshall *again* on October 17, 2017, this time allegedly for having three "preventable" accidents within a 12-month period. (ECF No. 74, Ex. 45-Answer ¶ 77; Ex. 69-Marshall 2017 Termination Letter). Marshall grieved her termination, but Defendants refused to overturn the grievance. (Ex. 68-Marshall 2017 Termination Grievance).

**F.  Other African Americans Made Similar Allegations Of Racial Discrimination**

77.     Plaintiffs are not the first or only African American drivers to claim Murry discriminates against them. Three former employees made similar allegations in a federal lawsuit prior to January 1, 2011. (ECF No. 173-9, Ex. 9-Murry Ind. 25:14-28:19; ECF No. 173-8, Ex. 8-Klafeta 30:12-31:22).

78.     During the relevant time period, African American driver Fonn Moore also alleged internal complaints of race discrimination against Caputo, Murry, and Klafeta, including with respect to discipline for violating the "three preventable accidents" policy. (ECF No. 173-8, Ex. 8-Klafeta 31:23-32:11, 33:7-34:9; ECF No. 173-29, Ex. 29-Moore EEO Complaint).

79.      In terminating Fonn Moore, allegedly for a "third preventable accident in a rolling twelve month period," Murry considered Moore's "entire work record," which included disciplinary actions outside the 12-month period prior to her termination (*e.g.,* absences, including one because her daughter had been a victim of a violent crime involving gunfire, etc.), in violation of Defendant Pace's obligations under its Collective Bargaining Agreement.  (Ex. 83-Moore Personnel File, PACE005573).

80.     Defendant Murry admitted that, like Plaintiffs Marshall and Nelson, former African American employees Johnson, Scates, Ento and Moore alleged discrimination in the application of disciplinary rules and[/]or the termination of employment.  (ECF No. 173-9, Ex. 9-Murry Ind. 25:1-30:8, "Q:  You're aware all of those individuals alleged discrimination in the application of disciplinary rules and[/]or the termination of employment, right?  A:  Correct").

**G.  Pace's EEO Policy Failed To Protect African Americans**

81.     Pursuant to Federal Transit Administration ("FTA") requirements, Pace maintains an Equal Employment Opportunity ("EEO") program, which includes an EEO policy that prohibits

race discrimination. (Ex. 34-Fedewa 30(b)(6) 59:3-62:10). But Murry unequivocally explained Pace's EEO program has no impact on her process for disciplining or terminating employees:

> Q.· ·What role does the equal employment opportunity program play in the process for disciplining employees about whom you're here to testify?
>
> A.· ·None.
>
> Q.· ·And what role does the equal employment opportunity program play in the termination of employees about whom you're here to testify?
>
> A.· ·None.

(Ex. 33-Murry 30(b)(6) 182:19-183:13; ECF No. 173-9, Ex. 9-Murry Ind. 67:18-68:7).

82.     An April 2016 EEO Audit of Defendant Pace's compliance with the Federal Transit Agency's requirements highlighted Pace's failure to track or report disciplinary actions by race, along with its general failure to perform detailed assessments of its employment practices (as required by FTA regulations). (Ex. 73-2016 EEO Audit, pp. 1, 24-25; Ex. 76-Gordon 30(b)(6) 100:11-16).

83.     Pace acknowledged those failures, as well as failing to implement two recommendations from the April 2016 audit: (a) specifically evaluating management's performance on their implementation of Pace's EEO policy; and (b) having a full-time EEO officer (Pace's Executive Director did not feel EEO duties justified a full-time position, notwithstanding the audit's identification of numerous deficiencies).  (Ex. 76-Gordon 30(b)(6) 33:9-35:6, 100:11-16, 137:13-138:2, 142:19-143:13).

84.     Defendant Pace failed to take care to prevent race discrimination in the workplace in accordance with EEOC Enforcement Guidance or in accordance with reasonable and customary Human Resources standards.  (ECF No. 173-31, Ex. 31-Plunket Rep. p. 3, ¶ 1).[1]

85.     Defendant Pace failed to take care to prevent Defendant Murry from engaging in discriminatory conduct in handling discretionary disciplinary and termination decisions.  (ECF No. 173-31, Ex. 31-Plunket Rep. p. 6, ¶ 4).

86.     Defendant Pace's EEO Policy statement in its Equal Employment Opportunity Program for 2013-2016 does not include key elements described in EEOC enforcement guidance, such as a clear explanation of prohibited conduct, assurance about protection against retaliation, a clearly described complaint process, an assurance the employer will protect confidentiality of complaints to the extent possible, a complaint process that provides a prompt and thorough investigation, or an assurance the employer will take immediate and appropriate corrective action. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 3; Ex. 77-Pace EEO Program 2016-2019, pp. PACE1004, 1016-1017; Ex. 78, Pace EEO Program 2013-2016, pp. PACE1195, 1207-1208).

87.     Defendant Pace failed to meet the threshold standards required by the FTA as detailed in the Pace Suburban Bus EEO Compliance Review Final Report dated April 2016.  (ECF No. 173-31, Ex. 31-Plunket Rep. p. 4 ¶ 2; Ex. 36-April 2016 FTA Compliance Review; Ex. 71- Z. Johnson 51:15-52:21; Ex. 72-Z. Johnson Rep. p. 3).  Presence of deficiencies point to the possible presence of unequal treatment based on a protected category; it gives rise to reasonable questions

---

[1] Plaintiffs acknowledge this Court's order prohibiting Plunkett from testifying as to whether Defendant Pace exercised "reasonable care" (ECF No. 168, pp. 9-10); but Plaintiffs believe the fact is supported by opinions without reference whether the care was "reasonable."

about whether intentional or unintentional discrimination happened. (Ex. 71-Z. Johnson 96:11-97:8; Ex. 72-Johnson Rep., p. 4).[2]

88.     As noted in the FTA Compliance review, Defendant Pace failed to evaluate managers like Defendant Murry on compliance with Pace's EEO policy the same way as their performance on Defendant Pace's other goals. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 5; Ex. 36, April 2016 FTA Compliance Review, p. 22). Even after the FTA Compliance Review noted this deficiency, and after this lawsuit was filed, Pace did not include EEO compliance as an element of Defendant Murry's performance review. (Ex. 74-Murry Jan 2017 Performance Evaluation). Evaluating Defendant Murry on that would have sent the message that EEO compliance is important. (Ex. 71-Z. Johnson 100:11-103:2).

89.     Defendant Murry received no substantive training about preventing race discrimination when exercising discretion in her job duties. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6).

90.     Defendant Pace's EEO Officer did not and could not track the number of race discrimination complaints against Defendant Murry. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 7; Ex. 76-Gordon 30(b)(6) 59:21-60:2).

91.     Defendant Murry admitted that the only way for a supervisor to know whether a manager had engaged in discrimination of which the manager was accused was to ask and, without asking, supervisors would not know. (ECF No. 173-9, Ex. 9-Murry 35:12-36:6).

---

[2] Plaintiffs rely on this evidence for purposes of overcoming summary judgment subject to and without waiving their objections to Defendants' untimely and improper attempts to submit rebuttal experts (specifically, the testimony and reports of Z. Wayne Johnson and Dr. Hart Blanton). (*See generally* ECF No. 186.) Plaintiffs contend the Court can and should deny Defendants' motion for summary judgment without consideration of that improper evidence; however, should the Court consider it, Plaintiffs believe it highlights disputed material facts.

92.     Despite being aware of the allegations against Defendant Murry by Johnson, Ento, Skates, Moore and Plaintiff, her superiors Metzger and Klafeta never asked whether Defendant Murry discriminated against any of them or African-Americans generally.  (ECF No. 173-8, Ex. 8-Klafeta 30:20-35:1; ECF No. 173-9, Ex. 9-Murry 25:1-33:4, 99:1-4) ("Q: Ms. Metzger ever ask whether you discriminated against any of these individuals?  A. No, she did not.  … Q.  Mr. Klafeta ever asked?  A. No, he did not.")

93.     Although Plaintiffs Nelson and Marshall both filed administrative charges with the EEOC alleging racial discrimination, Defendant Murry did not learn they had done so until November 2, 2017, when she received a copy of the federal court complaint Plaintiffs filed.  (ECF No. 173-9, Ex. 9-Murry Ind. 51:15-52:8; Ex. 37-Murry Email re Nelson & Marshall Fed Lawsuit).

94.     Defendant Pace also failed to track or report disciplinary actions by race, which prevented effective examination of its employment practices.  (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 28; Ex. 71-Z. Johnson 97:21-98:3, 103:4-105:5; Ex. 76-Gordon 30(b)(6) 100:11-16).  Prior to the Compliance Review, Pace did not perform any evaluation or assessment of employment practices to determine if race was a factor in disciplinary and termination decisions. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 28; Ex. 71-Z. Johnson 97:21-98:3, 103:4-105:5).  Even after the FTA Compliance Review noted this deficiency, Pace failed to track or report disciplinary actions by race.  (Ex. 71-Z. Johnson 105:6-107:3; Ex. 73-September 2016 EEO Utilization Analysis).

95.     Defendant Pace did not conduct any adverse impact analysis to evaluate disciplinary decisions.  (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 24, 28).  Prior to the FTA Compliance Review, involuntary terminations

were not differentiated from voluntary terminations so that terminations decisions could be appropriately analyzed to ensure a non-discriminatory application of policies. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 24, 28).

## H. Defendants Employment Policies May Have Fostered Racial Discrimination

96.     Defendant Pace maintained policies that were discretionary in nature such as grading of a preventable or non-preventable accident and defining certain actions that *may* be subject to dismissal. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6; Ex. 75-Peery Rep. pp. 11-12.) Such broad discretion is subject to abuse and discrimination. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6; Ex. 75-Peery Rep. pp. 5-11). There was no effort to evaluate whether Defendant Murry properly exercised her discretion and no oversight by human resources to ensure non-discriminatory execution of policies. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6).

97.     Social science research regarding employment decisions suggests structured processes are important to reduce subjective, highly discretionary decision-making. (Ex. 75-Peery Rep., p. 8). A structured process is important because subjective processes have been consistently shown to be vulnerable to the influence of bias and stereotyping. (Ex. 75-Peery Rep., p. 8). Racial minorities fare better in processes that are more structured and less subjective. (Ex. 75-Peery Rep., p. 8). Biases and stereotypes can lead to shifting criteria being used by evaluators or decisionmakers. (i.e., evaluating similar behavior in different ways, with favored individuals or groups perceived and evaluated more positively for the same behavior as a disfavored group or individual). (Ex. 75-Peery Rep., p. 9).

98.     Biases of all kinds color people's perception of the world around them, affecting how people perceive, gather, understand, and use information to make decisions about people and situations. (Ex. 75-Peery Rep., p. 6). Biases can include ingroup biases (i.e., preference for

individuals like oneself, including racial group), attributional biases (i.e., being more likely to attribute negative behaviors to outgroup members to internal causes, like personality, but attributing the same negative behaviors in ingroup members to circumstances outside the individual's control), and confirmation biases (i.e., focusing on information that supports a preconception, including those based on stereotypes).  (Ex. 75-Peery Rep., p. 6).

99.     Like biases, the presence or absence of stereotypes (generalizations of what certain types of people or groups are like or should be like) can lead decisionmakers to shift criteria for a decision in favor of a preferred or against a disfavored individual or group.  (Ex. 75-Peery Rep., pp. 7-8).  Common stereotypes of Black people, both historically and now, hold that Black People are dishonest, lazy, ignorant, stupid, incompetent, loud, aggressive, or criminal.  (Ex. 75-Peery Rep., p. 8).  Stereotypes of Black people are resistant to change; many have held constant for decades.  (Ex. 75-Peery Rep., p. 8).

## I.  Defendants Waived Certain Defenses Raised In Its Memorandum

100.     Defendants filed their Answer to Plaintiffs' Second Amended Complaint on December 14, 2018.  (Ex. 45-Answer, p. 1.)  Defendants asserted six affirmative defenses, none of which reference or allege Plaintiffs' failure to exhaust administrative remedies or Plaintiffs' failure to identify a specific employment practice in support of their disparate impact claims.  (Ex. 45-Answer, pp. 24-25.)  Nowhere in Defendants' answer does it otherwise raise those defenses.  (Ex. 45-Answer, pp. 1-25).

101.     Defendants' six affirmative defenses do not allege any of its employment practices are job related or consistent with business necessity.  (Ex. 45-Answer, pp. 1-25).  Nowhere in Defendants' answer does it otherwise raise those defenses.  (Ex. 45-Answer, pp. 1-25).

102.    In responding to Plaintiffs' interrogatories about potential explanations for disparities between African Americans and others in rates of discipline or terminations, Defendants did not identify any policy or practice it claimed was job related or justified by business necessity as a possible factor or circumstance explaining any disparities; it denied the existence of any disparities:

> 14. Identify and describe in detail any factors, criteria or circumstances Defendants believe could explain any racial disparities that exist between African-Americans and others in rates of discipline, termination, transfer, promotion or compensation of Pace drivers.
>
> **<u>ANSWER</u>: Defendants object as this interrogatory is overly broad and unduly burdensome. Subject to said objection, there are no racial disparities between African-Americans and others in rates of discipline, termination, transfer, promotion, or compensation.**

(Ex. 46, Def's Rog Answers, p. 6, Interrogatory No. 14).

**J.  Plaintiffs Exhausted Administrative Remedies At The IDHR**

103.    On approximately March 26, 2018, the IDHR mailed Defendant Pace and Plaintiff Marshall a notice explaining that:  (a) the IDHR would not be investigating Plaintiff Marshall's charge 180326-023; (b) if Plaintiff Marshall "do[es] not wish to proceed with [investigation at] the Department, [she] do[es] not need to take any further action; and (c) her "failure to timely provide the EEOC's findings to the Department will result only in the Department closing her file," ending tolling of the statutory investigation period prior to which she could pursue claims in Court.  (Ex. 87-IDHR Materials, pp. 1-2).

104.    Plaintiffs Nelson's EEOC charge was cross-filed with the Illinois Department of Human Rights.  (Ex. 45-Answer, p. 11, ¶ 53.)  On approximately May 29, 2018, the Illinois Department of Human Rights mailed Defendant Pace (through its then-counsel Christopher Lyons) and Plaintiff Nelson (through his counsel) a "Notice of Dismissal for Lack of Substantial Evidence

and Order of Closure" notifying Pace that Nelson could pursue a civil action against Defendant Pace within 90 days after receipt of the notice. (Ex. 87-IDHR Materials, p. 4).

## K. Defendants Treated Caucasians Favorably Under Its Rules

105. Caucasian driver Jacob Mack admitted to Plaintiff Nelson and Plaintiff Marshall that Mack had been the subject of multiple complaints of aggressive or wild driving from passengers, but was never disciplined. (ECF No. 173-15, Ex. 15-Nelson 186:6-186:25; ECF No. 173-17, Ex. 17-Marshall 94:19-96:25).

106. Klafeta conceded there may be an employee with more than three preventable accidents who was not terminated. (ECF No. 173-8, Ex. 8-Klafeta 157:4-7). Dines and Murry admitted that as part of Pace's normal routes, drivers often have accidents or incidents that go unreported, but drivers are not disciplined or terminated for failing to report them. (ECF No. 173-14, Ex. 14-Dines 204:21-205:24; ECF No. 173-9, Ex. 9-Murry Ind. 96:9-17).

107. A Caucasian employee (Michael Neilson, Jr.) – the son of another Caucasian Pace employee who worked at the Heritage Garage that was promoted – arrived late to training and had an accident during the training program. (ECF No. 173-13, Ex. 13-Caputo 94:22-95:25; ECF No. 173-9, Ex. 9-Murry Ind. 85:24-90:1; ECF No. 173-17, Ex. 17-Marshall 96:23-103:4). Although Defendant Pace's instructors (including Gerasch and Caputo specifically told trainees (including Plaintiff Marshall) that any tardiness or accident would result in termination, Caucasian Operator Michael Neilson suffered no disciplinary action for either. (ECF No. 173-17, Ex. 17-Marshall 97:11-99:15). Klafeta testified that the training policies above are a clear example of rules that are designed to prevent disparities; yet when they are not followed or consistently applied, the result could allow racial disparities to exist over time. (ECF No. 173-8, Ex. 8-Klafeta 95:1-97:3).

108. While Plaintiff Marshall was on the bus, Neilson, Jr. crashed into a construction sign while driving. (ECF No. 173-17, Ex. 17-Marshall 100:14-24). During the accident, Caputo shouted that Neilson was not watching his speed, and was not following Caputo's direction, and that this was a preventable accident. (ECF No. 173-17, Ex. 17-Marshall 100:14-24). Specifically, hitting a fixed object with the bus is always a preventable accident. (ECF No. 173-9, Ex. 9-Murry Ind. 93:13-18). Immediately after the crash, Caputo got off the bus and made a phone call, appearing very upset. (ECF No. 173-17, Ex. 17-Marshall 102:12-24).

109. Murry testified that Neilson's accident during training should have been included in Neilson's accident record. (ECF No. 173-9, Ex. 9-Murry Ind. 92:22-93:2). However, there is no documentation contained in Neilson's Personnel File indicating the accident was graded, and his Employee Accident / Incident Record omits the accident completely. (ECF No. 173-9, Ex.9-Murry Ind. 92:12-93:12; Ex. 38, Neilsen Record). Contradicting herself, however, Murry also claimed that not all accidents require a report – "You - - it depends on what the - - what happened." (ECF No. 173-9, Ex. 9-Murry Ind. 95:6-13).

110. Klafeta also acknowledged that Murry's subjective decision about what she characterizes as "failure to report" leads to terminations. (ECF No. 173-8, Ex. 8-Klafeta 95:1-97:3). Klafeta claimed he was confident Murry had recommended terminations for Caucasian drivers, because he is "sure that rule violations have occurred," but he could not recall any circumstances where Defendant Murry recommended termination of a Caucasian driver. (ECF No. 173-8, Ex. 8-Klafeta 45:1-46:9).

111. A Caucasian driver (Richard Ulrich) was not terminated despite failing to report an incident with a passenger that required police to be called and falsifying his overtime slipEven though both offenses should result in immediate termination, Murry did not recommend

termination to Klafeta. (ECF No. 173-14, Ex. 14-Dines 176:4-25, 180:4-181:15; ECF No. 173-9, Ex. 9-Murry Ind. 81:6-84:12; ECF No. 173-8, Ex. 8-Klafeta 101:10-102:22; Ex. 39-Murry April 2016 Email Exchange with Klafeta Regarding Ulrich).

112.    On March 28, 2016, a passenger fell asleep on Ulrich's bus, requiring him to call the police. (ECF No. 173-8, Ex. 8-Klafeta 92:19-24). An employee that fails to report an incident like this would be subject to termination. (ECF No. 173-8, Ex. 8-Klafeta 95:9-96:8). However, Ulrich did not compete his accident/incident report on the day of the incident, as required under Pace's policies. (ECF No. 173-9, Ex. 9-Murry Ind. 128:15-17; Ex. 39-Murry April 2016 Email Exchange with Klafeta Regarding Ulrich; ECF No. 173-8, Ex. 8-Klafeta 95:9-23; ECF No. 173-14, Ex. 14-Dines 176:20-25). Ignoring the failure to report, Klafeta emailed Murry to call him before meeting with Ulrich, stating "The falsification is a serious matter." (ECF No. 173-8, Ex. 8-Klafeta 101:19-24).

113.    On April 4, 2016, Murry, Dines, Union Representative Luis Campagna, and Ulrich attending a meeting to discuss the missed report. (ECF No. 173-9, Ex. 9-Murry Ind. 81:12-18; Ex. 60-Dines Notes, pp. 2-4). Ulrich claimed that he reported the incident while on a break, but Murry did not have it when interviewing Ulrich about the matter. (ECF No. 173-9, Ex. 9-Murry Ind. 81:19-24; Ex. 60-Dines Notes, pp. 2-4). Ulrich was not terminated for his failure to report. (ECF No. 173-9, Ex. 9-Murry Ind. 83:12-14; ECF No. 173-8, Ex. 8-Klafeta 93:4-7, ECF No. 173-14, Ex. 14-Dines 181:22-25).

114.    Murry notified Klafeta about a Caucasian employee (Michael Rooney) who failed to immediately notify Pace about an accident that destroyed a mirror (waiting about a half hour before notifying dispatch); hen Rooney notified dispatch, he did so using his personal cell phone while driving the bus with passengers on board, but Murry did not recommend termination; he was

only suspended 1 day. (ECF No. 173-8, Ex. 8-Klafeta:105:10-107:11; Ex. 41-Rooney Communications, pp. 1-2). Using a cell phone while operating a vehicle is against Pace rules. (ECF No. 173-8, Ex. 8-Klafeta 106:17-22). The offense is so serious, Murry stated it warrants termination in the first instance. (Ex. 33-Murry 30(b)(6) 136:20-137:16, 143:10-14, 144:6-25).

115.    Murry also knew a Hispanic employee (Richard Delgado) hit a pedestrian while backing up a Pace non-revenue relief van against the direction of traffic. (ECF No. 173-14, Ex. 14-Dines 190:8-195:6; ECF No. 173-9, Ex. 9-Murry Ind. 84:13-85:7). Delgado backed up the bus for a full block so his co-worker did not have to walk to the vehicle. (ECF No. 173-14, Ex. 14-Dines 192:13-18). It is in violation of Pace operating procedures to back up a van against the direction of traffic. (ECF No. 173-9, Ex. 9-Murry Ind. 84:23-85:1). It is a big deal when a Pace vehicle strikes a human being. (ECF No. 173-9, Ex. 9-Murry Ind. 85:2-4). Murry did not recommend his termination (he was only suspended). (ECF No. 173-9, Ex. 9-Murry Ind. 85:5-7; ECF No. 173-14, Ex. 14-Dines 193:7-10).

116.    Hispanic bus operator David Sosa had his third preventable accident on April 1, 2016 (Ex. 50-Sosa Accident Report, p. PACE48266.) Sosa was not terminated for that preventable accident, nor when, on April 4, 2016, he failed to immediately report what would have been his fourth preventable accident in less than one calendar year; Sosa was allowed to resign.  c

117.    Murry notified Klafeta about a Hispanic employee (Romeo Zamudio) who failed to immediately report an accident to dispatch without recommending that driver's termination. (ECF No. 173-8, Ex. 8-Klafeta 104:6-16). According to Dines' testimony, Zamudio resigned without any investigation or suspension. (ECF No. 173-14, Ex. 14-Dines 117:12-18).

118.    Murry recommended termination for Charlotte Perry (African American) for absenteeism. (ECF No. 173-9, Ex. 9-Murry Ind. 85:8-20; Ex. 60-Dines Notes, p. 5). Perry was

terminated for having eight absences, but at least one of the absences was incurred during FMLA leave. (ECF No. 173-14, Ex. 14-Dines 189:13-190:5).

Respectfully submitted for Plaintiffs,

By:   /s/ J. Bryan Wood

One of Plaintiffs' Attorneys

Attorneys for Plaintiffs:
J. Bryan Wood (No. 6270845)
THE WOOD LAW OFFICE, LLC
303 W. Madison St., Ste. 2650
Chicago, Illinois 60606
Telephone:  (312) 554-8600
Facsimile:  (312) 577-0749
bryan@jbryanwoodlaw.com
restes@jbryanwoodlaw.com

Quinton Osborne (No. 6319417)
Osborne Employment Law LLC
799 Roosevelt Road, Suite 3-201
Glen Ellyn, IL 60137
Telephone:  (331) 702-1538
Facsimile:  (331) 465-0450
Quinton@OsborneEmploymentLaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 25, 2022, a copy of the foregoing Plaintiffs

Local Rule 56.1(b)(3) Statement of Additional Facts was served upon all counsel of record via the

Court's electronic filing system.

Respectfully submitted

/s/ J. Bryan Wood