## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MAURICE NELSON and CHRISTI MARSHALL,<br><br>     Plaintiffs,<br><br>v.<br><br>PACE SUBURBAN BUS and MARGARET MURRY,<br><br>     Defendants. | No. 17-cv-7697<br><br>Judge Robert W. Gettleman |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1(b)(3) STATEMENT OF ADDITIONAL FACTS

Pursuant to Local Rule 56.1(c)(2), Defendants Pace Suburban Bus and Margaret Murry, through their undersigned counsel, submit this response to Plaintiffs' Statement of Additional Facts accompanying their Memorandum in Opposition to Defendants' Motion for Summary Judgment. (ECF No. 197, Pls' Statement of Additional Facts ("Pls' SOAF" )).

1.    Defendant Pace Suburban Bus ("Pace") is a regional governmental body created, operated, and funded pursuant to state and federal law, including the Regional Transportation Authority Act (70 ILCS 3515/1.01 *et seq.*); it provides bus and transportation service throughout Chicago's suburbs from 11 different locations. (ECF No. 74, Ex. 45-Answer ¶¶ 10-11).

**Defendants' Response to ¶ 1:** Undisputed.

2.    Plaintiffs Maurice Nelson (African American) and Christi Marshall (African American) worked as drivers at Pace's Heritage Division Garage under Defendant Margaret Murry, who oversaw daily operations at that location. (ECF No. 74, Ex. 45-Answer ¶¶ 7-8, 18; Ex. 33-Murry 30(b)(6) 9:13-22, 12:1-13:1, 13:10-21).

**Defendants' Response to ¶ 2:** Undisputed.

3.      Defendant Margaret Murry (Caucasian) has worked for Pace since October 1994 and has been the Division Manager at the Heritage Division Garage since approximately September 1999. (ECF No. 74, Ex. 45-Answer ¶¶ 15-16). Murry's duties require her "to ensure the safe operation of the fixed routes in Joliet and in Chicago ... to hire the employees, discipline the employees, oversee the drug and alcohol procedures, policies, ensure all Pace Policies are adhered to." (Ex. 33-Murry 30(b)(6) 9:13-22; ECF No. 74, Ex. 45-Answer ¶ 18).

**Defendants' Response to ¶ 3:** Undisputed.

4.      The non-supervisory positions at Heritage Garage with job duties that move or operate buses (i.e., "drivers") are: part-time operator, full-time operator, demand response shuttle driver, mechanic, mechanic helper, master mechanic, servicer, and building maintenance. (Ex. 33-Murry 30(b)(6) 12:1-13:21; Ex. 34-Fedewa 30(b)(6) 17:12-18:6, 21:7-20; Ex. 49-Job Title Summary; ECF No. 74, Ex. 45-Answer ¶ 79). Pace's Human Resources data shows that from January 1, 2011 through March 31, 2019, 209 individuals have held driver positions at some point; of those, 57 (27.27%) are Caucasian, 136 (65.07%) are African American, 13 (6.22%) are Hispanic and 3 (1.44%) are Asian. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 10).

**Defendants' Response to ¶ 4:** Defendants object to this proposed fact as lacking evidentiary support. Plaintiffs' cited "summary" of Pace's personnel records (ECF No. 173, Ex. 32) states that it purports to be a summary of voluminous records under Federal Rule of Evidence 1006. But Plaintiffs disregard the strictures of Rule 1006 because the unidentified author of Plaintiffs' summary exercised judgment in selecting the criteria used in summarizing the data, and because the author proffers opinions about the legality of the summarized results.  This renders Plaintiffs' summary inadmissible. *E.g., Swan v. Bd. of Educ. of City of Chicago*, Nos. 13 C 3623 & 13 C 3624, 2013 WL 4401439, at *22 n.15 (N.D. Ill. Aug. 15, 2013) (finding a similar "summary" inadmissible

as failing to comply with Rule 1006 because the summary's author "exercise[d] his judgment in selecting particular performance data from the progress reports, while excluding others").

Further, the "summarized" data states that from January 11, 2019—not 2011—to March 31, 2019, 65.07% of drivers were African American, 27.27% white, 6.22% Hispanic, and 1.44% Asian. (ECF No. 173, Ex. 32 Personnel Records Summary, ¶ 10 Table 1). For all these reasons, Paragraph 4 is disputed.

5.      As of October 17, 2018, the Heritage Garage management staff reporting to Murry included: (a) Brian Findlay (Caucasian), the Superintendent of Maintenance (a position he held since at least January 1, 2011); (b) Anthony Caputo (Caucasian), the Safety and Training Manager (a position he held since approximately May 2015); (c) David Dines (African American), the Superintendent of Transportation (a position he held since May 2015); and (d) several Dispatch Supervisors. (Ex. 33-Murry 30(b)(6) 15:10-16:16, 17:10-19:6, 20:1-3, 41:2242:2; ECF No. 173-14, Ex. 14-Dines 38:4-10; Ex. 44-Heritage Org. Chart). Jackie Gerasch (Caucasian), served as the Safety and Training Manager from before January 1, 2011 to May 2015 and performed duties that are now split between Caputo and Dines or that were not performed at the Heritage Garage. (Ex. 33-Murry 30(b)(6) 15:10-16:16, 88:1-88:12; ECF 173-13, Ex. 13-Caputo 33:11-12). The racial makeup and reporting structure of Dispatch Supervisors changed during the relevant time period; initially, they reported directly to Murry but have reported to Dines since his hiring. (Ex. 33-Murry 30(b)(6) 16:17-18:5; ECF No. 173-9, Ex. 9-Murry Ind. 118:16119:5; ECF 173-13, Ex. 13-Caputo 33:1-18).

**Defendants' Response to ¶ 5**: Undisputed.

6.      Murry has reported to Regional Manager Mark Klafeta (Caucasian) since approximately June 2008; Klafeta, who has worked for Pace since 1995, oversees multiple

divisions. (Ex. 44-Heritage Org. Chart; ECF No. 173-8, Ex. 8-Klafeta 11:12-18, 15:18-21; Ex. 33-Murry 30(b)(6) 52:9-12). Since June 2008, Klafeta typically has worked out of his office at Heritage Garage two to four days per month. (ECF No. 173-9, Ex. 9-Murry Ind. 204:10-14, 205:13-22; ECF No. 173-8, Ex. 8-Klafeta 19:12-17). Klafeta has reported to Deputy Executive Director Melinda Metzger (Caucasian), who has been employed by Pace since approximately 1985 and in the same role since at least 1995. (ECF No. 173-8, Ex. 8-Klafeta 26:16-27:1; Ex. 34-Fedewa 30(b)(6) 47:22-48:5; Ex. 44-Heritage Org. Chart).

**Defendants' Response to ¶ 6:** Undisputed.

7. Murry decides when operators are promoted from part-time to full-time. (Ex. 33-Murry 30(b)(6) 38:6-8). For those promotions, Murry considers length of employment and suspensions because any employee who was suspended within the prior 12 months is not eligible for any promotion. (Ex. 33-Murry 30(b)(6) 38:9-39:4; Ex. 34-Fedewa 30(b)(6) 63:24-65:6).

**Defendants' Response to ¶ 7:** Undisputed.

8. For hiring new employees and other types of promotions, pursuant to Pace's EEO policy, Pace's Human Resources representative (always an African American) identifies which candidates Murry will interview, and Murry must provide a written explanation for her candidate selection. (Ex. 33-Murry 30(b)(6) 25:13-26:4, 236:16-237:3).

**Defendants' Response to ¶ 8:** Defendants object to this proposed fact as lacking evidentiary support. First, pages 25–26 of Exhibit 33 state only that Murry was informed of applicants through Human Resources and that Superintendent of Transportation Dines sat in on some interviews. Second, the deposition transcript is 210 pages long; it does not have a page 236 or 237. For these reasons, the statements in Paragraph 8 are not supported.

9.      As they have since well before Plaintiffs' employment, Defendants maintain written policies regarding performance, discipline, bus accidents or moving violations, absenteeism and tardiness. (ECF No. 74, Ex. 45-Answer ¶ 23). Some of those policies are found in the two collective bargaining agreements in effect during the relevant time period. (ECF No. 173-6, Ex. 6-2011-2017 CBA; ECF No. 173-7, Ex. 7-2017-2022 CBA). Others are found in policy memoranda, all of which pre-date the relevant time-period (January 1, 2011 to the present). (ECF No. 173-10, Ex. 10-General Rule Book; ECF No. 173-5, Ex. 5-SOPs; Ex. 47-Handbook; ECF No. 173-2, Ex. 2-Absenteeism Policy; Ex. 48-Accident Grading Policy). All these policies have applied uniformly to drivers since at least January 1, 2011. (Ex. 33-Murry 30(b)(6) 33:15-35:1 [ECF No. 173-6, Ex. 6-2011-2017 CBA; ECF No. 173-7, Ex. 7-2017-2022 CBA], 89:7-90:3 [ECF No. 173-10, Ex. 10-General Rule Book], 90:4-12, 118:14-21 [ECF No. 173-2, Ex. 2-Absenteeism Policy], 90:13-91:14 [ECF No. 173-5, Ex. 5-SOPs], 138:10-141:15 [Ex. 47-Handbook], 143:2-21 [Ex. 48-Accident Grading Policy]).

**Defendants' Response to ¶ 9:** Undisputed.

10.     The CBA states "No employee will be disciplined without cause." (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 7; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 11). Pace utilizes a progressive disciplinary process for its employment rules, policies, or procedures (written warning, written warning with a suspension, and then termination). (Ex. 33-Murry 30(b)(6) 127:24-129:4).

**Defendants' Response to ¶ 10:** Undisputed that the CBA states that "[n]o employee will be disciplined without cause" and that Pace utilizes a progressive disciplinary process for violations, though a later excerpt of the cited deposition testimony from Murry shows that each step in the disciplinary process is not necessarily required for every violation; some violations are serious enough to warrant immediate termination. (ECF No. 191, Ex. 33, Murry Dep. at 136:24–

5

137:10).

11.     Only Murry can issue disciplinary actions that involve suspension. (Ex. 33-Murry 30(b)(6) 203:13-204:15). Dines can only give a verbal warning or a coaching without first consulting Murry; Dines has no authority to issue or determine the length of a suspension or recommend termination without Murry's approval. (ECF No. 173-14, Ex. 14-Dines 47:9-12, 55:5-18). Klafeta acknowledged he had no input on Murry's decisions to implement discipline not involving terminations (including suspending drivers by removing them from service). (ECF No. 173-8, Ex. 8-Klafeta 28:10-17).

**Defendants' Response to ¶ 11:** Undisputed that Murry can issue disciplinary actions involving suspensions, that Dines can give only a verbal warning or coaching without first consulting Murry, and that Dines has no authority to issue or determine the length of a suspension or to recommend termination without Murry's approval. The proposition that Klafeta has "no input on Murry's decisions to implement discipline not involving terminations" is unsupported by the cited evidence; rather, Klafeta states in the cited portion of his deposition that although Murry *can* make non-termination decisions (such as suspensions or written warnings) without his input, she sometimes consults with him about the decision and usually lets him know about it. (ECF No. 173, Ex. 8, Klafeta Dep. at 28:10–29:12). All recommendations for termination must be reviewed by Klafeta. (Id. at 28:10–12).

12.     Murry explained she usually does not consult with anyone in deciding what disciplinary action to give employees; she prepares a notice of personnel action form ("NOPA") and provides a copy to the union (Ex. 33-Murry 30(b)(6) 133:14-135:4, 166:18-169:9, 173:17-174:6). Murry claims she follows the "past practice" of progressive discipline for what others received for the same violations (e.g., for length of suspension); but Murry acknowledged she is

not given any guidelines for following this "past practice," and it is not described by the collective bargaining agreements. (Ex. 33-Murry 30(b)(6) 127:24–129:18).

**Defendants' Response to ¶ 12:** Undisputed that Murry said she usually does not consult with anyone when deciding a usual disciplinary action, though the cited excerpt of her deposition testimony also says that "if it's an unusual situation where it hasn't happened before, [she] would talk to [her] regional manager." (ECF No. 191, Ex. 33, Murry Dep. at 133:14–25). Undisputed also that Murry testified that she looks to "past practice" when determining the type of discipline to give an employee when the discipline is not predetermined by the collective bargaining agreement (*id.* at 127:24–129:18), but Defendants object, as unsupported by the record, to the proposition that Murry stated she is given "no guidelines" for following past practice or that "past practice" is not described by the collective bargaining agreement. Rather, the cited testimony states that for disciplinary decisions that are outside the scope of the collective bargaining agreement (i.e., "general rule book violations," *see id.* at 127:24–25), Murry looks to past practice—that is, she follows "progressive discipline" and looks to "however long other employees received for that same violation" —in order to determine what discipline is appropriate. (*Id.* at 128:4–22, 129:9–18).  It is undisputed that after making a disciplinary decision, Murry completes the NOPA form and provides a copy to the union.

13.     Under Pace's disciplinary process, Murry recommends employment terminations for drivers (including for probationary employees), which are subject to Klafeta's final approval. (Ex. 33-Murry 30(b)(6) 145:7-146:8, 174:21-175:21; ECF No. 173-14, Ex. 14-Dines 58:5-8). Murry has authority to recommend termination of drivers who are "probationary employees" for any reason during their first 120 days. (Ex. 33-Murry 30(b)(6) 135:8-136:19). As best Defendant Murry could recall, Klafeta never rejected Murry's recommendations for termination; Klafeta

never encouraged Murry to terminate someone she had not already recommended for termination. (ECF No. 173-9, Ex. 9-Murry Ind. 213:19-214:5).

**Defendants' Response to ¶ 13:** Undisputed.

14.     Klafeta admitted he is only informed about termination recommendations from Murry, the notices of personnel action forms she prepares, or the union. (ECF No. 173, Ex. 8-Klafeta 58:5-59:2). If Klafeta approves Murry's recommendation, Murry signs the letter notifying the employee of termination and identifies which of Pace's rules the employees violated. (Ex. 33-Murry 30(b)(6) 174:12-177:25; Ex. 52-Nelson Termination Letter; Ex. 69-Marshall 2017 Termination Letter).

**Defendants' Response to ¶ 14:** Defendants object to Paragraph 14 as not fully supported by the cited evidence. In the cited portion of his deposition, Klafeta is answering questions about how he learns about "disciplinary actions that don't involve termination" as well as termination recommendations. (ECF No. 173, Ex. 8, Klafeta Dep. at 58:9–10). He answers that he learns about recommendations for termination *and other, non-termination discipline decisions* from Murry, the notices of personnel action forms, and/or the union. Klafeta also testifies in this portion of his deposition that he "reviews[s] anyone that's up for termination" including by "look[ing] at the NOPAs" and ensuring they are "consistent with how Pace policy is to be administered." (*Id*. at 57:16–18.) It is undisputed that when Klafeta approves of a termination, Murry then signs the letter notifying the employee of termination and identifying for the employee what rule was violated.

15.     Unlike with hiring and promotions, Murry's implementation of Pace's disciplinary system (including termination) does not involve or require review or approval from Pace's Equal Employment Opportunity ("EEO") office or Human Resources. (ECF No. 173-9,

Ex. 9-Murry Ind. 67:7-68:11; ECF No. 173-13, Ex. 31-Plunkett Report, p. 5).

**Defendants' Response to ¶ 15:** Undisputed.

16. Pace's uses progressive discipline for its absenteeism policy. According to the policy: (a) an employee receives a caution notice for their first and second instances of absence; (b) an employee receives counselling sessions for their third and fourth instances; (c) a suspension "may be assessed" for the fifth through seventh instances; and (d) the "[e]mployee may be discharged" and face a hearing for the eighth instance. (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2). As the language indicates, Pace's absenteeism policy gives Murry virtually unfettered discretion in deciding discipline. (Ex. 33-Murry 30(b)(6) 115:9-22; ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2) ("Attendance in general is the concern of Pace and the subject of this policy. Abuse over a period of time may require greater disciplinary action for an individual violation than indicated.").

**Defendants' Response to ¶ 16:** Defendants object to the proposition that Murry has "virtually unfettered discretion" in deciding discipline for absences as unsupported by the cited evidence. Murry's cited deposition testimony states that "there are guidelines [on progressive discipline for absenteeism] in the policy," and that she has "discretion to deviate from those guidelines [when] there is an abuse over a period of time." (ECF No. 191, Ex. 33, Murry Dep. at 115:17–19). Thus, the evidence shows that she has *some* discretion in this area but not that it is "virtually unfettered." Paragraph 16 is otherwise undisputed.

17. Pace defines an "instance of absence" as "absence from work for any part of a work day, a single work day, or consecutive number of work days" so consecutive missed workdays count as one instance of absence. (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 1). A "miss out" is an "absence from duty for any reason that is not reported to the dispatcher [at least]

thirty minutes before report time, and the employee shows up later or calls." (ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1; Ex. 33-Murry 30(b)(6) 103:4-10).

**Defendants' Response to ¶ 17:** Undisputed.

18.     Discipline is more severe for a "miss out" than an "instance of absence;" an employee is terminated after their third miss out. (ECF No. 173-2, Ex. 2-Absenteeism Policy, p. 2); ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1). Other Pace employees provide Murry information about these events, but Murry ultimately decides if the employee is given a "miss out" or "instance of absence." (Ex. 33-Murry 30(b)(6) 105:23-106:12).

**Defendants' Response to ¶ 18:** Undisputed, though the cited portion of the record further states that Murry "decides" if the employee is given a "miss out" or "instance of absence" based on whether the dispatcher reporting the event records that the absent employee communicated the absence within 30 minutes of the shift's start; if the absent employee reported the absence within 30 minutes (or not at all), then it is labeled a "miss out", and if the employee reported the absence more than 30-minutes before the shift, then it is labeled an "instance of absence." (ECF No. 191, Ex. 33, Murry Dep. 105: 20–106:12).

19.     Murry also determines the length of a suspension after a second "miss out" and frequently changes "miss outs" to instances of absence, some of which Pace excuses. (Ex. 33-Murry 30(b)(6) 130:19-131:3; ECF No. 173-3, Ex. 3-Miss Out Policy, p. 1; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 18). Employees can ask to have an instance of absence or miss-out "excused;" Murry claimed only Klafeta can excuse an instance of absence, except for "something that the employee has to do with their child at school." (Ex. 33-Murry 30(b)(6) 51:3-18, 64:23-65:16; ECF No. 173-9, Ex. 9-Murry Ind. 203:1-205:12). Caputo's excused absences allowed him to be promoted. (ECF No. 173-13, Ex. 13-Caputo 85:17-24, 86:20-24).

**Defendants' Response to ¶ 19:** Defendants object to this proposition as unsupported by the cited evidence. The evidence cited in Paragraph 19 states only that Murry determines the discipline for a miss out based on an established past practice, which is as follows: "your first miss out is a written warning, your second is a day suspension, your third is termination" (ECF No. 173, Ex. 33, Murry Dep. at 131:1–3), and that Murry and Klafeta can "reduce[] 'miss outs' to 'instances of absence' under Pace's Attendance Policy" (ECF No. 191, Ex. 32, Personnel Records Summary, ¶ 18); nowhere in the cited evidence does it state or imply that Murry determines the length of a suspension after a second miss out arbitrarily or that she "frequently" changes miss outs to instances of absence. Undisputed that employees can ask to have an absence or miss out excused, that Murry can excuse an absence for child-related issues such as parent-teacher meetings, and that only Klafeta can excuse an absence for a reason other than a child-related issue. Defendants object to the unsupported and argumentative statement that Murry "claimed" that only Klafeta can excuse such absences; Murry and Klafeta both testified to this fact in their depositions. (*See* ECF No. 173, Ex. 9, Murry Dep. at 203:11–18; ECF No. 173, Ex. 8, Klafeta Dep. at 29:13–24).

20.     Pace buses are frequently involved in accidents. (ECF No. 173-14, Ex.14-Dines 204:21-205:24; ECF No. 173-9, Ex. 9-Murry Ind. 96:9-17). Caputo's job responsibilities (and Gerasch's before him) include "rating" accidents Defendants become aware of as "preventable" (i.e., avoidable by the driver) or "non-preventable" (i.e., not the driver's fault). However, Murry and Dines also are involved in grading accidents and determining grades. (Ex. 33-Murry 30(b)(6) 150:22-151:4; ECF No. 173-14, Ex. 14-Dines 48:13-52:4, 131:11-25; ECF No. 173-17, Ex. 17-Marshall 131:6-132:12). After any accident or incident (preventable, non-preventable and ungraded), an employee's accident and incident record should be updated. (*See, e.g.,* Ex. 70-

Marshall Accident/Incident Record; ECF No. 173-8, Ex. 8-Klafeta 121:6-14; ECF No. 173-9, Ex. 9-Murry Ind. 57:13-16, 92:3-93:12).

**Defendants' Response to ¶ 20:** Undisputed.

21.     Murry testified Pace's policy is to terminate an employee after the employee's third "preventable" accident within a 12-month period and claimed the policy was memorialized in a written memorandum. (Ex. 33-Murry 30(b)(6) 143:2-21). Pace's actual written policy states a third preventable accident results in "Possible Discharge," giving Murry discretion whether or not to recommend termination. (ECF No. 173-14, Ex. 14- Dines 46:17-47:3; Ex. 48-Accident Grading Policy).

**Defendants' Response to ¶ 21:** Undisputed.

22.     Murry has discretion to recommend termination if an employee has a "severe accident" before having three preventable accidents, or engages in other serious misconduct; she described she would do so if a driver "hit a pedestrian" or engaged in violations such as "talking on a cell phone while they're operating a bus" or a "physical altercation or threat." (Ex. 33-Murry 30(b)(6) 136:20-137:16, 143:10-14, 144:6-25; Ex. 48-Accident Grading Policy).

**Defendants' Response to ¶ 22:** Undisputed.

23.     Employees who fail to timely report an accident or incident can be terminated immediately. (Ex. 33-Murry 30(b)(6) 136:20-137:5). According to the CBA, an employee "may be subject to immediate dismissal" if they fail to report an accident or incident unless "it can be conclusively shown" that the employee did not or could know about the accident at the time it occurred. (ECF No. 173-6, Ex. 6-2011-2017 CBA, p. 9; ECF No. 173-7, Ex. 7-2017-2022 CBA, p. 12).

**Defendants' Response to ¶ 23:** Undisputed.

12

24.     Per Murry, an accident is "if something comes in contact in, on, or around the bus ... or comes into contact with the bus. An incident is ... anything unusual that happens in, on, or around the bus." (Ex. 33-Murry 30(b)(6) 138:20-139:1).

**Defendants' Response to ¶ 24:** Undisputed.

25.     According to Murry, at Pace's Heritage Garage, failure to report means having "an accident or incident that you have failed to report to dispatch before you leave the workplace the day that it happens." (Ex. 33-Murry 30(b)(6) 138:10-14). But Murry also testified she expected employees to immediately alert dispatch and to accurately complete the reporting form. (Ex. 33-Murry 30(b)(6) 139:2-140:17; ECF No. 173-5, Ex. 5-SOPs, p. 24-1).

**Defendants' Response to ¶ 25:** Undisputed that Murry's testimony contains these statements; Defendants object to the unsupported proposition that these two statements are in any way contradictory, as Pace's policy on accident reporting contains both requirements. (ECF No. 173, Ex. 5, Pace's Standard Operating Procedure Manual, at 24-1 (also paginated as page 117 of 170).)

26.     Murry claimed that a driver that fails to report an accident or incident is subject to immediate termination. (Ex. 33-Murry 30(b)(6) 139:2-140:17). However, Murry also acknowledged Pace's written policies grant her discretion to give lesser discipline. (Ex. 33-Murry 30(b)(6) 140:18-141:15; ECF No. 173-5, Ex. 5-SOPs, p. 24-1; Ex. 47-Handbook, p. 90).

**Defendants' Response to ¶ 26:** Undisputed that Murry's testimony contains these two statements; Defendants object to the unsupported proposition that these statements are in any way contradictory, as "subject to" is not synonymous with "required."

27.     The CBA allows non-supervisory employees to grieve Murry's decisions, including disciplinary decisions and/or terminations. (ECF No. 173-6, Ex. 6-2011-2017 CBA, pp. 6-8; ECF

No. 173-7, Ex. 7-2017-2022 CBA, pp. 9-11). Murry reviews an employee's grievance of her disciplinary actions, including terminations, as the first step. (Ex. 33-Murry 30(b)(6) 151:5152:25). Murry could not recall ever reversing her own initial decision. (Ex. 33-Murry 30(b)(6) 152:22-25). Murry is also involved if the employee takes their grievance to the second step, but Klafeta makes the final decision at the second step. (Ex. 33-Murry 30(b)(6) 153:1-22).

**Defendants' Response to ¶ 27:** Undisputed.

28.    Murry could name not any Pace policy or procedure that should apply differently to individuals because of their race. (Ex. 33-Murry 30(b)(6) 183:14-184:5). Defendants contend that "there are no racial disparities between African-Americans and others in rates of discipline, termination, transfer, promotion, or compensation." (Ex. 46-Interrogatory Answers, p. 6, Interrogatory No. 14).

**Defendants' Response to ¶ 28:** Undisputed.

29.    Defendants' human resources data and personnel records, compiled in Plaintiffs' Summary of Voluminous Personnel Records and Human Resources Data, show Murry suspended African American drivers more frequently and more severely than their Caucasian counterparts and virtually never terminated Caucasians. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 12-16).

**Defendants' Response to ¶ 29:** Defendants object to this proposed fact as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4, *supra*.

Defendants further object to this proposed fact as containing improper argument because it does not state facts but only draws inferences from the cherry-picked data in Plaintiffs' Summary of Pace's Personnel Records and Human Resources data. "[F]actual *inferences* do not constitute an

appropriate inclusion in a L.R. 56.1[ ] statement of fact." *Pike v. Caldera*, 188 F.R.D. 519, 525 (S.D.

Ind. 1999); *see Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 693 (7th Cir. 1998) (stating that

opinion, suggested inferences, legal arguments, and conclusions are improper in a statement of facts

for summary judgment). This makes sense, given that the goal of this document is to determine

the material facts in dispute by the parties' evidence, not to lay out arguments about those facts:

> On summary judgment, one of the court's jobs is to view all
> reasonable inferences in the light most favorable to the non-movant.
> But before the court can make an inference, or derive a conclusion
> from facts, it must have a clear picture of the facts. Enabling the
> court to efficiently and fairly determine the facts (and identify
> disputes of fact) is one purpose of requiring factual submissions to
> be in L.R. 56.1(f) form.

*Pike*, 188 F.R.D. at 525 (internal quotation marks omitted); *compare* S.D. Ind. L.R. 56.1(f), with

N.D. Ill. L.R. 56.1. Here, the cited information from the record shows only raw numerical data

concerning how many operators of each group were terminated or disciplined; the data does not

show how many violations total were committed by each group nor does it show what the

violations were. Without that material information, it is impossible to assert that, as a matter of

fact, African American operators were punished "more frequently and more severely" than their

white counterparts. Accordingly, the statements in Paragraph 29 are unsupported by evidence and

should not be considered.

30.     From 2011 to 2019, only *one* Caucasian was involuntarily terminated for

violations of Pace's policies (i.e., 3.85% of the total involuntarily terminated and 1.75% of all

Caucasian drivers). (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15; ECF No. 173-

14, Ex. 14-Dines 66:16-20, 68:4-10; ECF No. 173-9, Ex. 9-Murry Ind. 231:23-232:4). By

contrast, during that period, at least 24 African Americans were terminated for violating Pace's

policies (92.31% of the total involuntarily terminated and 17.65% of all African American

drivers); a summary of Defendants' records Murry prepared for the period 2012-2017 show 26 African Americans were terminated during that more narrow period. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15; Ex. 35-Murry 2017 Spreadsheet, p. 2; ECF No. 173-9, Ex. 9-Murry Ind. 231:622).

**Defendants' Response to ¶ 30:** Defendants object to Paragraph 30 as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4, *supra*.

31. Collectively, Caucasian drivers have been suspended only 43 times for any length of time (approximately 0.75 suspensions per driver); but African Americans have been suspended 157 times (a ratio of 1.15 per driver). (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 12).

**Defendants' Response to ¶ 31:** Defendants object to this proposed fact as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4 *supra*.

Defendants further object to the proposition in Paragraph 31 that white operators were suspended at a rate of .75 suspensions per driver and that African American or Black operators were suspended at a rate of 1.15 suspensions per driver. Although Plaintiffs pull these ratios from column 3 of the cited table—which purports to calculate the ratio of suspensions per operator broken down by race—the calculations are inaccurate because they fail to account for the diverse reasons for the suspensions and they reflect a ratio of suspensions "at any point before April 1, 2019" to the number of operators in each racial group during the limited window of January to March 2019. (*See* ECF No. 173, Ex. 32, Personnel Records Summary, ¶ 12, calculating the ratio of suspensions per racial group by dividing the total number of suspensions "at any point before

16

April 1, 2019" with the total number of operators in that racial group as reflected in ¶ 10 at Table 1, which is titled "Total Drivers 1/11/2019 to 3/31/2019.") In other words, the number of operators in Table 1 is extracted from a different set of employees than the number of suspensions listed in Table 3.

32.　　No Caucasian driver has been suspended for longer than 3 days; by contrast, African Americans have been suspended longer than 3 days six different times, up to 7.5 days. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 13-14).

**Defendants' Response to ¶ 32:** Defendants object to this proposed fact as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4 *supra*.

33.　　The only type of disciplinary action Caucasian drivers receive at approximately the same ratio as African Americans is a written warning. (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 11). But as the stages of Defendants' disciplinary process progress, African Americans fare worse and worse:

| Disciplinary Action | Caucasians | African Americans |
| --- | --- | --- |
| Percentage of Drivers | 27.27% | 65.07% |
| Written Warnings | 26.86% | 62.96% |
| Suspensions | 20.09% | 73.36% |
| Multi-Day Suspensions | 16.66% | 79.17% |
| Terminations | 3.85% | 92.31% |

(ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶ 10-16).

**Defendants' Response to ¶ 33:** Defendants object to this proposed fact as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4, *supra*. Defendants further object to the proposition that "as the stages of Defendants' disciplinary process progress, African Americans fare worse and worse" because this statement does not state facts, but draws inferences from Plaintiffs' inadmissible

summary of Pace's Personnel Records and Human Resources data. Thus, it is improper for the reasons stated in Defendants' response to Paragraph 29, *supra*. Accordingly, the statements and data in the second sentence of Paragraph 33 are unsupported by evidence and should not be considered. The statements in the first sentence of Paragraph 33 are admitted.

34.     After learning about Plaintiffs' lawsuit, at Klafeta's request, Defendant Murry prepared a spreadsheet based on Defendant Pace's personnel files identifying Heritage Garage employees who had been terminated and Heritage employees who had resigned or been promoted between 2012 and October 2017; Murry admitted that of the approximately 30 people terminated, only one was white. (ECF No. 173-9, Ex. 9-Murry Ind. 52:21-56:8, 57:21-58:19, 59:15-60:11, 62:4-62:18; Ex. 35-Murry's 2017 Spreadsheet, p. 2).

**Defendants' Response to ¶ 34:** Undisputed.

35.     Murry's spreadsheet shows different terminations from Pace's human resources data. (Ex. 35-Murry's 2017 Spreadsheet, p. 1; Ex. 42, Human Resources Data Terminated Employees 2011-2017; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶15.) But Murry's 2017 spreadsheet and Defendant Pace's Human Resources data for terminated employees establish that between 2012 and 2017, Defendants did not terminate any non-probationary Caucasian drivers for violating Pace's policies, but terminated at least 20 African Americans. (Ex. 35-Murry's 2017 Spreadsheet, p. 1; Ex. 42, Human Resources Data Terminated Employees 2011-2017; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 15.)

**Defendants' Response to ¶ 35:** Undisputed that the data sets show different termination data. Defendants object to the proposition that the two data sets show that "Defendants did not terminate any non-probationary Caucasian drivers for violating Pace's policies" as unsupported by the cited evidence; the cited evidence shows that at least one white driver was terminated in

2014 for failing to meet standards during training. (ECF No. 191, Ex. 35, Murry's 2017 Spreadsheet, at 2). The cited evidence further shows that at least six non-Black or non-African American employees were terminated from 2011 to 2019. (*Id*. listing four non-Black or African American employees who were terminated; ECF No. 191, Ex. 42, Human Resources Data Terminated Employees 2011–2017 (listing two additional non-Black or African American employees who were terminated).)

36.     As Murry admitted, Defendants administered discipline for violating Pace's rules in manner a jury could infer was discriminatory. (ECF No. 173-9, Ex. 9-Murry 65:14-67:4; Ex. 35-Murry's 2017 Spreadsheet, p. 2). As Murry testified:

> Q: If someone wanted to discriminate against African Americans in favor of whites, you would expect to see lots of African American terminations and – and virtually no Caucasian terminations, correct?
>
> A. Correct.
>
> Q. And I understand you deny the allegation, but that's essentially what appears on Pace 95829, the – the spreadsheet you preferred, right?
>
> A. Correct.
>
> ***
>
> Q. ... Is it -- is it correct that the criteria and methods you used to administer Pace's disciplinary system had the same effect as someone who would have been intentionally discriminating against individuals based on their race? [Objections omitted]
>
> A. It could be.
>
> Q. That would be a reasonable inference based on the spreadsheet [of terminated employees] you prepared, Pace 95829? [Objection omitted]
>
> A. Correct.

(ECF No. 173-9, Ex. 9-Murry Ind. 65:14-67:4; Ex. 35-Murry's 2017 Spreadsheet, p. 2).

**Defendants' Response to ¶ 36:** Defendants raise again the objection that they raised during Murry's deposition testimony, an objection that Plaintiffs have omitted from this excerpt.

Here is the full excerpt, including the relevant objection:

> Q. Sure. Is it -- is it correct that the criteria and methods you used to administer Pace's disciplinary system had the same effect as someone who would have been intentionally discriminating against individuals based on their race?
>
> MR. HAYES: Okay. I got it now. Objection. Confusing. Speculation. Legal conclusion. Go ahead.
>
> A. It could be.
>
> Q. That would be a reasonable inference based on the spreadsheet that you prepared, Pace 95829?
>
> MR. HAYES: Objection. Asked and answered. Go ahead.
>
> A. Correct.

(ECF No. 173, Ex. 9, Murry Dep., at 65:20–67:4). Specifically, Defendants object that this statement—about what a jury might infer from the data—poses a legal conclusion and inference as if it were a fact. Such inferences are inappropriate in Local Rule 56.1 statements for the reasons stated in Defendants' response to Paragraph 29, *supra*.

37.     For promotions from part-time operator to full-time operator, African Americans and Caucasians were promoted at rates comparable to their representation; but Caucasians sometimes were promoted over African Americans with more seniority. (ECF 173-13, Ex. 13-Caputo 21:12-22:23; ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶ 17). For other promotions, Caucasians were promoted at much higher rates than African Americans (half of those promotions went to Caucasian drivers, even though they comprise only 28.86% of drivers). (ECF No. 173-32, Ex. 32-Personnel Records Summary, ¶¶10, 17).

**Defendants' Response to ¶ 37:** Defendants object to this proposed fact as lacking evidentiary support because the cited Summary is inadmissible for the reasons stated in Defendants' response to Paragraph 4, *supra*.

Notwithstanding this objection, it is undisputed that for promotions from part-time to full-time operator, African American and white operators were promoted at rates comparable to their representation, and it is undisputed also that, for other promotions, more white employees were promoted than African American or Black employees. Defendants object to the proposition that "Caucasians were sometimes promoted over African Americans with more seniority" as unsupported by the cited evidence. In the cited portion of Caputo's deposition, Plaintiffs' counsel asked Caputo to "[a]ssume for the purposes for [his] question" that Robin Grenada (an African American, part-time operator) had more seniority than Caputo at the time he was promoted over her (ECF No. 173, Ex. 13, Caputo Dep. at 21:12–22:23); it does not state—and Plaintiffs provide no evidence—that she in fact had greater seniority than Caputo or that a single other promotion of a white operator over their more senior Black counterpart ever occurred. Further, in the cited portion of Plaintiffs' Summary of Pace's Personnel Records and Human Resources data, there is no reference to seniority. Thus, the statements in Plaintiffs' Paragraph 37 are unsupported by evidence and should not be considered.

38.     Plaintiff Maurice Nelson worked under Murry's supervision as a part-time bus operator beginning October 20, 2014, was promoted to full-time bus operator on September 14, 2015, and held that position until his termination on October 25, 2016. (ECF No. 74, Ex. 45-Answer ¶¶ 7, 42, 43, 50).

**Defendants' Response to ¶ 38:** Undisputed.

39.     Murry initially denied Nelson's promotion to full-time bus operator – purportedly because he had a suspension – but Nelson successfully grieved Murry's decision. (ECF No. 173-15, Ex. 15-Nelson 61:20-64:18, 93:12-94:3, 96:5-102:12; ECF No. 173-8, Ex. 8-Klafeta 143:2-144:6; Ex. 53-Nelson Promotion Grievance).

**Defendants' Response to ¶ 39:** Undisputed.

40.     While employed, Nelson received write-ups and suspensions for alleged violations of Pace's employment policies (including the attendance policy). (ECF No. 173-15, Ex. 15-Nelson 43:17-58:6, 61:20-64:18; Ex. 54-Nelson 2015 Suspension NOPA; Ex. 55-Nelson 2016 Suspension NOPA).

**Defendants' Response to ¶ 40:** Undisputed.

41.     Plaintiff Nelson's coworkers, including Dispatch Supervisor Sheldon Gray, told Plaintiff Nelson that Defendant Murry would block attempts by African Americans to transfer or promote out of the Heritage Garage. (ECF No. 173-15, Ex. 15-Nelson 201:14-204:7).

**Defendants' Response to ¶ 41:** Defendants object to Paragraph 41 as consisting entirely of inadmissible hearsay; Nelson cannot testify to what others stated as evidence of the truth of those statements. *See* FED. R. EVID. 801, 802.

42.     In a conversation with Plaintiff Nelson, Dispatch Supervisors Clark and Gray admitted Defendant Murry had favorites - "white drivers who – who missed out and [Murry] didn't discipline them." (ECF No. 173-15, Ex. 15-Nelson 61:20-63:25).

**Defendants' Response to ¶ 42:** Defendants object to Paragraph 42 as consisting entirely of inadmissible hearsay; Nelson cannot testify to what others stated as evidence of the truth of those statements. *See* FED. R. EVID. 801, 802.

43.     Dispatch Supervisor Delois Jenkins also told Plaintiff Nelson that Defendant Murry was attempting to discipline him wrongfully as a form of harassment, specifically telling Plaintiff Nelson "they sure are watching you – you and [Dion] Lewis" (another African American operator Murry terminated); Dispatch Supervisor Jenkins warned Plaintiff Nelson to "watch [him]self because Margaret Murry is looking for any reason to – to get rid of – to get rid of you" and stated Defendant Murry would "get rid of ours [African Americans] for – for anything, but she looks

out for her own [Caucasians]." (ECF No. 173-15, Ex. 15-Nelson 181:13-184:6).

**Defendants' Response to ¶ 43:** Defendants object to Paragraph 43 as consisting entirely of inadmissible hearsay; Nelson cannot testify to what others stated as evidence of the truth of those statements. *See* FED. R. EVID. 801, 802.

44.     Defendant Murry instructed Dispatch Supervisor Jenkins not to allow Plaintiff Nelson to drive routes from Joliet to downtown Chicago, resulting in him driving more difficult local routes that required more work. (ECF No. 173-15, Ex. 15-Nelson 198:2-199-20). The more difficult routes exposed Plaintiff Nelson to increased opportunities for discipline. (ECF No. 173-15, Ex. 15-Nelson 207:22-209:6).

**Defendants' Response to ¶ 44:** Defendants object to Paragraph 44 as containing inadmissible hearsay; Nelson cannot testify to what Jenkins told him as evidence of truth of that statement. FED. R. EVID. 802, 803. (Specifically, Nelson cannot testify that Dispatch Supervisor Jenkins said that Murry told her to reassign his routes as evidence that Murry did so). Defendants further object to Paragraph 44 as unsupported by the cited evidence; Nelson's testimony does not state that more difficult routes exposed Nelson to increased opportunities for discipline, but rather it states that he feared discipline for driving mistakes and that he felt pressure as an operator to drive perfectly. (ECF No. 173, Ex. 15, Nelson's Dep. at 207:22–209:6).

45.     Dispatch Supervisor Jenkins told Plaintiff Nelson repeatedly that Defendant Murry was "only messing with you guys because you guys are black" and gave examples of Caucasian drivers that Defendant Murry did not bother, such as Ray Ulrich, Jacob Mack and Eric Weiss. (ECF No. 173-15, Ex. 15-Nelson 184:9-185:25).

**Defendants' Response to ¶ 45:** Defendants object to Paragraph 45 as consisting entirely of inadmissible hearsay; Nelson cannot testify to what others stated as evidence of the truth of

those statements. *See* FED. R. EVID. 801, 802.

46.     Dispatch Supervisor Sheldon Gray also warned Plaintiff Nelson while in the parking lot that he better "watch [him]self because Defendant Murry was "out to get" him and Mr. Lewis; subsequently Dispatch Supervisor told Plaintiff Nelson that "you know she [Murry] don't like you guys because you're black" and then described examples based on his (Gray's) years of experience at the Heritage Garage where "he's witnessed her to do this to a number of drivers over the years." (ECF No. 173-15, Ex. 15-Nelson 190:23-192:6).

**Defendants' Response to ¶ 46:** Defendants object to Paragraph 46 as consisting entirely of inadmissible hearsay; Nelson cannot testify to what others stated as evidence of the truth of those statements. *See* FED. R. EVID. 801, 802.

47.     On October 20, 2016, Murry suspended Nelson pending investigation for his failure to report an accident that allegedly occurred at approximately 9:38 am; Defendant Murry suspended Plaintiff Nelson *before* the end of his workday and only hours of the alleged accident. (ECF No. 173-15, Ex. 15-Nelson 125:22-126:6; ECF No. 173-9, Ex. 9-Murry Ind. 189:16-193:5; Ex. 55-Nelson Oct 2016 Suspension Pending Investigation NOPA; ECF No. 74, Ex. 45-Answer ¶¶ 44-47; Ex. 57- October 20, 2016 Notes; Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson).

**Defendants' Response to ¶ 47:** Undisputed.

48.     On the day in question, Nelson parked his bus in the garage as closely as possible to the bus in front of his, as Dispatch Supervisors Norvell Clark and Kathleen Clemmer had instructed, so that more buses would fit in the garage. (ECF No. 173-15, Ex. 15-Nelson 146:119). After Nelson parked the bus, he got out of the bus and confirmed that his bus was not making contact with the bus in front of his; then Nelson went on his break before his afternoon route. (ECF No. 173-15, Ex. 15-Nelson 156:12-157:6).

**Defendants' Response to ¶ 48:** It is undisputed that Nelson testified to the statements in Paragraph 48. However, Defendants dispute that this is what Pace, after investigating the incident, determined had occurred. Rather, evidence shows that after investigating the incident, including by watching video and taking photographs of the buses, Pace concluded that Nelson hit a stopped bus while parking and that the bus's bumper was damaged from the bike rack on Nelson's bus. (ECF No. 173, Ex. 12, Excerpts of Nelson's Personnel File, at 20–21).

49.     According to Defendant Murry, Caputo noticed Plaintiff Nelson's bus had made contact within minutes of Plaintiff Nelson exiting (around 10:00 am). (Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson; ECF No. 173-9, Ex. 9-Murry Ind. 187:2-191:25). At 11:12 AM that day, about an hour after Plaintiff Nelson parked the bus, Defendant Murry notified Klafeta that she would be suspending Nelson pending investigation. (Ex. 58-Murry Oct 20 Emails with Klafeta re Nelson).

**Defendants' Response to ¶ 49:** Undisputed.

50.     When Nelson returned from his break, Defendant Murry summoned Nelson into her office at approximately 3:10 pm where Dines also was waiting to meet with Nelson. (ECF No. 173-15, Ex. 15-Nelson 157:7-13; Ex. 57-October 20, 2016 Notes). Defendant Murry asked Nelson a slew of vague and accusatory questions, such as is there anything that Nelson should tell Murry. (ECF No. 173-15, Ex. 15-Nelson 157:14-158:2). Defendant Murry questioned Plaintiff Nelson about rules violations and ultimately suspended Nelson pending investigation, but did not offer Plaintiff Nelson the opportunity to have a Union representative present because, according to her, "[i]t wasn't discipline" (even though a Hispanic employee involved in a similar meeting was afforded Union representation). (Ex. 57-October 20, 2016 Notes; Ex. 33-Murry 30(b)(6) 177:19-178:3; ECF No. 173-9, Ex. 9-Murry Ind. 193:2-195:17; Ex. 59-Dines Notes re Nelson Second Step Grievance, p.

2).

**Defendants' Response to ¶ 50:** Undisputed that after his break, Nelson met with Murry and Dines without a union representative, that Murry and Dines asked Nelson if there was anything he needed to report and if he had an accident with the bus, and that Nelson was removed from service pending the investigation into the accident. Defendants object to the characterization that these questions were "vague and accusatory" as an improper inference, as explained in more detail in Defendants' response to Paragraph 29, *supra.* Defendants also object, as unsupported by the cited evidence, to the proposition that Murry "did not offer Plaintiff Nelson the opportunity to have a Union representative present because, according to her, '[i]t wasn't discipline' (even though a Hispanic employee involved in a similar meeting was afforded Union representation)." Murry testifies in the cited portion of her deposition that employees may request to have a union representative present when "[a]fter the determination for discipline is made [and Murry] meet[s] with the employee to notify them of that"—not that she needs to, or ever does, offer a union representatives in meetings like this one with Nelson when no disciplinary decision has yet been made. (ECF No. 191, Ex. 33, Murry Dep., at 177:19–178:3). As for the statement about a Hispanic employee having a union representative present in a similar situation, the cited evidence states only that Murry could not recall whether this employee had a union representative present for his meeting, not that he had one. (ECF No. 173, Ex. 9, Murry Dep. at 193:2–195:17.) Thus, these portions of Statement 50 are unsupported by cited evidence and should not be considered.

51.     During the meeting with Plaintiff Nelson, Defendant Murry claimed that Nelson's bus made contact with the bus in front of his. (ECF No. 173-15, Ex. 15-Nelson 158:3-23). Murry alleged that Nelson's actions caused damage to the buses. (ECF No. 173-15, Ex. 15-Nelson 158:3-23). Murry did not show Nelson any photos or videos of the alleged accident at this meeting. (ECF

No. 173-15, Ex. 15-Nelson 158:3-7). During that conversation, Plaintiff Nelson explained to Defendant Murry that if he had made contact, he would have reported it because it would "only be [his] 2nd preventable." (Ex. 61-Nelson Grievance of Term). But Defendant Murry still suspended Plaintiff Nelson. (ECF No. 173-15, Ex. 15-Nelson 158:15-17; Ex. 56-Nelson Suspension Pending Investigation NOPA).

**Defendants' Response to ¶ 51:** Undisputed, although the cited evidence shows that Nelson was not suspended as a disciplinary matter but, rather, that he was removed from service during the pendency of the investigation into the accident. (ECF No. 191, Ex. 56, Nelson Suspension Pending Investigation NOPA.)

52.    Dines' notes confirm Nelson explained that he only had one preventable accident on his record at this time, so he had no reason to cover up an accident he actually knew happened; but Murry refused to believe him. (ECF No. 173-15, Ex. 15-Nelson 160:22-162:12; ECF No. 1739, Ex. 9-Murry 191:12-193:1; Ex. 61-Dines Notes re Nelson Grievance; Ex. 36, Murry Termination Notes).

**Defendants' Response to ¶ 52:** Defendants object to Paragraph 52 as unsupported by the cited evidence. Plaintiffs assert that "*Dines' notes confirm*" that Nelson had "only one preventable accident on his record at this time, so he had no reason to cover up an accident" and that "Murry refused to believe him", but Plaintiffs do not cite any notes from Dine on these matters. Rather, Exhibit 61—which Plaintiffs title "Dines Notes re: Nelson Grievance"—is merely a copy of Nelson's grievance; it does not contain any notes from Dines. Undisputed that Murry testified in the cited portion of her deposition that, given the video evidence of Nelson looking at the bus and the photographs of the damage on the bus, she did not believe that he did not know the buses had made contact. (ECF No. 173, Ex. 9 Murry Dep. at 192:13–18.)

27

53.     On October 25, 2016, Murry sent Nelson a termination letter identifying Pace rules Murry believed Nelson violated. (Ex. 52-Nelson Termination Letter). Klafeta claimed he reviewed video evidence of Plaintiff Nelson's conduct, but could not recall when or where. (ECF No. 173-8, Ex. 8-Klafeta 85:8-86:14). Klafeta was not certain of the number of preventable accidents Plaintiff Nelson had at the time he authorized Nelson's termination. (ECF No. 173-8, Ex. 8-Klafeta 88:7-88:16).

**Defendants' Response to ¶ 53:** Undisputed that on October 25, 2016, Murry signed a letter terminating Nelson's employment because of violations of Pace policy, that Klafeta reviewed video evidence of Nelson's conduct, and that Klafeta later could not recall the day he watched the video or whether he watched it in his own or someone else's office. Undisputed also that Klafeta was uncertain whether he knew Nelson had "one or two" preventable accidents at the time of his termination, but that Klafeta "knew [Nelson] had less than three." (ECF No. 173, Ex. 8, Klafeta Dep. at 88:7–12.) Defendants object to the proposition that the termination letter identified rules that Murry "believed" Nelson violated; the cited evidence shows that after an investigation, Nelson was conclusively found to have violated these policies. (ECF No. 191, Ex. 52, Nelson Termination Letter.) Defendants also object to the proposition that Klafeta "claimed" to have watched the video; as the cited evidence shows, Klafeta testified that he did so. (ECF No. 173, Ex. 8, Klafeta Dep. at 85:8–86:12.)

54.     Nelson grieved his termination, arguing he could not report an accident that he was unaware happened, but Murry and Klafeta denied the grievance. (ECF No. 173-15, Ex. 15-Nelson 130:6-23, 160:22-161:8; ECF No. 173-14, Ex. 14-Dines 202:1-203:17; Ex. 61-Nelson Termination Grievance). Klafeta claimed to be able to see the damage to the bus, as well, and knew this accident would not have been Plaintiff Nelson's third "preventable" accident. (ECF No. 173-8, Ex. 8-Klafeta

87:12-88:25; Ex. 59-Dines Notes re Second Step Grievance). During the grievance meeting, Klafeta also told Plaintiff Nelson he "could not use ignorance [of the accident] as an excuse," even though the Pace's policies and the collective bargaining agreement allow that excuse (if believed by Defendants). (ECF No. 173-8, Ex. 8-Klafeta 87:17-91:3).

**Defendants' Response to ¶ 54:** Undisputed. However, Defendants object to the proposition that Klafeta went against Pace policies by saying that Nelson could not use ignorance of the accident as an excuse; the cited portion of Klafeta's deposition testimony reveals that he told Nelson that he "could not use ignorance as an excuse" in this instance because "you can see the damage" on the bus. (ECF No. 173, Ex. 8, Klafeta Dep. at 88:17–19.)

55.     Caputo was involved in documenting the alleged accident by Plaintiff Nelson; but Caputo admitted from the photographs taken that he could not identify where Nelson's bus damaged the other buss. (ECF 173-13, Ex. 13-Caputo 120:9-25, 138:16-139:2, 148:13-151:6). Neither Murry, Caputo or Dines could not state whether the buses involved in Plaintiff Nelson's alleged accident was taken out of service for repairs. (ECF No. 173-13, Ex. 13-Caputo 121:4-7, 147:9-148:1; ECF No. 173-14, Ex. 14-Dines 162:25-168:25; ECF No. 173-9, Ex. 9-Murry Ind. 208:15-209:2).

**Defendants' Response to ¶ 55:** Undisputed that Caputo was involved in documenting Nelson's accident and that Caputo could not see any damage on the bus in the photo. Defendants further respond that in the cited portion of Caputo's testimony, he stated that he could not see damage in the photo because the photo was "too dark" and "[i]t's impossible to tell this is a bumper,"—not because the photo shows a lack of damage. (ECF No. 173, Ex. 13, Caputo Dep. at 150:20–23). Caputo testified in the cited portion of his deposition that the parked bus was damaged from Nelson's bus, including that it was scraped and had a large cut in its bumper from

29

the curved edge of the bike rack on Nelson's bus. (*Id*. at 120:22–121:3).

56. Plaintiff Christi Marshall worked under Defendant Murry's supervision at Pace's Heritage Garage from October 19, 2015 to October 17, 2017, initially as a part-time bus operator and then as a full-time bus operator beginning March 7, 2016. (ECF No. 74, Ex. 45-Answer, ¶¶ 8, 18, 56).

**Defendants' Response to ¶ 56:** Undisputed.

57. At some point before Nelson's termination (in October 2016), Caputo determined Marshall was "going to be a problem" and Caputo was "going to take care of that." (ECF No. 173-15, Ex. 15-Nelson 31:1-32:25).

**Defendants' Response to ¶ 57:** Disputed. Caputo testified that he never made these statements. (ECF No. 173, Ex. 13, Caputo Dep. at 118:7–19).

58. Defendants terminated Marshall's employment in September 2016, purportedly for failing to report an accident; however, Defendant Pace was forced to reinstate her. (ECF No. 74, Ex. 45-Answer, ¶¶ 8, 18, 56, 67; Ex. 62-Marshall Termination Letter Sept. 14, 2016).

**Defendants' Response to ¶ 58:** Undisputed that Defendants terminated Marshall's employment in September 2016 for failing to report an accident and that, after Marshall successfully grieved her termination, Pace reinstated her with back pay.

59. Prior to being terminated in September 2016, Marshall asked Caputo to review video from her September 1, 2016 shift because she wanted feedback on difficulty she had merging that day, among other issues (at that point, she had no preventable accidents within the past year). (ECF No. 173-17, Ex. 17-Marshall 103:19-104:17; ECF No. 74, Ex. 45-Answer ¶ 63; Ex. 70-Marshall Accident/Incident Record; ECF No. 173-13, Ex. 13-Caputo 102:3-12).

**Defendants' Response to ¶ 59:** Undisputed.

60.     Marshall repeatedly asked Caputo to pull the video to review and learn from the situation of cars not letting her merge into a lane. (ECF No. 173-13, Ex. 13-Caputo 102:5-104:2). Before Caputo even reviewed the video, Caputo did not believe Marshall's claim that no one would let her merge. (ECF No. 173-13, Ex. 13-Caputo 105:4-19).

**Defendants' Response to ¶ 60**: Undisputed. Defendants further respond that Caputo testified that he did not believe Marshall's assertion that no one would let her merge because "she drove that route for six months and was able to merge every day. . . . [S]he had a mile to go forward on the road before she had to get into the lane, she was able to do it for six months prior to that [and so] [t]here was no reason for me to believe that absolutely nobody would let her in." (ECF No. 173, Ex. 13, Caputo Dep. at 105:21–106:5.)

61.     Before being able to review that video, Marshall reported another accident she was involved in on September 9, which was graded non-preventable. (ECF 173-13, Ex. 13-Caputo 118:20-120:2; ECF No. 74, Ex. 45-Answer ¶ 64; ECF No. 173-9, Ex. 9-Murry Ind. 149:11-150:20; Ex. 70-Marshall Accident/Incident Record).

**Defendants' Response to ¶ 61**: Undisputed that on September 9, 2016, Marshall reported being involved in another accident. Otherwise, Defendants object to Paragraph 61 as unsupported by the cited evidence. The cited portion of Caputo's deposition states that Marshall was hit by a truck, but it does not state that this happened before she reviewed video of the other incident nor that the accident with the food truck was graded non-preventable. The cited portion of Defendants' Answer shows that Defendants denied the statement asserting that Marshall was involved in this non-preventable accident. (ECF No. 191, Ex. 45, Answer ¶ 64). The cited portion of Murry's deposition states only that Marshall reported that her bus was hit by a food truck on September 9, not that the accident was graded non-preventable or that it occurred before she watched the video

of the first incident. Finally, the Accident Report shows only that Marshall was hit by a truck on September 9, not that it was graded non-preventable or that it occurred before she reviewed the video of the other incident.

62. When Caputo and Murry reviewed the video from September 1, 2016, according to them it showed Plaintiff Marshall's bus making contact with another vehicle. (ECF 173-13, Ex. 13-Caputo 110:6-112:20, 114:7-117:14; ECF No. 173-9, Ex. 9-Murry Ind. 149:11-150:20).

**Defendants' Response to ¶ 62:** Undisputed.

63. Like Nelson, Marshall was unaware of the accident, but Murry suspended Marshall pending investigation on September 12, 2016. (ECF No. 74, Ex. 45-Answer ¶ 65; Ex. 63-September 12, 2016 Notes re Marshall; ECF No. 173-8, Ex. 8-Klafeta 79:1-4; ECF No. 173-17, Ex. 17- Marshall 104:12-17, 115:15-19).

**Defendants' Response to ¶ 63:** Undisputed.

64. Subsequently, on September 14, 2016, Murry informed Marshall her employment was terminated for failing to report an "accident" during her September 1 shift. (ECF No. 191, Ex. 45, Answer ¶ 67).

**Defendants' Response to ¶ 64:** Undisputed.

65. When Defendant Murry suspended Marshall and recommended Marshall's termination, Murry knew Marshall had *requested* to see the video *and* had reported other preventable accidents; despite that, Murry still believed Marshall was lying when denying knowledge of the alleged September 1, 2016 accident. (ECF No. 173-9, Ex. 9-Murry Ind. 149:7-150:20; Ex 62-Marshall 2016 Termination Letter).

**Defendants' Response to ¶ 65:** Undisputed.

66. Defendant Murry admitted her 2016 termination letter for Plaintiff Marshall

explaining the reasons for her termination references Plaintiff Marshall's "entire work record" as part of the basis for her termination, which included her attendance record and non-preventable accidents that Defendants could not consider as a basis for Plaintiff Marshall's termination. (ECF No. 173-9, Ex. 9-Murry 165:13-168:10; Ex. 62-Murry's 2016 Termination Letter Sept. 14, 2016).

**Defendants' Response to ¶ 66:** Defendants object to the proposition that Murry "admitted" that the reason for Marshall's termination was her "entire work record" as unsupported by the cited evidence. In the cited portion of Murry's deposition testimony, she states specifically that the reason for Marshall's termination was a failure to report, and that everything else listed in the termination letter could not be considered as a basis for termination. (ECF No. 173, Ex. 9, Murry Dep. at 166:10 –168:14).

67.    Defendant Murry and Klafeta denied Plaintiff Marshall's grievance; subsequently an Arbitrator found no just cause to terminate Marshall, so she was reinstated. (ECF No. 74, Ex. 45-Answer ¶¶ 69-70.) Defendants offered shifting explanations in the arbitration process, and the Arbitrator found the proffered reason – Marshall's failure to report an accident of which she was aware – was not worthy of credence. (ECF No. 173-16, Ex. 16-Marshall Personnel File, pp. 13-22 (Arbitration Award, pp. 11-20, describing shifting explanations offered to justify termination, and concluding Plaintiff Marshall was truthful in denying knowledge of the accident)

**Defendants' Response to ¶ 67:** Undisputed that Marshall grieved her termination, participated in a labor arbitration, and that the Arbitrator found that there was not just cause for Marshall's termination. (ECF No. 191, Ex. 45, ¶¶ 69–70. Defendants object to the characterization that Defendants had offered "shifting explanations in the arbitration process," because that characterization is unsupported by the record. Rather, the Arbitrator's decision shows that, although the Defendants terminated Marshall's employment for a single reason—that is, failing to

report her accident—the Arbitrator concluded that Marshall could not have reported the accident because she was not aware that it had occurred. (ECF No. 173, Ex. 16, Arbitration Award, at 11–22).

68.     Klafeta admitted Defendants' contention that Plaintiff Marshall requested to review video for a day she knew she had an unreported accident "makes no sense." (ECF No. 173-8, Ex. 8-Klafeta 79:23-80:15).

**Defendants' Response to ¶ 68:** Undisputed that Klafeta stated that Marshall requested to review video on that day, that it "makes no sense" to request to see video footage of an unreported accident, and that he could not speculate as to her motivations for doing so. (Doc. 173, Ex. 8, Klafeta Dep. at 80:1–15).

69.     When Plaintiff Marshall described her 2016 termination to Dispatch Supervisor Sheldon Gray, he apologized to her and said "this has been going on for years" and particularly since Defendant Murry came to the Heritage Garage. (ECF No. 173-17, Ex. 17-Marshall 175:20-177:24).

**Defendants' Response to ¶ 69:** Defendants object to Paragraph 69 as inadmissible hearsay; Marshall cannot testify to what other people stated as evidence of the truth of those statements. FED. R. EVID. 802, 803.

70.     When Plaintiff Marshall returned from reinstatement in June 2017, Dispatch Supervisor Delois Jenkins admitted that what Defendants "did to [Marshall] was wrong." (ECF No. 173-17, Ex. 17-Marshall 170:14-172:16.)

**Defendants' Response to ¶ 70:** Defendants object to Paragraph 69 as inadmissible hearsay; Marshall cannot testify to what other people stated as evidence of the truth of those statements. FED. R. EVID. 802, 803.

71.     On other occasions, Dispatch Supervisor Jenkins admitted to Plaintiff Marshall that Plaintiff Nelson had [sic] African American Operator Dion Lewis "both were lied on by Caputo" leading to suspension or termination. (ECF No. 173-17, Ex. 17-Marshall 172:17-174:2; 174:20175:13).

**Defendants' Response to ¶ 71:** Defendants object to Paragraph 69 as inadmissible hearsay; Marshall cannot testify to what other people stated as evidence of the truth of those statements. FED. R. EVID. 802, 803.

72.     Upon reinstatement, Defendant Murry assigned Marshall to drive a different bus (referred to as a "Pulse" bus), even though Marshall received limited training on how to operate it (a total of about 30 minutes). (ECF No. 173-17, Ex. 17-Marshall 124:3-21, 126:20-130:4; Ex. 65-Marshall July 7, 2017 Memo; ECF No. 74, Ex. 45-Answer ¶ 71).

**Defendants' Response to ¶ 72:** Undisputed that Murry assigned Marshall to drive the Pulse bus and that Marshall received training on how to operate the bus. Defendants object to the proposition that 30 minutes of training for this type of bus is "limited" as unsupported by the record and an impermissible inference rather than a fact, as explained in more detail in Defendants' response to Paragraph 29, *supra*.

73.     After her first allegedly preventable "accident" (June 30, 2017), Marshall asked to have the grade changed because she was only trained for a total of thirty minutes of training on the "Pulse" bus. (ECF No. 173-17, Ex. 17-Marshall 127:8-16), but Murry refused. (ECF No. 173-17, Ex. 17-Marshall 128:24-130:4; Ex. 66-Marshall 1st Preventable NOPA; Ex. 65-Marshall July 7, 2017 Memo; ECF No. 74, Ex. 45-Answer ¶ 76).

**Defendants' Response to ¶ 73:** Undisputed.

74.     On July 27, 2017, Plaintiff ran over the curb while making a right turn due to

inconsistent training related to the Pulse bus. (ECF No. 173-17, Ex. 17-Marshall 60:9-11). When she was initially trained to drive a Pulse bus by Dines, she was instructed to angle the bus out when turning right to gain more clearance. (ECF No. 173-17, Ex. 17-Marshall 129:4-11). After Marshall's first accident in the Pulse Bus, Caputo instructed Marshall to not angle out when making turns, but she was to simply pull out further when making turns. (ECF No. 173-17, Ex. 17-Marshall 129:4-11). Defendants suspended Plaintiff Marshall based on this allegedly preventable accident. (Ex. 67-Marshall 2nd Preventable Suspension NOPA.)

**Defendants' Response to ¶ 74:** Undisputed that Marshall ran over a curb on July 27, 2017, that Marshall testified she was initially told to angle the bus out when turning right and later told not to angle out when making these turns, and that Marshall was suspended based on this preventable accident. Defendants object to the proposition that the accident was "allegedly" preventable; the undisputed cited evidence demonstrates that the accident was deemed preventable. (ECF No. 191, Ex. 67, Marshall's 2nd Preventable Suspension NOPA). Defendants object to the proposition that Marshall hit the curb "due to inconsistent training" because it is an inference and impermissible for the reasons stated in Defendants' response to Paragraph 29, *supra*.

75.     On October 3, 2017, while Marshall was operating her bus, a man approached the bus and said something to the effect of "my mirror was hit." (ECF No. 173-17, Ex. 17-Marshall 65:8-12). Marshall parked the bus, and observed the other driver's vehicle had glass missing from the side mirror, but there was no glass on the ground in the area. (ECF No. 173-17, Ex. 17-Marshall 143:1-5). Marshall and the passengers on board did not hear, feel, or see an accident. (ECF No. 173-17, Ex. 17-Marshall 64:20-22). Marshall reported the incident later that day at the transfer point. (ECF No. 173-17, Ex. 17-Marshall 65:13-19).

**Defendants' Response to ¶ 75:** Undisputed that a man reported to Marshall that her bus hit his car's mirror, that Marshall observed no glass on the ground in the area, and that neither Marshall nor the bus's passengers felt, heard, or saw the accident, but Defendants dispute that there was no evidence that a collision had occurred: according to Marshall's own description of the incident, which is listed in her personnel file, Marshall stated that there was "damage[] to bus curbside rear panel and to the mirror of the other vehicle knocked the whole mirror off." (ECF No. 173, Ex. 16, Excerpts of M. Marshall Personnel File, at 44.)

76.     Defendants terminated Plaintiff Marshall *again* on October 17, 2017, this time allegedly for having three "preventable" accidents within a 12-month period. (ECF No. 74, Ex. 45-Answer ¶ 77; Ex. 69-Marshall 2017 Termination Letter). Marshall grieved her termination, but Defendants refused to overturn the grievance. (Ex. 68-Marshall 2017 Termination Grievance).

**Defendants' Response to ¶ 76:** Undisputed that Marshall was terminated on October 17, 2017 for having three preventable accidents within a rolling 12-month period, that Marshall grieved her termination, and that the decision was upheld. Defendants object to the characterization that Marshall was fired "allegedly" for having three preventable accidents as inaccurate; the undisputed evidence shows this was reason for which she was fired. (ECF No. 191, Ex. 45, Answer ¶ 77; Ex. 69, Marshall 2017 Termination Letter.)

77.     Plaintiffs are not the first or only African American drivers to claim Murry discriminates against them. Three former employees made similar allegations in a federal lawsuit prior to January 1, 2011. (ECF No. 173-9, Ex. 9-Murry Ind. 25:14-28:19; ECF No. 173-8, Ex. 8-Klafeta 30:12-31:22).

**Defendants' Response to ¶ 77:** Disputed as to the previous allegations being "similar"; though former employees challenged discharges as discriminatory in the *Johnson* case, they were

not discharged under the same policies as Marshall or Nelson (i.e., for failing to report an accident or obtaining three preventable accidents in one year). (ECF No. 173, Ex. 27, Answer to Am. Compl. in *Johnson.*)

78.　　During the relevant time period, African American driver Fonn Moore also alleged internal complaints of race discrimination against Caputo, Murry, and Klafeta, including with respect to discipline for violating the "three preventable accidents" policy. (ECF No. 173-8, Ex. 8-Klafeta 31:23-32:11, 33:7-34:9; ECF No. 173-29, Ex. 29-Moore EEO Complaint).

**Defendants' Response to ¶ 78:** Undisputed Defendants further respond for the sake of clarity that Moore's internal complaints of race discrimination were not part of the pre-2011 *Johnson* case referenced in Paragraph 77.

79.　　In terminating Fonn Moore, allegedly for a "third preventable accident in a rolling twelve month period," Murry considered Moore's "entire work record," which included disciplinary actions outside the 12-month period prior to her termination (*e.g.,* absences, including one because her daughter had been a victim of a violent crime involving gunfire, etc.), in violation of Defendant Pace's obligations under its Collective Bargaining Agreement. (Ex. 83-Moore Personnel File, PACE005573).

**Defendants' Response to ¶ 79:** Defendants object to Paragraph 29 as unsupported by the cited evidence. None of the cited evidence shows that Murry considered disciplinary actions outside the 12-month period prior to termination, including the listed examples. Rather, the cited evidence shows that Moore was terminated for a "third preventable accident in a rolling twelve-month period." (ECF No. 191, Ex. 83, Moore Personnel File, at PACE005573 (also paginated as page 139 of 140).)

80.　　Defendant Murry admitted that, like Plaintiffs Marshall and Nelson, former

African American employees Johnson, Scates, Ento and Moore alleged discrimination in the application of disciplinary rules and[/]or the termination of employment. (ECF No. 173-9, Ex. 9-Murry Ind. 25:1-30:8, "Q: You're aware all of those individuals alleged discrimination in the application of disciplinary rules and[/]or the termination of employment, right? A: Correct").

**Defendants' Response to ¶ 80:** Undisputed.

81.     Pursuant to Federal Transit Administration ("FTA") requirements, Pace maintains an Equal Employment Opportunity ("EEO") program, which includes an EEO policy that prohibits race discrimination. (Ex. 34-Fedewa 30(b)(6) 59:3-62:10). But Murry unequivocally explained Pace's EEO program has no impact on her process for disciplining or terminating employees:

> Q.· ·What role does the equal employment opportunity program play in the process for disciplining employees about whom you're here to testify?
>
> A.· ·None.
>
> Q.· ·And what role does the equal employment opportunity program play in the termination of employees about whom you're here to testify?
>
> A.· ·None.
>
> (Ex. 33-Murry 30(b)(6) 182:19-183:13; ECF No. 173-9, Ex. 9-Murry Ind. 67:18-68:7).

**Defendants' Response to ¶ 81:** Undisputed that Pace's EEO program applies to promotion and hiring decisions, not disciplinary decisions. This means—as explained in the cited evidence—only that "no one from human resources or Pace's EEO office is involved in the disciplinary system," (ECF No. 173, Ex. 9, Murry Dep. 67:18–68:7), whereas "individuals from human resources are involved in helping to make decisions [regarding] hiring and promotion." (*Id*. at 67:7–17).

82.     An April 2016 EEO Audit of Defendant Pace's compliance with the Federal Transit Agency's requirements highlighted Pace's failure to track or report disciplinary actions by race, along with its general failure to perform detailed assessments of its employment practices

39

(as required by FTA regulations). (Ex. 73-2016 EEO Audit, pp. 1, 24-25; Ex. 76-Gordon 30(b)(6) 100:11-16).

**Defendants' Response to ¶ 82:** Defendants object to Paragraph 82 as unsupported by the cited evidence. The "2016 EEO Audit" report cited by Plaintiffs is an audit report from September—not April—2016, and it shows no deficiencies in Pace's reporting. (ECF No. 191, Ex. 73, 2016 EEO Audit, at 1.) Also, this exhibit has only 11 pages, so the citation to pages 24–25 is inaccurate. As for the citation to Gordon's deposition testimony, this says only that a single person—the Pace EEO officer—tracks terminations but "doesn't really track lesser forms of discipline"; it says nothing about FTA requirements in general or about Pace's "general failure to perform assessments of its employment practices." (ECF No. 191, Ex. 76, Gordon Dep. at 100:11–16.) Paragraph 82 is thus unsupported by record evidence and should not be considered.

83.     Pace acknowledged those failures, as well as failing to implement two recommendations from the April 2016 audit: (a) specifically evaluating management's performance on their implementation of Pace's EEO policy; and (b) having a full-time EEO officer (Pace's Executive Director did not feel EEO duties justified a full-time position, notwithstanding the audit's identification of numerous deficiencies). (Ex. 76-Gordon 30(b)(6) 33:9-35:6, 100:1116, 137:13-138:2, 142:19-143:13).

**Defendants' Response to ¶ 83:** Paragraph 83 is unsupported by the cited evidence. Gordon's testimony does not acknowledge that Pace "fail[ed] to implement" the recommendations about manager performance evaluations and having a full-time EEO officer. Rather Gordon's cited testimony states only that she "is not 100 percent sure" whether Pace retained the recommended EEO language on manager performance appraisals, though she says "they may have." (ECF No. 191, Ex. 76, Gordon Dep. at 34:11–35:6.) As for the hiring of a full-time EEO position, the cited

portion of Gordon's testimony does not indicate any "failure" on Pace's part; rather, she states only that Pace gave "a lot more consideration" to hiring a full-time EEO officer in light of the FTA's "advisory comment," that the EEO specialist position "had been filled in the past," and that it was "not currently" filled with a full-time officer. (*Id.* at 142:19–144:8). Paragraph 83 is thus unsupported by evidence and should not be considered.

84.     Defendant Pace failed to take care to prevent race discrimination in the workplace in accordance with EEOC Enforcement Guidance or in accordance with reasonable and customary Human Resources standards. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 3, ¶ 1).

**Defendants' Response to ¶ 84:** Defendants object to Paragraph 84 and its footnote as relying on inadmissible evidence; Plaintiffs' stated belief about Plunkett's opinion cannot circumvent this Court's finding that "any opinion by Plunkett referring to Defendants' reasonable care or lack thereof will not be admitted." (Ex. 88, Judge Lee's Order on use of Plaintiffs' Expert Witnesses, at 9–10.) Defendants further object to this statement as asserting a legal conclusion (that is, "race discrimination in the workplace" exists) and an inference (that is, Pace "failed to take care to prevent race discrimination"), rather than a fact supported by the cited evidence. These inferences and legal conclusions are improper and should not be considered for the reasons stated in Defendants' response to Paragraph 29, *supra*.

85.     Defendant Pace failed to take care to prevent Defendant Murry from engaging in discriminatory conduct in handling discretionary disciplinary and termination decisions. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 6, ¶ 4).

**Defendants' Response to ¶ 85:** Defendants object to Paragraph 85 as relying on inadmissible evidence, given this Court's ruling that Plunkett cannot render an opinion about "whether Pace acted with 'reasonable care' in its creation of anti-discrimination policies and its

efforts to prevent discrimination by employees." (Ex. 88, Judge Lee's Order on use of Plaintiffs' Expert Witnesses, at 9–10.) Defendants further object to Paragraph 85 as asserting a legal conclusion (that is, Murry "engag[ed] in discriminatory conduct in handling discretionary discipline and termination decisions") and an inference (that is, Pace "failed to take care to prevent Murry" from doing so), rather than a fact supported by evidence. These inferences and legal conclusions are improper and should not be considered for the reasons stated in Defendants' response to Paragraph 29, *supra*.

86.     Defendant Pace's EEO Policy statement in its Equal Employment Opportunity Program for 2013–2016 does not include key elements described in EEOC enforcement guidance, such as a clear explanation of prohibited conduct, assurance about protection against retaliation, a clearly described complaint process, an assurance the employer will protect confidentiality of complaints to the extent possible, a complaint process that provides a prompt and thorough investigation, or an assurance the employer will take immediate and appropriate corrective action. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 3; Ex. 77-Pace EEO Program 2016-2019, pp. PACE1004, 1016-1017; Ex. 78, Pace EEO Program 2013-2016, pp. PACE1195, 1207-1208).

**Defendants' Response to ¶ 86:** Undisputed.

87.     Defendant Pace failed to meet the threshold standards required by the FTA as detailed in the Pace Suburban Bus EEO Compliance Review Final Report dated April 2016. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 4 ¶ 2; Ex. 36-April 2016 FTA Compliance Review; Ex. 71- Z. Johnson 51:15-52:21; Ex. 72-Z. Johnson Rep. p. 3). Presence of deficiencies point to the possible presence of unequal treatment based on a protected category; it gives rise to reasonable questions about whether intentional or unintentional discrimination happened. (Ex. 71-Z. Johnson 96:11-97:8; Ex. 72-Johnson Rep., p. 4).

**Defendants' Response to ¶ 87:** Disputed that the FTA found Pace had any employment-related deficiencies as of FTA's 2016 Triennial Review—Final Report issued on October 2, 2016, which stated: "The Triennial Review focused on 17 areas. No deficiencies were found with the FTA requirements in 16 areas. Deficiencies were found in one area: Title VI." (Ex. 89, FTA October 2016 Triennial Review, at 1.) Undisputed that Plunkett testified to her opinion that Pace failed to meet the threshold standards required by the FTA as detailed in the April 2016 Compliance Report, which predated the FTA's October 2016 Triennial Review. Defendants object to the proposition that these deficiencies "give rise to reasonable questions about whether intentional or unintentional discrimination happened" as an impermissible inference and, thus, improper for the reasons stated in Defendants' response to Paragraph 29, *supra*.

88.    As noted in the FTA Compliance review, Defendant Pace failed to evaluate managers like Defendant Murry on compliance with Pace's EEO policy the same way as their performance on Defendant Pace's other goals. (ECF No. 173-31, Ex. 31-Plunket Rep. p. 5; Ex. 36, April 2016 FTA Compliance Review, p. 22). Even after the FTA Compliance Review noted this deficiency, and after this lawsuit was filed, Pace did not include EEO compliance as an element of Defendant Murry's performance review. (Ex. 74-Murry Jan 2017 Performance Evaluation). Evaluating Defendant Murry on that would have sent the message that EEO compliance is important. (Ex. 71-Z. Johnson 100:11-103:2).

**Defendants' Response to ¶ 88:** Disputed that the FTA found Pace had any employment-related deficiencies as of FTA's 2016 Triennial Review - Final Report issued on October 2, 2016, which stated: "The Triennial Review focused on 17 areas. No deficiencies were found with the FTA requirements in 16 areas. Deficiencies were found in one area: Title VI." (Ex. 89, October 2016 Triennial Review, at 1.)  Accordingly, although it is undisputed that expert witness Plunkett

opined that Pace failed to evaluate managers on compliance with EEO policy based on the April 2016 FTA Compliance Review, that review was followed by the FTA's October 2016 Final Report, which found no deficiencies with the 16 FTA requirements pertaining to Title VII. Defendants object to the statements that "[e]ven after the FTA Compliance Review noted this deficiency, and after this lawsuit was filed, Paced did not include EEO compliance as an element of Defendant Murry's performance review" and that "[e]valuating Defendant Murry on that would have sent the message that EEO compliance is important" because these statements contain inferences and legal arguments, not facts, and so are improper for the reasons explained in Defendants' response to Paragraph 29, *supra*.

89.     Defendant Murry received no substantive training about preventing race discrimination when exercising discretion in her job duties. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6).

**Defendants' Response to ¶ 89:** Defendants object to Paragraph 89 as unsupported by the cited evidence. The citation provided is to an expert report's bare statement that does not cite to any document in the record. "Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, No. 04-CV-346, 2010 WL 1325732, at *5 (N.D. Ill. Mar. 30, 2010) (quoting *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008)). Thus, Defendants dispute the statement in Paragraph 89.

90.     Defendant Pace's EEO Officer did not and could not track the number of race discrimination complaints against Defendant Murry. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 7; Ex. 76-Gordon 30(b)(6) 59:21-60:2).

**Defendants' Response to ¶ 90:** Undisputed that Plunkett opined that Pace's EEO Officer did not track the number of race discrimination complaints against Defendant Murry. Defendants

otherwise object to Paragraph 90 as unsupported by the cited evidence, which does not state that the EEO Officer "could not" have tracked this data. Gordon's deposition testimony states only that she is not sure how many formal complaints were filed against Murry because she "tracked [EEO complaints] by the employee, not by if it's filed against Margaret Murry." (ECF No. 191, Ex. 76, Gordon Dep. at 59:21–60:2).

91.     Defendant Murry admitted that the only way for a supervisor to know whether a manager had engaged in discrimination of which the manager was accused was to ask and, without asking, supervisors would not know. (ECF No. 173-9, Ex. 9-Murry 35:12-36:6).

**Defendants' Response to ¶ 91:** Defendants object to this proposition as unsupported by the evidence; the cited evidence portion of Murry's testimony states only that if Caputo were accused of discrimination, she would not know about it unless he told her.

92.     Despite being aware of the allegations against Defendant Murry by Johnson, Ento, Skates, Moore and Plaintiff, her superiors Metzger and Klafeta never asked whether Defendant Murry discriminated against any of them or African-Americans generally. (ECF No. 173-8, Ex. 8-Klafeta 30:20-35:1; ECF No. 173-9, Ex. 9-Murry 25:1-33:4, 99:1-4) ("Q: Ms. Metzger ever ask whether you discriminated against any of these individuals? A. No, she did not. ... Q. Mr. Klafeta ever asked? A. No, he did not.")

**Defendants' Response to ¶ 92:** Undisputed that Murry testified that Klafeta and Metzger did not ask her whether she discriminated against these individuals. Defendants object to the proposition that "[d]espite being aware of the allegations against Defendant Murry by [some employees]," Klafeta and Metzger never asked Murry about whether she was discriminating against the employees, because this statement omits key details of the evidence in order to imply Klafeta and Metzger's supposed disinterest in whether Murry was discriminating. The cited

excerpt of Klafeta's deposition testimony reveals that Klafeta did not ask Murry about these charges of discrimination because the investigation "was already in process" when he started in his supervisory role, and thus "it was being handled" and he was not a part of the investigation. (ECF No. 173, Ex. 8, Klafeta Dep. at 30:20-32:16.) No cited evidence states whether Metzger knew about these discrimination charges, was involved in the investigation, or why she personally did not ask Murry about her discriminatory or non-discriminatory intentions. For these reasons, this proposition is not supported by evidence and should not be considered.

93. Although Plaintiffs Nelson and Marshall both filed administrative charges with the EEOC alleging racial discrimination, Defendant Murry did not learn they had done so until November 2, 2017, when she received a copy of the federal court complaint Plaintiffs filed. (ECF No. 173-9, Ex. 9-Murry Ind. 51:15-52:8; Ex. 37-Murry Email re Nelson & Marshall Fed Lawsuit).

**Defendants' Response to ¶ 93:** Undisputed.

94. Defendant Pace also failed to track or report disciplinary actions by race, which prevented effective examination of its employment practices. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 28; Ex. 71-Z. Johnson 97:21-98:3, 103:4-105:5; Ex. 76-Gordon 30(b)(6) 100:11-16). Prior to the Compliance Review, Pace did not perform any evaluation or assessment of employment practices to determine if race was a factor in disciplinary and termination decisions. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 28; Ex. 71-Z. Johnson 97:21-98:3, 103:4-105:5). Even after the FTA Compliance Review noted this deficiency, Pace failed to track or report disciplinary actions by race. (Ex. 71-Z. Johnson 105:6-107:3; Ex. 73-September 2016 EEO Utilization Analysis).

**Defendants' Response to ¶ 94:** Disputed that the FTA found Pace had any employment-related deficiencies as of FTA's 2016 Triennial Review—Final Report issued on October 2, 2016, which stated: "The Triennial Review focused on 17 areas. No deficiencies were found with the FTA requirements in 16 areas. Deficiencies were found in one area: Title VI." (Ex. 89, FTA October 2016 Triennial Review, at 1.) Undisputed that Pace did not track or report disciplinary actions broken down by race according to the April and September 2016 EEO reports, which predated the FTA's October 2016 Triennial Review. Defendants object to the propositions that these deficiencies "prevented effective examination of its employment practice" as containing an impermissible inference and therefore inadmissible for the reasons stated in Defendants' response to Paragraph 29, *supra*.

95. Defendant Pace did not conduct any adverse impact analysis to evaluate disciplinary decisions. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 24, 28). Prior to the FTA Compliance Review, involuntary terminations were not differentiated from voluntary terminations so that terminations decisions could be appropriately analyzed to ensure a non-discriminatory application of policies. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 5; Ex. 36-April 2016 FTA Compliance Review, pp. 5, 24, 28).

**Defendants' Response to ¶ 95:** Undisputed that this was the situation in April 2016 when the FTA issued its Compliance Report at that time. Undisputed evidence further shows that these deficiencies were cured as early as September 2016. (ECF No. 191, Ex. 73, Sept. EEO Audit.)

96. Defendant Pace maintained policies that were discretionary in nature such as grading of a preventable or non-preventable accident and defining certain actions that *may* be subject to dismissal. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6; Ex. 75-Peery Rep. pp. 11-12.) Such broad discretion is subject to abuse and discrimination. (ECF No. 173-31, Ex. 31-Plunket

Rep., p. 6; Ex. 75-Peery Rep. pp. 5-11). There was no effort to evaluate whether Defendant Murry properly exercised her discretion and no oversight by human resources to ensure non-discriminatory execution of policies. (ECF No. 173-31, Ex. 31-Plunket Rep., p. 6).

**Defendants' Response to ¶ 96:** Defendants object to the proposition that "There was … no oversight by human resources to ensure nondiscriminatory execution of policies" as supported only by inadmissible evidence, given this Court's ruling that Plunkett cannot render an opinion about "whether Pace acted with 'reasonable care' in its creation of anti-discrimination policies and its efforts to prevent discrimination by employees."  (Ex. 88, Order, at 9–10). Defendants further object to the proposition that "[t]here was no effort to evaluate whether Defendant Murry properly exercised her discretion and no oversight by human resources to ensure non-discriminatory execution of policies" because the citation provided is to an expert report's bare statement that does not cite to any document in the record. "Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Wm. Wrigley Jr. Co.*, No. 04-CV-346, at *5) (quoting *Sitrick*, 516 F.3d at 1001)). Thus, Plaintiffs' statement in Paragraph 96 is unsupported by admissible evidence and should not be considered.

97.     Social science research regarding employment decisions suggests structured processes are important to reduce subjective, highly discretionary decision-making. (Ex. 75-Peery Rep., p. 8). A structured process is important because subjective processes have been consistently shown to be vulnerable to the influence of bias and stereotyping. (Ex. 75-Peery Rep., p. 8). Racial minorities fare better in processes that are more structured and less subjective. (Ex. 75-Peery Rep., p. 8). Biases and stereotypes can lead to shifting criteria being used by evaluators or decisionmakers. (i.e., evaluating similar behavior in different ways, with favored individuals or groups perceived and evaluated more positively for the same behavior as a disfavored group or

individual). (Ex. 75-Peery Rep., p. 9).

**Defendants' Response to ¶ 97:** Undisputed.

98.     Biases of all kinds color people's perception of the world around them, affecting how people perceive, gather, understand, and use information to make decisions about people and situations. (Ex. 75-Peery Rep., p. 6). Biases can include ingroup biases (i.e., preference for individuals like oneself, including racial group), attributional biases (i.e., being more likely to attribute negative behaviors to outgroup members to internal causes, like personality, but attributing the same negative behaviors in ingroup members to circumstances outside the individual's control), and confirmation biases (i.e., focusing on information that supports a preconception, including those based on stereotypes). (Ex. 75-Peery Rep., p. 6).

**Defendants' Response to ¶ 98:** Undisputed.

99.     Like biases, the presence or absence of stereotypes (generalizations of what certain types of people or groups are like or should be like) can lead decisionmakers to shift criteria for a decision in favor of a preferred or against a disfavored individual or group. (Ex. 75-Peery Rep., pp. 7-8). Common stereotypes of Black people, both historically and now, hold that Black People are dishonest, lazy, ignorant, stupid, incompetent, loud, aggressive, or criminal. (Ex. 75-Peery Rep., p. 8). Stereotypes of Black people are resistant to change; many have held constant for decades. (Ex. 75-Peery Rep., p. 8).

**Defendants' Response to ¶ 99:** Undisputed.

100.     Defendants filed their Answer to Plaintiffs' Second Amended Complaint on December 14, 2018. (Ex. 45-Answer, p. 1.) Defendants asserted six affirmative defenses, none of which reference or allege Plaintiffs' failure to exhaust administrative remedies or Plaintiffs' failure to identify a specific employment practice in support of their disparate impact claims. (Ex.

45-Answer, pp. 24-25.) Nowhere in Defendants' answer does it otherwise raise those defenses. (Ex. 45-Answer, pp. 1-25.)

**Defendants' Response to ¶ 100:** Undisputed.

101.     Defendants' six affirmative defenses do not allege any of its employment practices are job related or consistent with business necessity. (Ex. 45-Answer, pp. 1-25). Nowhere in Defendants' answer does it otherwise raise those defenses. (Ex. 45-Answer, pp. 1-25).

**Defendants' Response to ¶ 101:** Undisputed.

102.     In responding to Plaintiffs' interrogatories about potential explanations for disparities between African Americans and others in rates of discipline or terminations, Defendants did not identify any policy or practice it claimed was job related or justified by business necessity as a possible factor or circumstance explaining any disparities; it denied the existence of any disparities:

> 14. Identify and describe in detail any factors, criteria or circumstances Defendants believe could explain any racial disparities that exist between African-Americans and others in rates of discipline, termination, transfer, promotion or compensation of Pace drivers.
>
> **ANSWER: Defendants object as this interrogatory is overly broad and unduly burdensome. Subject to said objection, there are no racial disparities between African-Americans and others in rates of discipline, termination, transfer, promotion, or compensation.**

(Ex. 46, Def's Rog Answers, p. 6, Interrogatory No. 14).

**Defendants' Response to ¶ 102:** Undisputed that Defendants denied the existence of a racial disparity in discipline and termination decisions and did not identify in their interrogatory answers a business necessity as a possible factor to explain the disparities that it denied exist.

103.     On approximately March 26, 2018, the IDHR mailed Defendant Pace and Plaintiff Marshall a notice explaining that: (a) the IDHR would not be investigating Plaintiff Marshall's charge 180326-023; (b) if Plaintiff Marshall "do[es] not wish to proceed with [investigation at] the

Department, [she] do[es] not need to take any further action; and (c) her "failure to timely provide the EEOC's findings to the Department will result only in the Department closing her file," ending tolling of the statutory investigation period prior to which she could pursue claims in Court. (Ex. 87-IDHR Materials, pp. 1-2).

**Defendants' Response to ¶ 103:** Undisputed that IDHR sent Marshall this letter. Defendants object to the proposition that this letter "end[ed] the tolling of the statutory investigation period prior to which she could pursue claims in Court" as proposing an improper legal conclusion regarding the statute of limitations, not a fact supported by the record evidence.

104.    Plaintiffs Nelson's EEOC charge was cross-filed with the Illinois Department of Human Rights. (Ex. 45-Answer, p. 11, ¶ 53.) On approximately May 29, 2018, the Illinois Department of Human Rights mailed Defendant Pace (through its then-counsel Christopher Lyons) and Plaintiff Nelson (through his counsel) a "Notice of Dismissal for Lack of Substantial Evidence and Order of Closure" notifying Pace that Nelson could pursue a civil action against Defendant Pace within 90 days after receipt of the notice. (Ex. 87-IDHR Materials, p. 4).

**Defendants' Response to ¶ 104:** Undisputed that IDHR sent Nelson this letter.

105.    Caucasian driver Jacob Mack admitted to Plaintiff Nelson and Plaintiff Marshall that Mack had been the subject of multiple complaints of aggressive or wild driving from passengers, but was never disciplined. (ECF No. 173-15, Ex. 15-Nelson 186:6-186:25; ECF No. 173-17, Ex. 17-Marshall 94:19-96:25).

**Defendants' Response to ¶ 105:** Defendants object to the proposition as inadmissible hearsay; Marshall and Nelson cannot testify as to what another person said as evidence that the statement is true. FED. R. EVID. 802, 803. Thus, Paragraph 105 should not be considered.

106.    Klafeta conceded there may be an employee with more than three preventable

accidents who was not terminated. (ECF No. 173-8, Ex. 8-Klafeta 157:4-7). Dines and Murry admitted that as part of Pace's normal routes, drivers often have accidents or incidents that go unreported, but drivers are not disciplined or terminated for failing to report them. (ECF No. 173-14, Ex. 14-Dines 204:21-205:24; ECF No. 173-9, Ex. 9-Murry Ind. 96:9-17).

**Defendants' Response to ¶ 106:** Undisputed that Klafeta so testified as indicated in the first sentence of Paragraph 106. Defendants object to the second sentence as unsupported by the cited evidence; the cited deposition testimony states only that operators may not be terminated for failing to report routine contacts with a curb; the testimony does not address the repercussions for failing to report other incidents or accidents. (ECF No. 173, Ex. 9, Murry Dep. 96:9–98:6; Ex. 14, Dines Dep. at 204:21–205:24.)

107.    A Caucasian employee (Michael Neilson, Jr.) – the son of another Caucasian Pace employee who worked at the Heritage Garage that was promoted – arrived late to training and had an accident during the training program. (ECF No. 173-13, Ex. 13-Caputo 94:22-95:25; ECF No. 173-9, Ex. 9-Murry Ind. 85:24-90:1; ECF No. 173-17, Ex. 17-Marshall 96:23-103:4). Although Defendant Pace's instructors (including Gerasch and Caputo specifically told trainees (including Plaintiff Marshall) that any tardiness or accident would result in termination, Caucasian Operator Michael Neilson suffered no disciplinary action for either. (ECF No. 173-17, Ex. 17-Marshall 97:11-99:15). Klafeta testified that the training policies above are a clear example of rules that are designed to prevent disparities; yet when they are not followed or consistently applied, the result could allow racial disparities to exist over time. (ECF No. 173-8, Ex. 8-Klafeta 95:1-97:3).

**Defendants' Response to ¶ 107:** Undisputed that Michael Neilson, Jr., is the son of another Pace employee, that Marshall saw him arrive late to training one day, that it was stated during the training that late arrivals to training would result in termination, and that Neilson Jr.

was not terminated during training. Defendants dispute that preventable accidents during training result in termination. (ECF No. 173, Ex. 13, Caputo Dep. at 94:23–25:16 (stating that Caputo did not give this instruction during training and that he does not know if that was the policy at the time); ECF No. 173, Ex. 9, Murry Dep. at 89:23–90:2 (stating only that if an employee is in an accident during training, it should be reported and in their record).) Defendants object to the proposition that Klafeta testified that "training policies above are a clear example of rules that are designed to prevent disparities; yet when they are not followed or consistently applied, the result could allow racial disparities to exist over time" as entirely unsupported by the cited evidence, which says nothing of the sort. (*See* ECF No. 173, Ex. 8, Klafeta Dep. at 95:1–97:3 (discussing circumstances of another employee disciplinary action).)

108.     While Plaintiff Marshall was on the bus, Neilson, Jr. crashed into a construction sign while driving. (ECF No. 173-17, Ex. 17-Marshall 100:14-24). During the accident, Caputo shouted that Neilson was not watching his speed, and was not following Caputo's direction, and that this was a preventable accident. (ECF No. 173-17, Ex. 17-Marshall 100:14-24). Specifically, hitting a fixed object with the bus is always a preventable accident. (ECF No. 173-9, Ex. 9-Murry Ind. 93:13-18). Immediately after the crash, Caputo got off the bus and made a phone call, appearing very upset. (ECF No. 173-17, Ex. 17-Marshall 102:12-24).

**Defendants' Response to ¶ 108:** Undisputed that Neilson, Jr. hit a construction sign while driving. Defendants object to the proposition that Caputo "shouted" these statements as unsupported by the cited evidence:

Q. Did you grade the accident?

A. I did not.

Q. All right. Have you see[n] anywhere in a document the grade of that accident?

A. No.

Q. All right. How do you know it was deemed preventable?

A. I don't know.

Q. Okay. So … is that your opinion, that it was preventable?

A. I know that it was preventable because Anthony Caputo said it right in front of all of us.

Q. …Anthony Caputo said, at the time of the accident, that it was preventable?

A. Yes.

Q. … What exactly did he say, if you remember?

A. That he wasn't watching his speed and not following his instruction, this is a preventable accident.

Q. Do you know if the accident then was officially graded by Mr. Caputo?

A. I do not know.

(ECF No. 173, Ex. 17, Marshall Dep. at 100:4–101:2.) Defendants do not dispute that Murry testified that hitting a fixed object is a preventable accident, nor that Marshall thought Caputo seemed upset when he got off the bus after the Neilson Jr.'s accident.

109.     Murry testified that Neilson's accident during training should have been included in Neilson's accident record. (ECF No. 173-9, Ex. 9-Murry Ind. 92:22-93:2). However, there is no documentation contained in Neilson's Personnel File indicating the accident was graded, and his Employee Accident / Incident Record omits the accident completely. (ECF No. 173-9, Ex.9-Murry Ind. 92:12-93:12; Ex. 38, Neilsen Record). Contradicting herself, however, Murry also claimed that not all accidents require a report – "You - - it depends on what the - - what happened." (ECF No. 173-9, Ex. 9-Murry Ind. 95:6-13).

**Defendants' Response to ¶ 109:** Undisputed that Neilson Jr.'s personnel file does include a report on an accident during training. The proposition that Murry testified "that Neilson [Jr.]'s accident during training should have been included in Neilson [Jr.]'s accident record" is unsupported by the cited evidence, which states only that no accident during training was listed in Neilson Jr.'s record, that she did not know why it was not listed, and that she knows nothing about this accident—not that it should necessarily have been included. (ECF No. 173, Ex. 9, Murry Dep. at 92:22–93:2.)  Defendants object to the proposition that Murry "[c]ontradict[ed] herself" by saying that not all accidents require a report as an improper inference not a fact; in the portion of Murry's deposition testimony directly following the portion cited in Paragraph 109, Murry lists multiple examples of times when it would be appropriate for an accident not to be reported. (*Id.* at 96:2–6.) Defendants also respond that the undisputed record shows that Neilson immediately reported his accident to Caputo, who was on the bus when it occurred, and filed a written report with Caputo "immediately when [they] got back." (ECF No. 173, Ex. 13 at 97–98.)

110.    Klafeta also acknowledged that Murry's subjective decision about what she characterizes as "failure to report" leads to terminations. (ECF No. 173-8, Ex. 8-Klafeta 95:1-97:3). Klafeta claimed he was confident Murry had recommended terminations for Caucasian drivers, because he is "sure that rule violations have occurred," but he could not recall any circumstances where Defendant Murry recommended termination of a Caucasian driver. (ECF No. 173-8, Ex. 8-Klafeta 45:1-46:9).

**Defendants' Response to ¶ 110:** Defendants object to the proposition that Klafeta "acknowledged that Murry's subjective decision about what she characterized as 'failure to report' leads to terminations" as unsupported by the cited evidence; in the cited portion of Klafeta's testimony, he acknowledges the reporting procedure in the collective bargaining

agreement but does not opine as to whether Murry's decision-making in this process leads to terminations.  (ECF No. 173, Ex. 8, Klafeta Dep. at 95:1–97:3).  Undisputed that Klafeta stated that he was confident Murry had recommended terminations for white drivers but he could not recall any such circumstances because he never asks what the race of the person is, so he would not know for sure.  (*Id*. at 45:14–25.)

111.    A Caucasian driver (Richard Ulrich) was not terminated despite failing to report an incident with a passenger that required police to be called and falsifying his overtime slipEven though both offenses should result in immediate termination, Murry did not recommend termination to Klafeta. (ECF No. 173-13, Ex. 14 Dines 176:4-25, 180:4-181:15; ECF No. 173-9, Ex. 9-Murry Ind. 81:6-84:12; ECF No. 173-8, Ex. 8-Klafeta 101:10-102:22; Ex. 39-Murry April 2016 Email Exchange with Klafeta Regarding Ulrich).

**Defendants' Response to ¶ 111:** Undisputed that Ulrich, a Caucasian driver, was not terminated after an incident with a passenger that required police be called. Defendants object to the proposition that Ulrich "fail[ed] to report" the incident; the evidence cited in Paragraph 111 shows that he reported the incident right away by calling into dispatch but did not immediately fill out the report paperwork. (ECF No. 173, Ex. 14, Dines Dep. at 176:4–25 (explaining that Ulrich did not "writ[e] a report on a timely basis"), 180:4–181:15 (explaining that Ulrich called in the dispatch operator right away after accident); ECF No. 173, Ex. 9, Murry Dep. at 81:6–84:12 (explaining that Murry could not recall whether Ulrich filled out the written report on the same day as the accident)). Defendants object to the proposition—"Even though both incidents should result in immediate termination, Murry failed to recommend termination to Klafeta"—as containing an impermissible inference and as unsupported by the cited evidence; the cited evidence shows that Murry did not recommend termination after the falsification incident because

the union represented Ulrich through the process and recommended that he be able to retain his job. (ECF No. 173, Ex. 8, Klafeta Dep. at 101:25–102:11). No evidence is cited to support the proposition that "immediate termination" is required in this situation or where, as here, an employee immediately calls dispatch to report an incident and then files a belated written report about the incident. Thus, these propositions are not supported by evidence and should not be considered.

112.     On March 28, 2016, a passenger fell asleep on Ulrich's bus, requiring him to call the police. (ECF No. 173-8, Ex. 8-Klafeta 92:19-24). An employee that fails to report an incident like this would be subject to termination. (ECF No. 173-8, Ex. 8-Klafeta 95:9-96:8). However, Ulrich did not compete his accident/incident report on the day of the incident, as required under Pace's policies. (ECF No. 173-9, Ex. 9-Murry Ind. 128:15-17; Ex. 39-Murry April 2016 Email Exchange with Klafeta Regarding Ulrich; ECF No. 173-8, Ex. 8-Klafeta 95:9-23; ECF No. 17314, Ex. 14-Dines 176:20-25). Ignoring the failure to report, Klafeta emailed Murry to call him before meeting with Ulrich, stating "The falsification is a serious matter." (ECF No. 173-8, Ex. 8-Klafeta 101:19-24).

**Defendants' Response to ¶ 112:** Undisputed that a passenger fell asleep on Ulrich's bus, requiring him to call the police, that an employee's altogether failure to report an incident like this would be subject to termination, and that Ulrich did not complete his written incident report on the day of the accident. Defendants object to the proposition that Klafeta "ignored the failure to report" as an impermissible inference unsupported by the evidence. (Further, undisputed evidence shows that Ulrich did report the incident using the proper channels, his report was simply not filed on the day of the accident. *See* ECF No. 173, Ex. 20, Excerpt of Ulrich Personnel File, "Accident Report", at 4.) Thus, this statement, that Klafeta ignored a failure to report, should not

be considered. Defendants do not dispute that Klafeta wrote in an email that "falsification is a serious matter," but dispute that this statement had anything to do with Ulrich's filing of a belated report about his accident; the cited evidence shows that this statement referred to a potential time-card falsification, which was looked into separately. (ECF No. 191, Ex. 39, Email Exchange Regarding Ulrich; ECF No. 173, Ex. 8, Klafeta Dep. at 101:10–102:22 (discussing falsification matter).)

113.    On April 4, 2016, Murry, Dines, Union Representative Luis Campagna, and Ulrich attending a meeting to discuss the missed report. (ECF No. 173-9, Ex. 9-Murry Ind. 81:12-18; Ex. 60-Dines Notes, pp. 2-4). Ulrich claimed that he reported the incident while on a break, but Murry did not have it when interviewing Ulrich about the matter. (ECF No. 173-9, Ex. 9-Murry Ind. 81:19-24; Ex. 60-Dines Notes, pp. 2-4). Ulrich was not terminated for his failure to report. (ECF No. 173-9, Ex. 9-Murry Ind. 83:12-14; ECF No. 173-8, Ex. 8-Klafeta 93:4-7, ECF No. 173-14, Ex. 14-Dines 181:22-25).

**Defendants' Response to ¶ 113:** Undisputed. Defendants further respond that, although Ulrich did not file a written report right away, the undisputed evidence shows that he verbally reported the incident right away by calling dispatch, and he later filed a written, though belated, form reporting the event. (ECF No. 173, Ex. 20, Excerpt of Ulrich Personnel File, "Accident Report," at 4.)

114.    Murry notified Klafeta about a Caucasian employee (Michael Rooney) who failed to immediately notify Pace about an accident that destroyed a mirror (waiting about a half hour before notifying dispatch); hen [sic] Rooney notified dispatch, he did so using his personal cell phone while driving the bus with passengers on board, but Murry did not recommend termination; he was only suspended 1 day. (ECF No. 173-8, Ex. 8-Klafeta:105:10-107:11; Ex. 41-Rooney

Communications, pp. 1-2). Using a cell phone while operating a vehicle is against Pace rules. (ECF No. 173-8, Ex. 8-Klafeta 106:17-22). The offense is so serious, Murry stated it warrants termination in the first instance. (Ex. 33-Murry 30(b)(6) 136:20-137:16, 143:10-14, 144:6-25).

**Defendants' Response to ¶ 114:** Undisputed. Defendants further answer that Rooney was disciplined because he "failed to notify dispatch immediately of an accident." (ECF No. 173, Ex. 23, Excerpt's from Rooney's Personnel File, at 5).

115.    Murry also knew a Hispanic employee (Richard Delgado) hit a pedestrian while backing up a Pace non-revenue relief van against the direction of traffic. (ECF No. 173-14, Ex. 14-Dines 190:8-195:6; ECF No. 173-9, Ex. 9-Murry Ind. 84:13-85:7). Delgado backed up the bus for a full block so his co-worker did not have to walk to the vehicle. (ECF No. 173-14, Ex. 14-Dines 192:13-18). It is in violation of Pace operating procedures to back up a van against the direction of traffic. (ECF No. 173-9, Ex. 9-Murry Ind. 84:23-85:1). It is a big deal when a Pace vehicle strikes a human being. (ECF No. 173-9, Ex. 9-Murry Ind. 85:2-4). Murry did not recommend his termination (he was only suspended). (ECF No. 173-9, Ex. 9-Murry Ind. 85:5-7; ECF No. 173-14, Ex. 14-Dines 193:7-10).

**Defendants' Response to ¶ 115:** Undisputed. Defendants further answer that this accident was Delgado's second preventable accident in a twelve-month period. (ECF No. 173, Ex. 25, Excerpt of Delgado Personnel File, at 4; ECF No. 173, Ex. 14, Dines Dep. at 193:7–25).

116.    Hispanic bus operator David Sosa had his third preventable accident on April 1, 2016 (Ex. 50-Sosa Accident Report, p. PACE48266.) Sosa was not terminated for that preventable accident, nor when, on April 4, 2016, he failed to immediately report what would have been his fourth preventable accident in less than one calendar year; Sosa was allowed to resign.

**Defendants' Response to ¶ 116:** Undisputed that Sosa was not terminated for these

accidents before he resigned. Defendants object to the proposition that he was "allowed" to resign as an unsupported inference; the evidence shows simply that he resigned. (*See* ECF No. 173, Ex. 1, Murry Decl, ¶ 78 (explaining that "operators can elect to resign or retire while under investigation or to avoid involuntary termination after the conclusion of an investigation").

117.    Murry notified Klafeta about a Hispanic employee (Romeo Zamudio) who failed to immediately report an accident to dispatch without recommending that driver's termination. (ECF No. 173-8, Ex. 8-Klafeta 104:6-16). According to Dines' testimony, Zamudio resigned without any investigation or suspension. (ECF No. 173-14, Ex. 14-Dines 117:12-18).

**Defendants' Response to ¶ 117:** Undisputed that Zamudio did not immediately report an accident to dispatch. Defendants further answer that the evidence shows that Zamudio filed a written report about his accident, but did so belatedly. (ECF No. 173, Ex. 22, Excerpt of Zamudio Personnel File, "Accident Report", at 3). Further, the proposition that Zamudio resigned without an investigation is unsupported by the evidence, which states that he retired, not that he resigned. (ECF No. 173, Ex. 14, Dines Dep. at 117:12–18).

118.    Murry recommended termination for Charlotte Perry (African American) for absenteeism. (ECF No. 173-9, Ex. 9-Murry Ind. 85:8-20; Ex. 60-Dines Notes, p. 5). Perry was terminated for having eight absences, but at least one of the absences was incurred during FMLA leave. (ECF No. 173-14, Ex. 14-Dines 189:13-190:5).

**Defendants' Response to ¶ 118:** Undisputed that Perry was terminated for accruing eight absences. Defendants object to the proposition that one of the absences was accrued during FMLA as unsupported by the cited evidence; the cited portion of Dines' testimony says that Perry's "absence was not covered by FMLA." (ECF No. 173, Ex. 14, Dines Dep. at 189:13–16.)

Dated: October 7, 2022

Respectfully submitted,

**PACE BUS SERVICES** and **MARGARET MURRY**

By: */s/ David L. Weinstein*
One of Defendants' Attorneys

David L. Weinstein (ARDC No. 3125588)
dweinstein@taftlaw.com
Rachel L. Schaller (ARDC No. 6306921)
rschaller@taftlaw.com
Benjamin S. Morrell (TBPR No. 035480)
bmorrell@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MAURICE NELSON and CHRISTI MARSHALL, | |
| Plaintiffs, | No. 17-cv-7697 |
| v. | |
| PACE SUBURBAN BUS and MARGARET MURRY, | Judge Robert W. Gettleman |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
LOCAL RULE 56.1(b)(3) STATEMENT OF ADDITIONAL FACTS**

Exhibit 88    Judge Lee's Order re: Use of Plaintiffs' Expert Witnesses
Exhibit 89    FTA October 2016 Triennial Review

74978967v2